**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| THE FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case: |
| Plaintiff, | ) ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | ) ) | |
| TELOS CORPORATION, JOHN B. WOOD, MICHELE NAKAZAWA, and MARK BENDZA, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

Plaintiff the Firemen's Retirement System of St. Louis ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by the Telos Corporation ("Telos" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Telos' website concerning the Company's public statements; and (d) review of other publicly available information concerning Telos and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities that purchased Telos common stock between November 19, 2020 and November 12, 2021, inclusive (the "Class Period"), against Telos and certain of its officers (collectively, "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "Exchange Act").

2.      Telos is an Ashburn, Virginia-based company that focuses on developing and implementing cyber, cloud, and enterprise security technology and products.  The Company provides services to government, military, and Fortune 500 companies across the world.  For instance, some of the entities Telos has inked contracts with include the Department of Defense, the Federal Bureau of Investigation, the Central Intelligence Agency, Oracle, the National Geospatial-Intelligence Agency, and DLT Solutions.

3.      Among the Company's product offerings is "ID Trust 360," which is an FBI-certified, enterprise-class digital identity risk platform for extending software-as-a-service and

1

custom digital identity services. It is designed to reduce threats by integrating advanced technologies that fuse biometrics, credentials, and other identity-centric data to continuously monitor for data integrity.

4. In July 2020, Telos announced it was one of three vendors chosen by the U.S. Transportation Security Administration (the "TSA") for a ten-year contract to provide TSA PreCheck® enrollment services using the ID Trust 360 platform. The award of the TSA PreCheck contract also included Designated Aviation Channeling services for processing aviation worker background checks. Through this service, Telos would collect biographic and biometric data to conduct background checks for individuals working in secure areas of the airport.

5. Then, in October 2020, Telos announced a ten-year, multibillion-dollar contract with the Centers for Medicare and Medicaid Services ("CMS") using ID Trust 360.

6. On the shoulders of the TSA and CMS contract announcements, Telos held its initial public offering ("IPO") on the NASDAQ Global Market (the "NASDAQ"), after the Company's shares had previously traded over-the-counter for several years.

7. In connection with its IPO, on October 6, 2020, Telos filed a Form S-1 Registration Statement, which was declared effective on November 18, 2020. Therein, the Company touted "rapidly accelerating revenue growth beginning in 2021 and 2022" due in part to the significant revenue stream the TSA and CMS contracts would generate.[1] In fact, the Company forecasted that these two contracts would generate "in excess of $135 million in revenue in 2021 and 2022." By the time of Telos' first earnings call as a public company in March 2021, Chief Executive Officer ("CEO") John B. Wood ("Wood") projected the Company would earn "almost $1 billion

_____

[1] Unless otherwise noted, all emphasis in quotations is added.

of annual revenue within 5 years" with the CMS and TSA contracts substantially contributing to that figure.  The figure represented a dramatic increase in revenue as Telos had reported annual revenues of $138 million in 2018, $159.2 million in 2019, and $179.9 million in 2020.

8.     At the time of the IPO, Telos reported that the TSA contract would launch in early 2021 and that the Company would begin providing services under the CMS contract in 2021.

9.     Defendants repeatedly assured the market that it was on track to commence work on the TSA and CMS contracts as scheduled, that revenues would be recognized from these contracts in 2021, and that the guidance it was providing was "conservative."  For example, when asked on Telos' full-year 2020 earnings call in March 2021 whether the contracts were "on track," CEO Wood answered in the affirmative and informed investors that "we try and be as conservative as we can" in providing guidance.  Similarly, when asked on Telos' first quarter earnings call in May 2021 if there was "anything that changed with regard to [his] confidence or [Telos'] ability – or [its] visibility into the back half of the year," CEO Wood responded, "[n]o there's nothing that's changed."  Wood continued, "[a]nd as we're closer to the second half of the year, we will make a decision as to whether or not we're going to adjust to the upside, but just from our standpoint we're just trying to be conservative."   Chief Financial Officer ("CFO") Michele Nakazawa ("Nakazawa") reaffirmed full year 2021 guidance, and CEO Wood characterized the Company's guidance as "conservative."

10.     However, by Telos' second quarter of 2021 earnings call on August 16, 2021, the Company announced the TSA and CMS contracts were experiencing headwinds due to recent cyber-attacks.  The Company adjusted its revenue projection for TSA PreCheck from $8 million in the third quarter and $30 million in the fourth quarter to no revenue in the third quarter and approximately $25 million in the fourth quarter due to the headwinds.  In addition, the Company

adjusted its revenue projection for CMS from $8 million of revenue each in the third and fourth quarters to no revenue from this program for 2021.

11.     Despite the TSA and CMS delays, Telos continued to affirm its revenue guidance for 2021, citing, among other things, ***public*** statements by the TSA.  For example, during the second quarter earnings call, newly installed CFO Mark Bendza ("Bendza") reiterated that "[o]ur overall guidance remains unchanged."  In addition, with regard to the TSA PreCheck contract, CEO Wood explained that Telos "remain[ed] confident in [its] service launch in 2021" and "[t]hat's why we have held our guidance."

12.     Unbeknownst to investors, throughout the Class Period, Telos lacked a reasonable basis for its repeated assurances regarding the schedule for executing the crucial TSA and CMS contracts and its associated revenue guidance.  Despite being in constant communication with the TSA and CMS, Defendants did not disclose that these two contracts were in continual delay and management could not accurately forecast when work on these two contracts would commence.

13.     Specifically, Defendants failed to disclose that: (1) the TSA and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented at the end of 2021 and in 2022; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) COVID-19- and hacking scandal-related headwinds were throwing off the timing for performance of the TSA and CMS contracts and their associated revenues; (4) as a result, the guidance provided by Defendants was not in fact "conservative"; (5) as a result of the delays, Telos would be forced to dramatically reduce its revenue estimates; and (6) as a result of the foregoing, Defendants' statements about Telos'

business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

14.     The truth regarding Telos' inability to execute these contracts on the schedule repeatedly promised was revealed by CFO Bendza during the Company's earnings call regarding its third quarter 2021 results held on November 15, 2021 before the markets opened.  CFO Bendza shocked the market by disclosing that the CMS and TSA PreCheck contracts would be delayed with only the TSA PreCheck *commencing in 2022*, while the CMS contract was pushed back *after* full year 2022.

15.     Despite CEO Wood admitting that Telos had been "in near daily communication with TSA program officials," Telos blamed the TSA PreCheck delay on new mandatory cybersecurity requirements being imposed due to the hacking scandal.  Telos blamed the delay of the CMS contract on the fact that "government agencies have not been reverting back to full in-person fingerprinting" due to the COVID-19 pandemic.

16.     CFO Bendza also acknowledged deficiencies in Telos' past guidance process, stating that "*going forward* . . . I will guide based on what [we] have a high degree of visibility into at a point in time.  And so you're going to see that in how we guide *going forward*."

17.     In reaction to these revelations, Telos' stock price fell $6.84 per share, or more than 28 percent, from a close of $24.38 per share to a close of $17.54 per share on November 15, 2021—representing a $328 million decline in market capitalization.

18.     Analysts were quick to excoriate Telos and its management, specifically criticizing management for their prior misrepresentations and even going so far as to state that Telos' "credibility [was] shredded."  Despite Telos' assurances that work with the TSA would commence at the start of 2022, one analyst proclaimed, "management has shown an inability to accurately

forecast when the project will go live, and we are thus not baking in any TSA revenue contribution in our revised numbers until Q2'2[2]."

19.     As a result of Defendants' false and misleading statements and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this District as Telos is headquartered in Ashburn, Virginia.

23.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

24.      Plaintiff the Firemen's Retirement System of St. Louis provides retirement, disability, death, and survivor benefits to nearly 2,000 active and retired firefighters in the city of St. Louis, Missouri, and their beneficiaries.  The Firemen's Retirement System of St. Louis

oversees approximately $435 million in assets.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Telos common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

25.     Defendant Telos is incorporated in Maryland, and the Company's principal executive offices are located in Ashburn, Virginia.  Telos' common stock has traded on the NASDAQ under the ticker symbol "TLS" since its offering on November 19, 2020.

26.     Defendant John B. Wood ("Wood") has served at all relevant times as the Company's Chairman, President, and CEO.

27.     Defendant Michele Nakazawa ("Nakazawa") served as the Company's CFO from 2004 through July 2021.

28.     Defendant Mark Bendza ("Bendza") has served as Executive Vice President and CFO since July 2021.

29.     Defendants Wood, Nakazawa, and Bendza (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Telos' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Further, the Individual Defendants signed reports that Telos filed with the SEC during the Class Period, including the Company's 2020 Annual Report on Form 10-K, which was signed by Defendants Wood and Nakazawa, and the Company's First Quarter of 2021 Form 10-Q for 2021, which was signed by

Wood and Nakazawa, and the Company's Second Quarter of 2021 Form 10-Q, which was signed by Wood and Bendza and thus were responsible for statements made therein. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

30.    The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Telos' business.

31.    As senior executive officers and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Telos' financial condition and performance, growth, operations, compliance with applicable laws, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Telos' common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

### Background

32.     Based in Ashburn, Virginia, Telos was founded in 1968 and offers advanced technology in the field of cybersecurity.

33.     The Company provides products and services to the government, military, and Fortune 500 companies.  Telos has had lucrative contracts with the Department of Defense, the Federal Bureau of Investigation, the Central Intelligence Agency, and has partnered with technology leaders such as Amazon Web Services (AWS), Microsoft Azure, Palo Alto Networks, Citigroup Inc., Salesforce.com, and Rackspace.   Telos reported annual revenues of $159.2 million for 2019 and $179.9 million for 2020.

34.     Telos' products fall into two broad categories: (1) Security Solutions and (2) Secure Networks.  Telos' contracts with the TSA and CMS fall under the purview of Security Solutions, which include the Company's ID Trust 360 platform.

35.     ID Trust 360 is an enterprise-class digital identity risk platform for extending software-as-a-service and custom digital identity services that reduces threats through the integration of advanced technologies that fuse biometrics, credentials, and other identity-centric data used to continuously monitor trust.

36.     The Company's Security Solutions also include Xacta and Telos Ghost.  Xacta is a platform that provides enterprise cyber risk management and security compliance automation products for large commercial and government enterprises.  Telos Ghost is a product designed to eliminate cyber-attack surfaces by obfuscating and encrypting data to ensure the safety and privacy of people, information, and resources on networks.

37.     In July 2020, Telos announced that it was one of three vendors selected by the TSA to provide TSA PreCheck enrollment services as well as background check services, using the Company's ID Trust 360 platform.  The services under this agreement were to include the creation of customized biometric and identity trust technology to work with TSA systems to (1) screen individual, fee-paying applicants who wish to avoid long security lines by signing up for TSA PreCheck and (2) vet non-travelers who need access to secure locations in an airport.

38.     In addition, on October 6, 2020, Telos announced a ten-year, multibillion-dollar contract with CMS using ID Trust 360.  The services pursuant to this agreement were to include technology to detect, prevent, and proactively deter fraud, waste, and abuse in the Medicare and Medicaid programs, including by confirming the credentials of 1.5 million healthcare providers who are required annually to undergo FBI-based non-criminal history checks including identity verification, fingerprinting, and continuous monitoring.

39.     Prior to holding its IPO and joining the NASDAQ, Telos stock traded over-the-counter for more than a decade.  On the heels of securing the TSA and CMS contracts, Telos decided to join the NASDAQ and trumpeted its contracts with the TSA and CMS as major selling points in its IPO.

40.     The importance of these agreements to Telos' outlook cannot be overstated. Reflecting on the agreements in November 2021, CFO Bendza characterized them as "very large needle-moving growth opportunities in our portfolio that we're very excited about and we think our shareholders are excited about."

**Defendants' Materially False and Misleading Statements**
**During the Class Period**

41.     The Class Period begins on November 19, 2020, the date Telos held its IPO, selling 17.2 million shares of Telos common stock, at $17.00 per share, thereby raising gross proceeds of

$292.6 million.  The IPO Offering Documents stated that the IPO's net proceeds were to be used, among other things, to acquire the balance of Telos ID, which includes ID Trust 360 and a portion of which was held by an outside investor, to repay outstanding senior and subordinated debt, and for general corporate purposes.

42.    The Offering Documents also addressed the timing for commencement of the TSA and CMS contracts—Telos' two largest contracts—and provided additional detail on the revenue the contracts would generate during 2021 and 2022.  For instance, Registration Statement on Form S-1 filed on October 6, 2020, and declared effective on November 18, 2020, stated:

> We expect our growth to accelerate beginning in 2021 and 2022 due to, among other factors, ***recent contract awards that are significant to our business***.  Notable recent awards include an expanded contract with a U.S. government agency for our Telos Ghost® managed intelligence support solution and contract wins under the [TSA] PreCheck™ enrollment program and a program with [CMS]. We believe the Telos Ghost contract will generate approximately $4 million to $5 million of incremental revenue in 2021 and represents a platform for potential further growth through military and civilian government units during and after 2021
>
> The TSA PreCheck™ enrollment program – a 10-year contract on which we are one of three vendors – is ***expected to launch in early 2021***.  TSA estimates the market for TSA PreCheck™ enrollments is 2 million to 5 million travelers annually over the term of the contract, and we believe that ***the share of those enrollments we may secure on an average annual basis over that term should grow to approximately 30% to 40% of those travelers***.  We anticipate charging $85 for each TSA PreCheck™ membership transaction, with the possibility that additional revenue may be generated from co-marketing efforts.  The CMS program – a 10-year indefinite delivery/indefinite quantity contract under which we anticipate providing services beginning in 2021 – involves our FBI-certified biometric enrollment solution.  CMS estimates that approximately 1.5 million healthcare workers will obtain background checks annually under the program, and we believe we are well-positioned to secure this work over the 10-year contract term.  Based on these and other assumptions, ***we believe these programs collectively may grow from a base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess***

*of $135 million in revenue in 2021 and 2022, respectively*.  For these reasons, we anticipate these recent contract awards, combined with our organic growth as well as other opportunities for business expansion, to contribute to rapidly accelerating revenue growth beginning in 2021 and 2022

43.     The Form S-1 emphasized the significance of the TSA PreCheck and CMS contract awards and their timing:

> *TSA PreCheck ™ Enrollment Screening*. Telos ID's recent award of a 10-year contract to provide enrollment services in support of the TSA PreCheck™ Enrollment Program presents ***a large, high-profile opportunity for us, and we are preparing to launch services under this program in early 2021***. The TSA PreCheck™ contract is an important example of a government-sponsored, consumer facing opportunity, in which we provide PreCheck™ enrollment services to individual, fee-paying applicants. Telos ID's service will engage with the world's leading airline, hospitality, credit card, ride share, and other Fortune 500 businesses to provide consumer marketing and loyalty program tie-ins to promote the PreCheck™ program. In addition, this program is expected to feature an omni-channel market approach that leverages advanced digital services to reach our customers across several market segments.

> *CMS Healthcare Provider Screening.* Telos ID was recently awarded a 10-year contract to provide technology and service solutions that detect, prevent, and proactively deter fraud, waste and abuse in the Medicare and Medicaid programs.  Telos ID's digital identity trust platform and digital services is expected to offer critical technology necessary to identify and mitigate fraud across the United States.  Each year, approximately 1,500,000 health care providers are required to undergo FBI-based non-criminal history checks requiring identity trust services, including identity verification, fingerprinting, and continuous monitoring.

44.     The IPO, which originally planned to offer 12.35 million shares, was a success.  It was upsized to offer 14.9 million shares, and with underwriters exercising their "greenshoe" option to sell additional shares to meet public demand, ended up selling 17.2 million total shares for gross proceeds of $292.6 million.

45.     After the markets closed on March 25, 2021, Telos filed its Annual Report on Form 10-K for the full year ending December 31, 2020.  The Risk Factors section of the Form 10-K made clear how important the TSA and CMS contracts were to the Company's outlook and future performance and implied that the risks described had not materialized:

> A small number of our large customer contracts, including **the TSA PreCheck™ enrollment program and our program with CMS, are expected to comprise a significant portion of our future revenue**. Our business will likely be harmed if any of our key customer contracts do not generate as much revenue as we forecast, and the termination or delay of a large contract or of multiple contracts could have a material adverse effect on our revenue and profitability. Adverse events affecting the programs subject to these contracts could also negatively affect our ability to process transactions under those contracts, which could adversely affect our revenue and results of operations.    For example, the COVID-19 pandemic may adversely affect or disrupt the TSA PreCheck™ enrollment program, which could lead to delays in the implementation of that program and changes in demand for that program.  In addition, if the COVID-19 pandemic and associated protective or preventative measures expand, we may experience a material adverse effect on our business operations, revenues, financial condition, and ability to execute on business or contract opportunities; however, the ultimate impact is highly uncertain and subject to change.

46.     That same afternoon, Telos held its earnings call for the fourth quarter of 2020. During the call, CEO Wood underscored the Company's positive prospects, in part due to the TSA and CMS contracts:  "With the growth trajectory of our Xacta and Telos Ghost solutions, driven by increased direct sales and channel partnerships, **coupled with the multibillion-dollar TSA PreCheck and CMS contracts**, we believe we have visibility to almost $1 billion of annual revenue within 5 years."

47.     During the earnings call, Wood addressed the "expected launch time for both the TSA and CMS contracts," acknowledging with regard to the CMS contract that "[o]bviously, with the COVID vaccination rolling out, that's kind of put the health care industry in sort of a tizzy.

But we still see very strong results for us for the second half of the year as we had expected through

the IPO process."  Wood also noted that the TSA PreCheck work was on schedule to begin as

travel had picked up to about 60% in 2021 compared to the previous year during the pandemic,

which was at 30%.

48.     During the same earnings call, Wood was again asked whether the TSA contract

was "on track" and whether Telos considered itself to be in a leadership position because of its

technology.  In response, Wood affirmed:

> *We are on track*.  We do think with the customer wanting us to
> certify and get the authority to operate through the use of Xacta, that,
> that does give us a leg up over the other competitors who have to
> use Xacta as well.  And so *we do think we're on track*.  And I think
> *what we shared during the IPO is still an appropriate metric in
> terms of the growth path*.

49.     CEO Wood also emphasized that "we try and be as conservative as we can" in

providing guidance.

50.     The next day, Telos' stock price closed $6.96 per share higher than the previous

day, closing at a price of $37.71 per share.

51.     On April 2, 2021, Telos filed a Prospectus Supplement or Form 424B5 regarding a

secondary public offering ("SPO") of stock.  The SPO offered for sale at a price of $33 per share—

nearly double the IPO price—9,090,909 shares of Telos common stock comprising approximately

1.2 million shares sold by the Company, more than 6.6 million shares sold by Company insiders,

and the option of underwriters to purchase 1.1 million shares.  The SPO generated gross proceeds

in excess of $64.6 million.  The insiders selling stock included CEO Wood, then-Executive Vice

President ("VP") and Chief Operating Officer Ed Williams, Executive VP of Secure Networks

Brendan Malloy, and longtime shareholder Toxford Corp.

52.     Following the close of the markets on May 17, 2021, Telos held its earnings call for the first quarter of 2021.  In support of Telos' stance regarding the timing for the TSA contract, during the call, CEO Wood noted that the TSA was reporting higher passenger numbers that almost reached pre-pandemic levels and that summer air traffic was "expected to surge."  CEO Wood also stated that Telos was seeing "a similar uptick" in the Company's IDTrust 360 airport program, "where [the Company's] aviation workers' biometric enrollment submissions have increased 177% from April 2020 to April 2021."

53.     During the earnings call, CEO Wood was asked whether "there [is] anything that changed with regard to [his] confidence or [his] ability—or [his] visibility into the back half of the year" given that the Company did not "roll through the upside [of its good results] into the annual outlook."  In response, CEO Wood assured analysts, "***No, there's nothing that's changed***.  It's really just being—it's been driven into our heads that we have to meet or exceed our numbers, so I can – we can tell you guys that ***we feel very confident about the year***."  CEO Wood contended that Telos was "just trying to be conservative."

54.     During the earnings call, Wood also was asked when he anticipated "to be live on [TSA PreCheck and CMS]."  In response, Wood stated, "[i]n the case of PreCheck, I think ***we're looking at the end of June . . . to be officially approved***.  In the case of CMS, ***we're thinking Q3 to be approved***."  Wood continued, "[the CMS work] may start a little bit later in third quarter than we were thinking [due to prioritization of the COVID vaccine rollout over all else], but I think the – we had so much upside planned into that contract vehicle, anyway, that ***we don't worry about that at all***."

55.     Also during that same earnings call, CFO Nakazawa stated, "[w]e are pleased with our continued success at winning new business, combined with our backlog of orders and contracts, and therefore *we are reaffirming our full year 2021 guidance*."

56.     On July 19, 2021, Telos announced that Bendza was succeeding Nakazawa as CFO after Nakazawa had served in the position for nearly 17 years.

57.     After the close of the markets on August 16, 2021, Telos held its earnings call for the second quarter of 2021.  During the call, the Company disclosed that work on the TSA contract had not commenced on schedule.  When asked by an analyst about the TSA PreCheck delay, CEO Wood stated that it was "driven by virtue of the fact that we've had . . . a bunch of different cybersecurity hacks.  And that has caused the TSA to take a step back to make sure that their own systems fundamentally won't have a problem by any third parties coming after them."  Similarly, during the earnings call, CEO Wood acknowledged, with regard to CMS, that there would be "short-term, customer driven delays" due to the cybersecurity hacks.

58.     Nevertheless, CEO Wood assured investors that work on the TSA contract would commence in 2021.  CEO Wood cited *public* comments from the TSA:  "TSA said in a public notice that they expect the additional TSA PreCheck enrollment providers to become available in 2021."  Wood further commented that "[Telos] remain[s] confident in our service launch in 2021."

59.     Also, during the same earnings call, new CFO Bendza forecasted there would be "sequential revenue growth from the third quarter to the fourth quarter primarily drive by TSA PreCheck."  CFO Bendza also noted that Telos had previously forecasted $8 million in revenue in the third quarter and $30 million in revenue in the fourth quarter from TSA PreCheck.  The Company adjusted those projections to "no revenues from that program in the third quarter and approximately $25 million in the fourth quarter."

60.     In addition, CFO Bendza addressed the CMS contract and walked back projections for that contract:

> [Telos] previously assumed approximately $8 million of revenues from [CMS] in each of the third and fourth quarters, but ***we're now assuming no revenues from that program this year***.  So overall, we're assuming approximately $30 million of revenues from [CMS and TSA PreCheck] will be recognized in 2022 instead of during the second half of 2021.

61.     Nevertheless, when asked by an analyst whether Telos would still "hit the original expectations for TSA Pre[Check] and [CMS] in '22," CEO Wood responded, "Correct.  Yes."

62.     The Company also reaffirmed its guidance for full-year 2021, with CEO Wood noting that other business was covering the delayed revenue from the TSA and CMS contracts. According to CEO Wood, had the contracts been "up-and-running," the Company would have raised guidance, but "in an overabundance of being cautious," Telos was reaffirming its previously issued guidance.

63.     In addition, when asked about a recent string of insider selling on the same call, CEO Wood explained that the timing of Rule 10b5-1 plans and a desire to diversify investments by long-term employees were the cause, adding "[i]t's not a question about the company or its condition."

64.     In closing, CEO Wood reminded investors about the value of the TSA and CMS contracts:  "I like people to remember that we have very long-term contracts and 2022 is going to be a bang up year in my opinion."

65.     The next day Telos' stock price increased by $1.25 per share to close at $25.81 per share.

66.     On November 1, 2021, Brandon Malloy, then a Telos General Manager and now Executive VP of Secure Networks, sold 250,799 shares of Telos common stock.  This sale represented a significant portion of Malloy's holdings.

67.     The above statements identified in ¶¶ 41 – 66 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants failed to disclose that: (1) the TSA and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented at the end of 2021 and in 2022; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) COVID- and hacking scandal-related headwinds were throwing off the timing for performance of the TSA and CMS contracts and their associated revenues; (4) as a result, the guidance provided by Defendants was not in fact "conservative"; (5) as a result of the delays, Telos would be forced to dramatically reduce its revenue estimates; and (6) as a result of the foregoing, Defendants' statements about Telos' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

**The Truth Is Revealed**

68.     The truth regarding Telos' inability to timely commence the CMS and TSA PreCheck contracts was revealed during the Company's third quarter 2021 earnings call held on November 15, 2021 prior to the market open.  Despite Defendants' repeated reaffirmations of earlier issued guidance for full year 2021 and reassurances that the critical TSA and CMS contracts were progressing on schedule with only minor delays, Telos revealed further delays of performance regarding the TSA and CMS contracts.  As a result of the delays, Telos reduced

guidance from a range of $283 million to $295 million to a range of $240 million to $245 million—a massive miss that could not be offset by the balance of the Company's business.

69.     During the call, CEO Wood discussed the delay in the TSA contract.  CEO Wood characterized the TSA delay as "short-term," attributing it to concerns about "superior security of the enrollment provider ecosystem and superior quality of the customer experience."   While acknowledging that Telos was "in near daily communication with TSA program officials," CEO Wood focused on the timing set forth in two "***public*** notices" from the TSA setting forth that enrollment providers would be able to "come online in 2021."

70.     CFO Bendza added that "While we are encouraged by the TSA's public confirmations, at this stage in the fourth quarter, ***we are not expecting [the TSA PreCheck] program to deliver meaningful sales this year***."  Bendza also admitted that because of the delay, the Company was "now eliminating the remaining $25 million of sales and $10 million of adjusted EBITDA from the TSA PreCheck expansion program in the fourth quarter."  CEO Wood affirmed that Telos was ready to execute the contract but had not yet received authority to operate.

71.     During the same call, when questioned by an analyst regarding the start of the CMS contract, CFO Bendza stated, "now at this stage, ***we're not putting CMS into our '22 outlook***."  Another Telos executive explained that because the resumption of in-person fingerprinting of lower-risk healthcare providers—a key component of the CMS contract—had been delayed due to COVID concerns, the "expansion and increased opportunity this contract was afforded has been delayed."

72.     CFO Bendza also discussed changes the Company was making to its guidance process under his new leadership.  According to CFO Bendza, "***guidance going forward . . . will [be] based on what we have a high degree of visibility into at a point in time***."

73.     In reaction to this news, Telos' stock price fell $6.84 per share, or more than 28 percent, from $24.38 per share to close at $17.54 per share on November 15, 2021—representing a $328 million decline in market capitalization.

74.     Analysts were quick to criticize the Company for its utter inability to accurately forecast the start of its two most important contracts.  For instance, a Wedbush Securities analyst expressed disbelief that "management [could] be ***so off in terms of miscalculating the timing of deals as well as just the complexity***" in light of the "massive guidance cut."   Following the call, Wedbush downgraded the Company from outperform to neutral and described the state of the government contracts as "a moving dartboard over the coming year that is hard to get confidence around."  Wedbush noted the "***head scratching challenges*** management would have in forecasting and executing on these government deals which have now negatively tainted the Telos story."  In condemnation of the Company, Wedbush summed up:  "In a nutshell, ***the credibility of the Telos story is a major question mark for the Street after this disastrous quarter/guidance/ communication*** on the conference call."

75.     Needham & Co. analysts similarly questioned Telos during the earnings call, asking whether Telos could provide "a concise and clear explanation of why TSA has slipped as much as it has?  Is it just simply because of the hacks that happened in the first half?  What are – what is the mechanics that's causing the slippage?"  Dissatisfied with the response blaming the delay on the "increased security heightened policy and procedure" implemented by the TSA, the Needham analysts chastised the Company, titling their report, "TLS: More Questions Than Answers As ***Credibility Is Shredded***."  The Needham report also noted that "[t]he sharply lowered estimates for CY4Q21 and CY22 offered on the CY3Q earnings call sharply damaged perceptions and caused those that have taken the time to understand the company to question their thinking and

management's credibility."   The report further declared that "it will take a long time for management to rebuild its credibility and to prove out the growth opportunity."  Finally, the report also titled a section dealing with the contracts as a "Communications debacle: The numbers and the Messaging Do Not Foot."

76.     In another analyst report, D.A. Davidson & Co. analysts stated that "TSA & CMS were delayed again & ***management's credibility in terms of forecasting when the projects will launch is shot, in our view***."  The report also noted that "management has shown an inability to accurately forecast when the project will go live, and we are thus not baking in any TSA revenue contribution in our revised numbers until Q2'2[2]."  In addition, the report characterized management's decision to reiterate the FY21 outlook "despite pushing out $21M of TSA & CMS revenue…. [as] a bit aggressive."

**CLASS ACTION ALLEGATIONS**

77.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Telos common stock between November 19, 2020 and November 12, 2021, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Telos'

21

common stock actively traded on the NASDAQ (an open and efficient market) under the ticker symbol "TLS." Millions of Telos shares were traded publicly during the Class Period on the NASDAQ. As of November 8, 2021, Telos had more than 66.7 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Telos or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a)  whether Defendants violated the Exchange Act by the acts and omissions alleged herein;

      b)  whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Telos;

c)  whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Telos;

d)  whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e)  whether the market price of Telos common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations and omissions complained of herein; and

f)  the extent to which the members of the Class have sustained damages and the proper measure of damages.

82.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

83.  The market for Telos common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Telos common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Telos common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Telos and have been damaged thereby.

84.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Telos common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Telos' business, operations, and prospects as alleged herein.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## LOSS CAUSATION

85.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

86.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.   This artificially inflated the price of Telos' common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Telos' stock fell precipitously, as the prior artificial inflation came out of the price.

## SCIENTER ALLEGATIONS

87.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws

88.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Telos, their control over, receipt, and/or modification of Telos' allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Telos, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

89.     The market for Telos common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Telos common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Telos common stock and market information relating to Telos and have been damaged thereby.

90.     At all relevant times, the market for Telos common stock was an efficient market for the following reasons, among others:

   a)   Telos was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)  As a regulated issuer, Telos filed periodic public reports with the SEC and/or the NASDAQ;

c)  Telos regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)  Telos was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

91.     As a result of the foregoing, the market for Telos common stock promptly digested current information regarding Telos from all publicly available sources and reflected such information in Telos' stock price.  Under these circumstances, all purchasers of Telos stock during the Class Period suffered similar injury through their purchase of Telos stock at artificially inflated prices and a presumption of reliance applies.

92.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material

in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

93.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

94.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Telos who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

95.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

96.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

Case 1:22-cv-00135   Document 1   Filed 02/07/22   Page 29 of 34 PageID# 29

including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Telos common stock; and (iii) cause Plaintiff and other members of the Class to purchase Telos common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

97.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Telos common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below

98.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Telos' business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Telos' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Telos and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

99.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

100.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Telos' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were

reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

101.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Telos common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Telos common stock during the Class Period at artificially high prices and were damaged thereby.

102.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Telos was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Telos common stock, or if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

103.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

104.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

105.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106.    The Individual Defendants acted as controlling persons of Telos within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further, Individual Defendants Wood and Nakazawa signed the Company's 2020 Annual Report on Form 10-K and First Quarter of 2021 Form 10-Q for 2021 and Individual Defendants Wood and Bendza signed the Company's Second Quarter of 2021 Form 10-Q.

107.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

108.    As set forth above, Telos and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position

as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.  Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.  Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c.  Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.  Awarding such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 7, 2022                    Respectfully submitted,

By: */s/ Steven J. Toll*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
1100 New York Ave, NW| Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com

dommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel*

**SAXENA WHITE P.A.**

Steven B. Singer
Rachel A. Avan
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
ravan@saxenawhite.com

--and--

Maya Saxena
Joseph E. White, III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Plaintiff*
*The Firemen's Retirement System of St. Louis*