UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| THE FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, ALASKA ELECTRICAL PENSION FUND and INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 793 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TELOS CORPORATION, JOHN B. WOOD, MICHELE NAKAZAWA, MARK BENDZA, BERNARD C. BAILEY, DAVID BORLAND, MAJ. GEN. JOHN W. MALUDA, ROBERT J. MARINO, BONNIE L. CARROLL, FREDERICK D. SCHAUFELD, ANDREW R. SIEGEL, and WILLIAM H. ALDERMAN,<br><br>Defendants. | Civil Action No. 1:22-cv-00135-AJT-IDD<br><br>CLASS ACTION<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


Page

I. INTRODUCTION ....2

II. JURISDICTION AND VENUE ....6

III. PARTIES ....7

A. Lead Plaintiffs ....7

B. Defendants ....8

1. Telos and the Executive Defendants ....8

2. The Director Defendants ....10

IV. CLASS ACTION ALLEGATIONS ....11

V. SUBSTANTIVE ALLEGATIONS ....13

A. Telos and Its Business ....13

B. Telos Goes Public After Landing Its Two Biggest Contracts and Touts Them As Huge Sources of Immediate And Long-Term Revenues ....16

C. After the IPO, Telos Reaffirms Its “Conservative” Revenue Guidance and Reassures Investors that Revenues Will Only Increase as a Result of the COVID-19 Pandemic and Major Cybersecurity Breaches ....17

D. Unbeknownst to Investors, Defendants’ Statements Regarding Revenue from the TSA and CMS Contracts Lacked Any Factual Basis ....20

E. Telos Conducts a Secondary Public Offering Enabling Insiders to Dump Their Personal Telos Shares at Inflated Prices ....25

F. Defendants Continue to Mislead Investors Regarding the Timeframe of the TSA and CMS Contracts and Their Related Revenues ....25

G. The Truth Begins to Emerge ....30

VI. EXCHANGE ACT VIOLATIONS ....37

A. Defendants’ Materially False and Misleading Statements and Omissions ....37

1. IPO Registration Statement ....37

2. 2020 Annual Report, Press Release and Conference Call ....38

3. May 17, 2021 Quarterly Report, Press Release and Conference Call ....43

**Page**


4. May 19, 2021 - Needham & Co. 16th Virtual Technology & Media Conference ....46

5. June 23, 2021 - Northland Capital Markets SMB and Travel Conference ....46

6. August 16, 2021 Quarterly Report, Press Release and Conference Call ....49

7. August 25, 2021 - BMO 2021 Technology Summit ....52

8. September 9, 2021 - D.A. Davidson 20th Annual Software and Internet Conference ....52

9. November 15, 2021 Quarterly Report, Press Release and Conference Call ....53

B. Additional Scienter Allegations ....55

1. The Crucial Importance the TSA and CMS Contracts to the Company's Growth Supports a Strong Inference of Scienter ....55

2. Defendants' Repeated, Specific, and Emphatic Statements About the TSA and CMS Contracts Further Support a Strong Inference of Scienter ....57

3. Defendants' and Other Insiders' Massive Stock Sales Reinforce a Strong Inference of Scienter ....59

4. Suspicious Executive Departures Further Support a Strong Inference of Scienter ....62

5. The Obvious and Crucial Requirement to Assess Whether Telos Was a "Principal" or "Agent" Under GAAP Before Issuing Revenue Guidance Further Supports a Strong Inference of Scienter ....62

6. The Sharp Analyst Reaction to the Company's Complete Reversal in its Guidance for the TSA and CMS Contracts Further Support a Strong Inference of Scienter ....63

C. Loss Causation ....65

D. Presumption of Reliance (Fraud-On-The-Market Doctrine) ....68

E. Omissions Based on Violations of Items 303 and 503 of Regulation S-K ....70

**Page**


1. Item 303 ....................70

2. Item 503 ....................71

F. Inapplicability of the Statutory Safe Harbor ....................72

G. Undisclosed Adverse Facts ....................73

H. Exchange Act Counts ....................74

COUNT I ....................74

Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against Telos and the Executive Defendants) ....................74

COUNT II ....................77

Violation of Section 20(a) of the Exchange Act (Against the Executive Defendants) ....................77

VII. SECURITIES ACT VIOLATIONS ....................78

A. Summary of the IPO ....................78

B. Defendants' Materially False and Misleading Statements and Omissions in the IPO Registration Statement ....................79

C. Securities Act Counts ....................80

COUNT III ....................80

Violation of Section 11 of the Securities Act (Against Telos, Wood, Nakazawa and the Director Defendants) ....................80

COUNT IV ....................82

Violation of Section 15 of the Securities Act (Against Wood, Nakazawa and the Director Defendants) ....................82

VIII. PRAYER FOR RELIEF ....................84

IX. JURY TRIAL DEMAND ....................84

Lead Plaintiffs Firemen's Retirement System of St. Louis, Alaska Electrical Pension Fund, and International Union of Operating Engineers Local 793 Pension Plan (collectively, "Lead Plaintiffs") bring this action individually and on behalf of all persons and entities that purchased Telos Corporation ("Telos" or the "Company") common stock: (i) during the period of November 19, 2020 to March 16, 2022, inclusive (the "Class Period"), and were damaged thereby; and (ii) pursuant and/or otherwise traceable to the October 6, 2020 registration statement, as amended ("IPO Registration Statement") for the Company's initial public offering ("IPO"). Lead Plaintiffs are pursuing remedies against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) ("Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§77k and 77o ("Securities Act").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon the investigation of their undersigned counsel, conducted under Lead Plaintiffs' supervision, which includes, without limitation: (a) review and analysis of Telos' public filings with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Telos; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Telos' website concerning the Company's public statements; (d) reports by securities analysts; (e) accounting rules, regulations, and guidance; (f) consultation with expert consultants; (g) review of other publicly available information concerning Defendants; and (h) additional materials and data concerning Telos, its industry, and customers as identified herein. Lead Plaintiffs' investigation is ongoing and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Telos is a Virginia-based company that focuses on developing and implementing cyber, cloud, and enterprise security technology and products. Telos was a private company for over fifty years before going public in November 2020, only months after being awarded two major government contracts. Specifically, in July 2020, Telos announced that it was one of three vendors chosen by the U.S. Transportation Security Administration ("TSA") for a ten-year contract to provide TSA PreCheck enrollment services, and three months later, in October 2020, Telos announced that it had been awarded another ten-year, multibillion-dollar contract with the Centers for Medicare & Medicaid Services ("CMS"). These contracts were by far the largest in Telos' history. Analysts immediately highlighted that the significant revenue streams to be generated by the TSA and CMS contracts were an absolutely critical metric for investors—declaring them a "Key Catalyst[]" for Telos's growth and success.

2. On November 19, 2020, Telos went public, selling over 17 million shares at an offering price of $17 per share. From its inception as a public company, and throughout the Class Period, Defendants repeatedly emphasized the importance of the TSA and CMS contracts and assured investors that these contracts would generate "***rapidly accelerating revenue growth***" beginning no later than 2021. Indeed, to bolster interest in Telos' IPO, the Company touted that the two contracts alone were expected to deliver revenues of "***between $75 million and $80 million***" in 2021 and "***in excess of $135 million***" in 2022, leading to full-year, full-company revenue guidance of ***$283 million to $295 million in 2021***—a seismic increase compared to Telos' annual revenues of between $138 and $180 million during the prior three years.[1] During Telos' first earnings call on March 25, 2021, Defendant John B. Wood ("Wood"), the Company's CEO, reiterated and expanded upon this highly favorable revenue guidance, trumpeting the TSA and

[1] Unless otherwise noted, all emphasis in quotations is added.

CMS contracts as the linchpin in securing "***almost $1 billion of annual revenue within 5 years***." Further, Telos' senior management, including Defendants Wood and Michele Nakazawa ("Nakazawa"), the Company's then-CFO, repeatedly assured the market that the Company's revenue forecasts were based on a solid foundation, touting their guidance as not only "***good***," but "***conservative***" and "***the most prudent forecast for our business***."

3. Defendants' assurances had the desired effect. Fueled by Defendants' representations, Telos stock price immediately soared after the IPO, reaching a Class Period high of $40.21 on January 20, 2021—and Company insiders took full advantage. Indeed, less than six months after taking Telos public, and with the Company's stock price still trading near record highs, Telos completed a secondary public offering ("SPO") in April 2021 at an offering price of $33 per share—nearly ***twice*** the IPO price. Significantly, in connection with that SPO, Company insiders dumped massive amounts of their personal holdings of Telos shares at fraud-inflated prices. Defendants Wood and Nakazawa, who had been with the Company for approximately 20 and 30 years, respectively, sold 20% and 45% of their holdings in the SPO, collectively realizing proceeds of more than ***$58 million***. And the insider selling continued after the SPO. In all, Telos insiders realized a staggering ***$341 million*** in proceeds during the short 16-month Class Period—more than the Company's ***entire valuation*** as of the IPO. The extensive insider selling was so suspicious that management was specifically questioned about it during investor conference calls, forcing Wood to reassure investors that "[i]t's not a question about the Company or its condition."

4. Defendants' statements about the TSA and CMS contracts were false. Indeed, rather than generating the hundreds of millions of dollars of revenue that Defendants had repeatedly touted, to date neither contract has even generated a ***single penny*** of revenue to the Company—and Defendants have now admitted that they have no idea ***when*** the contracts will be approved. As Defendants knew or recklessly disregarded, there were significant roadblocks to

these contracts going live, particularly on the accelerated timeframe that Defendants had publicly represented. In fact, in stark contrast to Defendants' repeated assurances to investors throughout the Class Period, and despite being in "near daily" communication with the TSA, Defendants concealed that their contracts were in continual delay and management had no meaningful visibility as to when work on these two contracts would commence.

5. Moreover, Defendants have admitted that, even assuming the contracts had been approved, the revenue guidance for these major contracts was massively inflated and false. Indeed, prior to issuing guidance for the TSA and CMS contracts, Telos failed to undertake a fundamental, basic, and critical assessment pursuant to Generally Accepted Accounting Practices ("GAAP")—an assessment they were required to take before making their revenue forecasts. Specifically, Accounting Standards Codification 606 ("ASC 606") requires that in any arrangement where more than one party (*i.e.*, a third party) is involved in transferring goods or services to an end consumer, a company must undertake an initial evaluation of whether a party is a principal or agent under the contract. This threshold determination can be hugely consequential, as a principal recognizes revenues on a ***gross*** basis, whereas an agent recognizes revenues on a ***net*** basis. Despite explicitly adopting ASC 606 two years earlier, Telos failed to undertake this most fundamental, obvious, and crucial test in issuing revenue guidance for the critically important TSA and CMS contracts.

6. The truth about the TSA and CMS contracts began to emerge in the second half of 2021. On November 15, 2021, during the Company's third quarter 2021 earnings call, Defendant Mark Bendza ("Bendza"), the Company's new CFO, shocked the market by disclosing that rather than being "on track" to realize upwards of $75 million in revenues under the TSA and CMS contracts in 2021, the TSA contract was ***delayed until 2022***, and the CMS contract was ***delayed until at least 2023***. Moreover, as Bendza was forced to concede during the third quarter earnings call, Telos' prior revenue guidance was not based on any meaningful "visibility"—a shocking

admission that fundamentally undermined Defendants' prior representations to investors that, if anything, their revenue guidance was "conservative." In response to these revelations, Telos stock price plunged more than 28 percent, declining $6.84 per share in a single day. Analysts excoriated Defendants, expressing disbelief at the Company's utter "inability to accurately forecast when the project will go live," and reporting that management's "***credibility [was] shredded***."

7. The news only got worse in early 2022. On February 28, 2022, after the markets closed, Telos disclosed that it was forced to delay filing its 2021 Form 10-K due to "material weaknesses" in the Company's internal controls over financial reporting. In response, Telos stock price tumbled nearly 20 percent over the next four trading days.

8. On March 16, 2022, Telos admitted that it had provided the market with materially false and misleading revenue guidance for the TSA and CMS contracts since its inception as a public company. Indeed, Telos admitted that it had never even bothered to undertake the foundational evaluation required by ASC 606 to determine whether Telos was a principal or agent, and instead, merely "***assum[ed]***"—incorrectly—that Telos would be treated as the principal to the transaction. The impact of the Company's failure to undertake this fundamental accounting analysis was staggering. According to the Company's calculations, once Telos conducted the test required by ASC 606, the amount of revenue that could be booked under the TSA contract was reduced by nearly ***two-thirds***. Making matters worse, Telos disclosed further delays to the launch of the TSA contract, and that the Company still had not yet received authority to operate from the TSA. In response to this news, Telos stock price fell another 11 percent.

9. Analysts immediately slashed their price targets for Telos shares by up to 45 percent and renewed their criticisms that management lacked any creditability or integrity. As one analyst succinctly stated: "***Telos stock has collapsed under the weight of significant delays in both the TSA Pre and the CMS programs that have eroded Management's credibility***." Analysts

castigated management for its failure to undertake the basic agent/principal determination under ASC 606, noting that such a failure was inexcusable. As one analyst commented in rebuking Defendants Wood and Bendza during the Q&A portion of the March 16, 2022 earnings call: "***Shouldn't that have been vetted pre-IPO? And shouldn't it have been consistent with what you had -- was doing anyway? So shouldn't you have known that before you IPO-ed?***" Tellingly, the analyst's questions went unanswered.

10. Telos' shareholders have been significantly harmed by Defendants' material misrepresentations and omissions. Indeed, as of the filing of this Complaint, Telos ***still*** has not received authority to operate under the TSA or CMS contracts nor recorded a ***penny*** of revenue under either contract, as its stock trades in the single digits for less than ***half*** the IPO price. This action seeks redress on behalf of Telos' aggrieved investors.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), as well as Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa), and Section 22 of the Securities Act (15 U.S.C. §77v).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)), and Section 22 of the Securities Act (15 U.S.C. §77v). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

15. Lead Plaintiff the Firemen's Retirement System of St. Louis (the "Firemen's Retirement System") is a defined benefit pension plan with over $470 million in assets under management for the benefit of approximately 1,300 participants. As set forth in the accompanying certification, incorporated by reference herein, the Firemen's Retirement System purchased Telos common stock during the Class Period, including shares traceable to the IPO Registration Statement, and suffered damages as a result of the federal securities law violations alleged herein. Specifically, but not exclusively, the Firemen's Retirement System purchased 10,000 shares of Telos common stock between the IPO and SPO, and suffered significant losses and damages as a result of such purchases.

16. Lead Plaintiff Alaska Electrical Pension Fund is a multiemployer defined benefit pension plan with over $2 billion in assets under management for the benefit of over 10,000 participants. As set forth in the accompanying certification, incorporated by reference herein, Alaska Electrical Pension Fund purchased Telos common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

17. Lead Plaintiff International Union of Operating Engineers Local 793 Pension Plan is a multiemployer defined benefit pension plan with over $2.71 billion in assets under management for the benefit of approximately 14,500 active members, 7,000 retired members and 11,670 deferred vested members. As set forth in the accompanying certification, incorporated by reference herein, International Union of Operating Engineers Local 793 Pension Plan purchased

Telos common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

**B. Defendants**

**1. Telos and the Executive Defendants**

18. Defendant Telos maintains its principal executive offices in Ashburn, Virginia. Telos common stock has traded on the NASDAQ under the ticker symbol "TLS" since its IPO on November 19, 2020.

19. Defendant John B. Wood has served as the Company's Chairman, President, and CEO since 1992. Wood was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

20. Defendant Michele Nakazawa served as the Company's CFO from 2004 until her "resignation" in July 2021. Nakazawa signed the materially false and misleading IPO Registration Statement.

21. Defendant Mark Bendza replaced Defendant Nakazawa as CFO, and has served as the Company's Executive Vice President and CFO since July 2021.

22. Defendants Wood, Nakazawa, and Bendza are collectively referred to herein as the "Executive Defendants."

23. The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Telos' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Further, the Executive Defendants signed reports that Telos filed with the SEC during the Class Period, including the Company's 2020 Annual Report on Form 10-K, which was signed by Defendants

Wood and Nakazawa, the Company's First Quarter of 2021 Form 10-Q for 2021, which was signed by Wood and Nakazawa, the Company's Second Quarter of 2021 Form 10-Q, which was signed by Wood and Bendza, and the Company's Third Quarter of 2021 Form 10-Q, which was signed by Wood and Bendza, and thus were responsible for statements made therein. Because of their positions and access to material non-public information available to them, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

24. The Executive Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Executive Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Executive Defendants were able to and did, directly or indirectly, control the conduct of Telos' business.

25. The Executive Defendants also participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, as well as other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

26. As senior executive officers and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Executive Defendants had a duty to promptly disseminate accurate and truthful information with respect to Telos' financial condition and performance, growth, operations, compliance with applicable laws,

financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Telos common stock would be based on truthful and accurate information. The Executive Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27. Telos and each Executive Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Telos common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Telos' financial performance, business, prospects and operations, as well as the intrinsic value of Telos common stock; (b) enabled the Executive Defendants to sell approximately $66.7 million worth of their personal Telos common stock at artificially inflated prices; and (c) caused Lead Plaintiffs and the Class to purchase Telos common stock at artificially inflated prices.

### 2. The Director Defendants

28. Defendant Bernard C. Bailey ("Bailey") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

29. Defendant David Borland ("Borland") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

30. Defendant Maj. Gen. John W. Maluda ("Maluda") was a director of Telos at the of the time IPO and signed the materially false and misleading IPO Registration Statement.

31. Defendant Robert J. Marino ("Marino") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

32. Defendant Bonnie L. Carroll ("Carroll") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

33. Defendant Frederick D. Schaufeld ("Schaufeld") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

34. Defendant Andrew R. Siegel ("Siegel") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

35. Defendant William H. Alderman ("Alderman") was a director of Telos at the time IPO and signed the materially false and misleading IPO Registration Statement.

36. Defendants Bailey, Borland, Maluda, Marino, Carroll, Schaufeld, Siegel and Alderman are collectively referred to herein as the "Director Defendants."

## IV. CLASS ACTION ALLEGATIONS

37. Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased Telos common stock: (i) during the Class Period, seeking to pursue remedies under the Exchange Act (the "Exchange Act Class"); and (ii) pursuant or otherwise traceable to the IPO Registration Statement, seeking to pursue remedies under the Securities Act (the "Securities Act Class," and together with the Exchange Act Class, the "Class").

38. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. For instance, throughout the Class Period, Telos common stock actively traded on the NASDAQ (an open and efficient market) under the ticker symbol "TLS." Millions of Telos shares were traded publicly during the Class

Period on the NASDAQ. As of November 8, 2021, Telos had more than 66.7 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Telos or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that are complained of herein.

41. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

42. Common questions of law and fact exist as to members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act or Exchange Act by the acts and omissions alleged herein;

(b) whether the IPO Registration Statement misrepresented or omitted material information in violation of the Securities Act;

(c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Telos, in violation of the Exchange Act;

(d) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Telos, in violation of the Exchange Act;

(e) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading, in violation of the Exchange Act;

(f) whether the market price of Telos common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations and omissions complained of herein in violation of the Exchange Act; and

(g) the extent to which the members of the Class have sustained damages and the proper measure of damages.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V. SUBSTANTIVE ALLEGATIONS

### A. Telos and Its Business

44. Telos was founded in 1968 and offers advanced technology in the field of cybersecurity. Telos markets itself as offering technologically advanced, software-based security solutions that protect organizations against evolving, sophisticated and pervasive threats. The Company bills its services as protecting its customers' personnel, information, and digital assets so they can pursue their corporate goals with confidence in their security and privacy, and provides products and services to the government, military, and Fortune 500 companies.

45. Telos' products fall into two general categories: (1) Security Solutions; and (2) Secure Networks. Among its Security Solutions offerings is Telos ID, which encompasses IDTrust360, a digital identity services platform used to mitigate cyber threats by integrating biometrics, credentials, and other identity-centric data. According to the Company, IDTrust360's key capabilities include that it: (a) supports touchless, live scan, and wet fingerprint card scanning;

(b) identifies, prioritizes, and mitigates threats to protect enterprise resources; (c) tracks criminal history, terrorist watchlists, vetting, and payment processing; (d) aligns with federal agency guidelines for digital identity, enrollment, and identity proofing; (e) provides facial recognition, live scan, and no-touch fingerprint scanning and matching; and (f) provides access and appointment scheduling via mobile, web, kiosk, and client apps.

46. IDTrust360 relies heavily on third-party government agencies to deliver its service and utilizes information gathered from several U.S. federal agencies and commercial intelligence sources to provide both business-to-business and business-to-consumer security solutions. It is this access to third-party databases, such as the FBI and Department of Homeland Security watch lists, that makes IDTrust360 such a marketable tool.

47. In July 2020, Telos announced that it was one of three vendors selected by the TSA to provide TSA PreCheck enrollment services, as well as background check services, using the IDTrust360 platform. The services under this agreement were to include the creation of customized biometric and identity trust technology to work with TSA systems to screen individual, fee-paying applicants who wish to avoid long security lines by signing up for TSA PreCheck. In addition, Telos was to vet non-travelers who need access to secure locations in an airport, including aviation workers.

48. Approximately three months later, in October 2020, Telos announced a ten-year, multibillion-dollar contract with CMS using IDTrust360. The services to be performed under the CMS agreement included providing technology and service solutions to detect, prevent, and proactively deter fraud, waste, and abuse in the Medicare and Medicaid programs. For example, Telos was to confirm the credentials of 1.5 million healthcare providers who are required to undergo FBI-based non-criminal history checks annually (including identity verification, fingerprinting, and continuous monitoring).

49. On the heels of securing the TSA and CMS contracts, Telos touted both contracts as substantial sources of immediate and long-term revenue growth. As discussed below, with the TSA and CMS contracts in place, Defendants told the market they expected annual revenue of approximately $283 million in 2021, growing to over $1 billion by 2026. These estimates represented dramatic revenue growth compared to the Company's prior performance. Indeed, Telos' revenue estimates for 2021 represented growth of 57%, compared to the Company's reported annual revenues of approximately $180 million in 2020 and $159 million in 2019. Moreover, Telos' five year revenue estimate of $1 billion represented extraordinary growth of over ***450%***, as provided below:



**B. Telos Goes Public After Landing Its Two Biggest Contracts and Touts Them As Huge Sources of Immediate And Long-Term Revenues**

50. The Class Period begins on November 19, 2020, when Telos shares were first listed on the NASDAQ.[2] In the IPO, the Company sold 17.2 million shares of common stock at a price of $17.00 per share, raising gross proceeds of over $292 million. None of the Company's officers or directors were permitted to sell shares in the IPO. Instead, as is customary in initial public offerings, Telos' officers and directors were subject to a 180-day lockup on any sales of their personal Telos holdings.

51. In going public, Telos emphasized and the market recognized that the TSA and CMS contracts were not only the largest contracts in the Company's history, but also that the substantial revenues that were to be generated under the contracts were absolutely critical to the Company's growth and success. The IPO Registration Statement and other offering documents made it clear that the TSA and CMS contracts were to provide immediate, substantial, and unprecedented sources of revenue growth. For example, the IPO Registration Statement stated that the Company expected accelerated growth due to "recent contract awards that are significant to our business" and explicitly referred to Telos' "contract wins" with the TSA and CMS. The IPO Registration Statement represented that these contracts were expected to launch promptly and "collectively may grow from a ***base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively***."

52. Fueled by the representations regarding the TSA and CMS contracts, the IPO was an enormous success and generated significant investor demand. The offering was upsized by more than 20%, from an originally planned offering of 12.35 million shares to 14.9 million shares.

[2] Prior to Telos' initial public offering in 2020, the Company had one series of preferred stock that traded over-the-counter and was issued by C3 Inc., a separate company.

Moreover, the underwriters exercised their "greenshoe" over-allotment option to sell additional shares. In total, the IPO encompassed a total of 17.2 million shares and raised gross proceeds of $292.6 million.

53. Securities analysts credited Defendants' bullish statements in the IPO Registration Statement regarding the substantial and rapidly accelerating revenue streams from the TSA and CMS contracts. For example, a BMO Capital Markets Report dated December 14, 2020, stated: "We believe Telos' multiple can move higher based on ***growing revenue*** and cost execution as captured in our forecast," specifically, by "execut[ing] on business largely already captured in existing contracts." The BMO analyst emphasized Telos' "***high revenue visibility***" for these two major contracts as a "Key Catalyst[]," stating: "Management forecasts IDTrust360 as Telos' largest revenue sub-segment through FY22, primarily due to two very large contracts with the Transportation Security Administration (TSA) and the Centers for Medicare and Medicaid Services (CMS)." A D.A. Davidson & Co. Report, also dated December 14, 2020, hailed Telos' purported accelerated revenue growth as "[t]he first tenet of our investment thesis," noting that revenues will be "***largely driven by the TSA PreCheck and CMS [] wins.***" A Northland Capital Market Report, from the same day, similarly centered on Telos' revenue growth, underscored that in the first two contract years, "***the TSA and CMS will drive revenue growth acceleration from mid-teens to 40+%, representing stage 1.***"

### C. After the IPO, Telos Reaffirms Its "Conservative" Revenue Guidance and Reassures Investors that Revenues Will Only Increase as a Result of the COVID-19 Pandemic and Major Cybersecurity Breaches

54. Shortly after the IPO, the nation was struck by a series of data breaches that threatened national security. Starting in mid-December 2020, the FBI, the Cybersecurity and Infrastructure Security Agency ("CISA"), and the Office of the Director of National Intelligence ("ODNI"), warned of a "significant and ongoing cybersecurity campaign," involving SolarWinds

Orion products. According to the FBI, the hackers were exploiting these products to gain access to emails at the U.S. Treasury, Justice and Commerce departments, and other federal agencies.

55. Due to the fact that multiple networks had been penetrated through the SolarWinds breach, media outlets reported that it would be both expensive and difficult to secure government systems again and could even take years to do so. Experts believed that it would take months to even understand the full scope of the breach.

56. In response to these unprecedented data and cybersecurity breaches, analysts pressed Telos management to provide further clarity on what impact, if any, these developments would have on the cybersecurity industry, and Telos specifically. Defendants doubled-down on their misrepresentations, telling investors that the cybersecurity attacks would actually ***bolster demand*** for Telos' services, rather than impede the Company's growth. For example, on January 14, 2021, Defendant Wood participated in the 23rd Annual Needham Virtual Growth Conference. During the conference, analyst Alex Henderson of Needham & Co. raised the topic of the SolarWinds' Orion breach and directly questioned Wood about its potential impact on Telos. Wood, while acknowledging that "the SolarWinds impact[s] are far reaching," quickly pivoted to highlighting the capabilities of Telos' Xacta security solution. Henderson, who apparently did not think his question was sufficiently answered, reiterated his initial question and explicitly asked whether these developments would change government spending. Wood silenced any concerns that revenues from the federal contracts would be reduced or delayed and responded unequivocally that "they're going to increase spend[ing] associated with cyber security."

57. On March 25, 2021, the Company issued a press release reporting Telos' financial results for the fourth quarter and full year of 2020, which included a highly favorable financial outlook. For the first quarter 2021, the Company estimated revenue in the range of $49 million to $52 million. For the full-year 2021, the Company estimated revenue in the range of $283 million

to $295 million, which the Company noted was an improvement of 57% to 64% compared to 2020. The Company also boasted that it anticipated to generate revenues under the 10-year TSA contract in excess of $1.5 billion, and that the 10-year CMS contract provided an additional $2 billion revenue "ceiling."

58. That same afternoon, Telos held its fourth quarter 2020 earnings call during which Defendant Wood highlighted the TSA and CMS contracts, and stated that the Company had "visibility to almost $1 billion of annual revenue within 5 years." Defendant Nakazawa confirmed the guidance for both the first quarter and full-year of 2021. Wood assured investors that Telos' revenue forecasts were based on a solid foundation and emphasized that "we try and be as conservative as we can" in providing guidance, and that the guidance was not only "good," it was "the most prudent forecast for our business at this time."

59. During the same earnings call, Defendant Wood also addressed the expected launch time for both the TSA and CMS contracts. With respect to the CMS contract, Wood reassured investors that "[o]bviously, with the COVID vaccination rolling out, that's kind of put the health care industry in sort of a tizzy. But we still see very strong results for us for the second half of the year as we had expected through the IPO process." When asked if the service launch for the TSA contract was still "on track," Wood responded unequivocally: "We are on track. . . . [W]hat we shared during the IPO is still an appropriate metric in terms of the growth path."

60. Despite these positive assurances that the TSA and CMS contracts would not be negatively impacted by circumstances related to the COVID-19 pandemic or the prevalent national cybersecurity breaches, analysts continued to probe the Company on these issues. Again, Defendants silenced concerns about the TSA contract by assuring the market that, rather than negatively impacting Telos' business, the widespread breaches would be *beneficial* for Telos. For example, during the March 25, 2021 earnings call, Defendant Wood was asked about the

SolarWinds and Microsoft Exchange hacks, and whether he expected any sort of tailwind from these events. In response, Wood dismissed these concerns and stated, "I think it does put wind in everybody who's in the cybersecurity industry's sails. Obviously, there's a profound focus now with SolarWinds and Exchange, which is really, I think, long overdue. So yes, I do think there will be some benefit that we'll derive as an industry."

61. Defendants' positive statements had their intended effect of reassuring the market regarding the tremendous revenue growth purportedly attendant to the TSA and CMS contracts. The next day, March 26, 2021, Telos stock price closed $6.96 per share higher than the previous day, increasing over 22% to close at $37.71 per share.

62. Analysts applauded Defendants' statements and raised their ratings on Telos shares. For example, on March 26, 2021, a Needham & Co. report specifically cited the TSA contract when raising its price target, saying that Telos "looks like a strong re-opening play on rebounding travel with its IDTrust business associated with TSA Pre volumes . . . ." Northland Capital Markets echoed that sentiment, coming away from the earnings call projecting TSA revenues "to start flowing within our 3Q21 expectations and potentially earlier." D.A. Davidson relayed the takeaway that "the large wins with TSA PreCheck and CMS will begin contributing in the back half of the year."

### D. Unbeknownst to Investors, Defendants' Statements Regarding Revenue from the TSA and CMS Contracts Lacked Any Factual Basis

63. As discussed more fully below, Defendants' statements concerning the expected revenues from the TSA and CMS contracts lacked any reasonable basis. In particular, Defendants' revenue guidance was based on gross revenues that vastly overstated the amount of revenue that could ever be recorded from these contracts under GAAP. Remarkably, as was eventually disclosed at the end of the Class Period, ***for years***, beginning with Telos' inception as a public company in 2020, Defendants failed to apply a critical threshold inquiry required by ASC 606 for

determining whether revenues under the contracts should be recorded on a gross or net basis, and simply "assumed" that gross revenues should be recorded. Significantly, as Defendants would later admit, the failure to even undertake this most basic, fundamental and rudimentary test led to a staggering overstatement of the Company's guidance: indeed, the erroneous gross revenue figures that Telos consistently affirmed were approximately ***two-thirds*** higher than the appropriate net revenue figures.

64. ASC 606 is the authoritative GAAP standard governing how companies record revenue (and, by extension, provide revenue forecasts), including revenues associated with contracts that involve three parties (such as the TSA and CMS contracts). Pursuant to the express terms of ASC 606, any arrangement where more than one party is involved in transferring goods or services to an end consumer requires an evaluation of whether a party is a "principal" or an "agent" in accordance with ASC 606 guidance. This required evaluation is both obvious and critical and must occur prior to recognizing revenue under ASC 606.

65. According to Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net)* ("ASU 2016-08"), issued in March 2016, "[t]he core principle of the guidance in Topic 606 is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." ASU 2018-16, *Summary*. The principal versus agent assessment is a two-step process that consists of: (1) identifying the specified good(s) or service(s) to be provided to the end consumer (under ASC 606, assessing if the good or service is "distinct"); and (2) assessing whether the reporting entity (intermediary) controls the specified good or service before it is transferred to the end consumer. ASC 606-10-55-36, ASC 606-10-55-36A.

66. Pursuant to ASC 606, an entity is the ***principal*** in a transaction with an end consumer if it ***controls*** the specified good or service before it is transferred to the end consumer. ASC 606-10-55-37. An entity is an ***agent*** if it ***does not control*** the specified good or service before it is transferred to the end consumer. ASC 606-10-55-38. "Control" is defined in ASC 606 as the ability to direct the use of, and obtain substantially all of the remaining benefits from, an asset. ASC 606-10-25-25. ASC 606 provides examples of how an entity that is a principal may control a good or service before it is transferred to the end consumer. When another party is involved in providing goods or services to a customer (*e.g.*, TSA PreCheck enrollment services), an entity that is a principal obtains control of any one of the following:

(a) A good or another asset from the other party that it then transfers to the customer.

(b) A right to a service to be performed by the other party, which gives the entity the ability to direct that party to provide the service to the customer on the entity's behalf.

(c) A good or service from the other party that it then combines with other goods or services in providing the specific good or service to the customer.

ASC 606-10-55-37A.

67. The ASC further makes clear why the distinction between a "principal" and an "agent" is so fundamentally important and why it is absolutely essential for any public company to undertake this assessment. Indeed, if a company is considered a "principal" under ASC 606, it is entitled to recognize revenue for the contract on a "gross" basis, reflecting the full amount of consideration it is entitled to for the service or good transferred to the customer. If the Company is considered an "agent" however, it may only recognize revenue on a "net" basis, which subtracts the costs the Company must pay out in order to generate that revenue. ASU 2016-08 makes the point crystal clear: "[w]hen another party is involved in providing goods or services to a customer,

an entity is required to determine whether the nature of its promise is to provide the specified good or service itself (***that is, the entity is a principal***) or to arrange for that good or service to be provided by the other party (***that is, the entity is an agent***). When (or as) an entity that is a principal satisfies a performance obligation, the entity recognizes revenue in the ***gross*** amount of consideration to which it expects to be entitled in exchange for the specified good or service transferred to the customer. When (or as) an entity that is an agent satisfies a performance obligation, the entity recognizes revenue ***in the amount of any fee or commission*** to which it expects to be entitled in exchange for arranging for the specified good or service to be provided by the other party." ASU 2018-16, *Summary*.

68. Here, by the Company's own admission, there was no question that Telos' contracts with the TSA and CMS were subject to ASC 606. Accordingly, the Company acknowledged that there was never any question that ASC 606 required an initial evaluation to determine whether Telos was a principal in these transactions or an agent of the TSA or CMS. As set forth above, this bedrock determination was critical to the proper accounting treatment under ASC 606, as principals recognize revenues on a gross basis, whereas agents recognize revenues on a net basis.

69. Importantly, ASC 606 was not new GAAP to Telos, as it had adopted ASC 606 on January 1, 2018, over two years before it went public. Moreover, the TSA and CMS contracts were the typical types of agreements governed by ASC 606, because there were three parties involved in all transactions and Telos did not control all aspects of the transactions. In particular, the three involved entities were: (1) Telos; (2) the TSA or CMS; and (3) the applicant, each of which is a party to each transaction under the contract at issue. In the case of the TSA contract, TSA PreCheck enrollments are the product or service, and the TSA required assistance with their TSA PreCheck enrollments. Telos performed that service at the behest of TSA to facilitate the transaction between TSA and the TSA PreCheck applicant. Consistent with this arrangement,

Telos' own website refers to its service to TSA as "third party," as follows: "Telos ID Designated Aviation Channeling (DAC) was the first third-party channeling service to be approved for operation by the TSA." Thus, Defendants had specific knowledge that Telos' service would be directed by and for the benefit of TSA and CMS, which undisputedly alerted the Company of the need to, at a minimum, conduct an ASC 606 analysis to determine how to properly account for revenue from these contracts.

70. As Telos ultimately admitted, the Company did not even bother to undertake the principal/agent evaluation until late in 2021, over a year after going public. Instead, Telos improperly "assum[ed]" without any basis whatsoever, that the Company was a principal and thus could record revenues under the contracts on a gross basis, when in fact it was an agent and could only record revenue on a net basis. As a result of ignoring this obvious and critical evaluation, Defendants' revenue forecasts for the TSA and CMS contracts vastly overstated the amount of revenues the Company could properly record, and required a reduction of nearly ***two-thirds***. Stated differently, Defendants' admitted their prior revenue guidance was ***overstated*** (at gross vs. net) by up to ***175%***.

71. In addition to providing vastly inflated revenue guidance for the TSA and CMS contracts, Defendants falsely assured investors regarding the timeframe of when revenue associated with both the CMS and TSA contracts would be recognized. Indeed, Defendants lacked any reasonable basis for their repeated assurances to investors throughout 2020 and 2021 that the TSA and CMS contracts would go live in 2021. Although Defendants bullishly communicated their "confiden[ce]" that these programs would begin in 2021, they were aware or recklessly disregarded the significant delays and uncertainties due to government action in response to the COVID-19 pandemic and the pervasive cybersecurity threats.

**E. Telos Conducts a Secondary Public Offering Enabling Insiders to Dump Their Personal Telos Shares at Inflated Prices**

72. On April 2, 2021, less than a week after Telos executives assured investors that the Company's two biggest contracts were on track to inject substantial revenues by the end of 2021, Telos announced an SPO. The SPO provided an opportunity for management—including Defendants Wood and Nakazawa, as well as ten other members of Telos' executive management team—to profit handsomely from the sale of their personally held shares at inflated prices. Notably, Defendants, who largely consisted of longtime Company employees with tenures of over thirty years (*e.g.*, Defendant Wood) set the SPO to occur even before the end of the traditional 180-day lock-up period following an initial public offering, which cemented the insiders' ability to dump their shares as soon as possible.

73. The SPO offered over ***9 million*** shares of Telos common stock at a price of $33 per share—nearly ***double*** the IPO price. While the Company itself only sold approximately 2 million shares, Company insiders sold more than 7 million shares, generating ***$232 million*** in gross proceeds. Defendants Wood and Nakazawa alone sold more than 1.7 million shares for gross proceeds of ***$58.4 million***. These substantial insider sales represented large portions of their respective personal holdings; Wood sold 20% of his personal holdings, while Nakazawa sold 45% of her personal holdings. Together, their sales accounted for about 20% of ***all*** shares sold in the offering.

**F. Defendants Continue to Mislead Investors Regarding the Timeframe of the TSA and CMS Contracts and Their Related Revenues**

74. After the SPO, Defendants continued to mislead investors regarding the purported massive amounts of revenues that the Company would generate under the TSA and CMS contracts, as well as the timing of when those revenues would be realized. Unbeknownst to investors, the continued pervasive cyber-attacks on government networks was diverting the government's attention away from the TSA contract.

75. For example, on May 8, 2021, a cyber-attack was perpetrated against the top U.S. fuel pipeline operator, Colonial Pipeline Co. This attack, considered one of the most disruptive digital ransom operations ever reported, shut down the entire Colonial Pipeline network—the source of nearly half of the east coast's fuel supply. To remediate the cyber-attack, Colonial Pipeline Co. paid nearly $5 million to eastern European hackers for a decryption tool to reverse the hack and help restore the pipeline. This cyberattack, and other ones like it, exposed how vulnerable governments and industries were to even the most basic assaults on their computer networks, and caused the U.S. government to redouble its efforts to prevent and remediate such attacks. Toward that end, President Biden issued Executive Order 14028: Improving the Nation's Cybersecurity, which, among other things, required service providers to share cyber incident and threat information that could impact government networks and established baseline security standards for the development of software sold to the government.

76. Ultimately, the TSA, which controls pipeline security oversight, issued a directive tightening cybersecurity measures. Specifically, the directive required TSA-specified pipeline owners/operators to: (a) report cybersecurity incidents to the CISA; (b) designate a cybersecurity coordinator who was required to be available to TSA and CISA 24 hours a day, 7 days a week, to coordinate cybersecurity practices and address any incidents that arise; and (c) review their current activities against TSA's recommendations for pipeline cybersecurity to assess cyber risks, identify any gaps, develop remediation measures, and report the results to TSA and CISA.

77. In the wake of these cyber-attacks, Defendants failed to apprise the market of any delays or risks posed to the TSA contract. In fact, on May 17, 2021, Telos reported its quarterly results for the first quarter of 2021 and reaffirmed its guidance for the full-year 2021, stating that it would generate revenue in the range of $283 million to $295 million. Defendant Nakazawa similarly reaffirmed Telos' full-year 2021 guidance in the accompanying first quarter 2021

earnings call and Defendant Wood assured analysts and investors that the TSA and CMS contracts would begin to generate revenue in 2021, specifically representing that "we intend to see a significant ramp in the second half of the year due to those 2 10-year multibillion-dollar contracts that we talked about during the IPO."

78. During the call, Defendant Wood shut down concerns regarding the potential impact to the TSA contract of the federal government's increased commitment to cybersecurity in the wake of SolarWinds, Colonial Pipeline, and other substantial hacks. Wood put a positive spin on these developments and assured investors that these hacks would actually serve to benefit Telos, claiming that these cybersecurity breaches helped to "accelerate the sales cycle and make the opportunities larger."

79. Similarly, during the earnings call, Defendant Wood continued to dismiss concerns regarding whether the CMS contract would be negatively impacted by the COVID-19 pandemic. For example, an analyst at D.A. Davidson & Co. asked Wood whether there was any change in visibility in the back half of the year. Wood stated point blank: "[n]o, there's nothing that's changed" and "we feel very confident about the year." Similarly, when asked by an analyst at B. Riley Securities when he anticipated "to be live on" the TSA and CMS contracts, Wood stated that for TSA PreCheck "we're looking at the end of June . . . to be officially approved" and "[i]n the case of CMS, we're thinking Q3 to be approved." Wood assured investors that the COVID-19 vaccine rollout would have little or no impact on the CMS contract, stating "we had so much upside planned into that contract vehicle, anyway, that we don't worry about that at all."

80. Two days later, on May 19, 2021, Defendant Wood and Richard P. Tracy, Senior Vice President and Chief Security Officer ("Tracy"), participated in the Needham & Co. 16th Virtual Technology & Media Conference. During the conference, Wood reiterated that the TSA contract would go live at "the end of June" with "between 400,000 and 500,000 transactions in the

latter half of the year." Wood also told investors the CMS contract would go live in the third quarter of 2021.

81. Despite these reassurances, as June 2021 drew to a close, Telos management pushed out the start date for the Company's performance on the TSA and CMS contracts, while simultaneously reaffirming guidance estimates. On June 23, 2021, for example, Defendant Wood participated in the Northland Capital Markets SMB and Travel Conference during which he reassured investors that while the Company had not yet begun operating under the TSA contract, it was set to receive its approval in the third quarter and that he did not see any risk with respect to the expected 400,000 transactions. As for the CMS contract, Wood stated that the Company pushed the "activity" from the third to fourth quarter, but the prior guidance remained unchanged.

82. As Defendants were slowly revealing delays to the Company's largest contracts, on July 19, 2021, Telos announced—without explanation—that Defendant Bendza was succeeding Defendant Nakazawa as CFO. Nakazawa's resignation came after she had served in the position for nearly 17 years and reaped over $21.6 million by selling nearly half of her personal holdings in the SPO.

83. As the third quarter of 2021 progressed, Defendants further pushed out the start date for the TSA contract and slightly reduced the associated 2021 revenue forecast. Defendants also pushed out the start date for the CMS contract and eliminated forecasted 2021 revenues under that contract. Importantly, however, Defendants ***continued to reaffirm the Company's full year 2021 revenue guidance*** and reassured investors regarding the substantial ***long-term revenue streams*** that would be derived from the TSA and CMS contracts.

84. On August 16, 2021, the Company announced its financial results for the second quarter of 2021 and held an accompanying earnings call with analysts and investors. During the call, Defendant Bendza disclosed that the Company now expected "no revenues" under the TSA

PreCheck program in the third quarter and only approximately $25 million in the fourth quarter (down from its prior guidance of $30 million). Bendza also walked back the Company's prior revenue forecasts under the CMS contract, explaining that while Telos had previously forecasted $8 million in both the third and fourth quarters, Telos was now assuming no revenues from that program this year. Notwithstanding these significant delays, Defendants again quelled investor concern by ***reaffirming full year 2021 revenue guidance in the range of $283 million to $295 million***. In addition, Defendant Wood ***emphasized the purported long-term benefit of the contracts*** and downplayed the delays as meaningless, stating: "[t]hese government actions haven't changed anything for Telos in the near term" and "in the long term, they will provide the Company with far more opportunities and will grow our pipeline." Wood further reassured investors that Telos "remain[s] confident in our service launch in 2021." When asked by an analyst whether Telos would still "hit the original expectations for TSA Pre[Check] and [CMS] in 2022," Wood responded very directly, "Correct, correct, yes."

85. According to Defendant Wood, other Telos business would compensate for the delayed revenue from the TSA and CMS contracts. Wood explained that had the contracts been "up and running," the Company would have raised guidance, but "in an overabundance of being cautious," Telos was reaffirming its previously issued guidance. In closing, Wood underscored that the Company was on the brink of delivering substantial long-term revenues under the TSA and CMS contracts: "I'd like people to remember that we have very long-term contracts and 2022 is going to be a bang up year in my opinion."

86. Fueled by these false reassurances, Telos stock price increased by $1.25 per share the following day to close at $25.81. Analysts credited Defendant Wood's reassurances. A BMO Capital Markets analyst report following the news highlighted as a key point that "despite the delay of the TSA/CMS contracts, TLS maintained guidance due to new contract wins and expansion

within existing customers." A Wedbush Securities analyst report echoed Wood's reassurances that Telos should see "a significant amount of revenue come in during 4Q" from the TSA contract. A Needham & Co. report similarly stated, "As we look out to CY22, despite delays in the launch timing ***TSA should deliver the originally forecasted Revenues with potential upside***. The timing doesn't change our CY22 outlook." A Collier Securities report similarly reported, "Management remains confident that these contracts will ramp in 2022 and the delay will have no impact on the full opportunity."

87. On September 9, 2021, Defendant Wood participated in the D.A. Davidson 20th Annual Software and Internet Conference during which he represented that the TSA contract was on track for the fourth quarter of 2021. Wood continued to emphasize the substantial long term revenues the Company would generate under its major contracts, explaining that "this is a 10-year contract and when you think about our share of that 10-year contract, we estimate it to be around $1.7 billion, which generates almost $800 million in profit to us over that period of time." With respect to questions surrounding the scheduling pushouts, Wood explained that for the TSA contract, "[t]he push from Q3 to Q4 is because TSA want to make sure their own systems would not be subject to ransomware" but it was only a "one quarter delay" and "[t]hat was it." As for CMS, Wood attributed the delay to the COVID-19 vaccination program, which was a government priority, but nonetheless assured investors that Telos would begin providing services under the CMS contract in the first quarter of 2021 and even raised revenue expectations from $3.5 billion or $4 billion. Wood emphasized the TSA contract "has no [revenue] ceiling."

**G. The Truth Begins to Emerge**

88. The truth regarding Telos' total inability to commence the TSA and CMS contracts and realize ***any*** revenue from the contracts in 2021 began to emerge after the third quarter of 2021. On November 15, 2021, before market open, Telos filed its quarterly report for the third quarter

of 2021 and held an accompanying earnings call in which Defendants announced that, despite their repeated reaffirmations of guidance for full year 2021, Telos would dramatically reduce its full-year revenue guidance from a range of $283 million to $295 million, down to $240 million to $245 million. Further, despite Defendants' prior insistence that the TSA and CMS contracts were progressing "on track" and largely on-schedule, Telos revealed extensive delays. According to Defendants, Telos was "not expecting [TSA PreCheck] to deliver meaningful sales this year," pushing it into 2022, and the CMS contract would not be in the 2022 outlook at all.

89. During the earnings call, Defendant Bendza specifically identified the delays to the launches of the TSA and CMS contracts as the driver of the enormous reduction in revenue guidance. He explained:

> Now let's recap the buildup to our updated guidance. On our second quarter earnings call, we lowered our modeling assumptions on 2 programs due to customer delays beyond our control. First, we eliminated the provider enrollment and oversight program with the Centers for Medicare and Medicaid Services, including ***$16 million*** of sales. . . . Second, for the TSA PreCheck expansion program, we eliminated ***$13 million*** of sales . . . while maintaining a forecast of $25 million of sales . . . in the fourth quarter. With our updated guidance this quarter, we are now eliminating the remaining ***$25 million*** of sales . . . from the TSA PreCheck expansion program in the fourth quarter. ***In total, we have lowered our sales assumptions on these 2 programs by $54 million*** . . . .

90. Tellingly, on the call, Defendant Bendza also admitted that the Company's prior revenue guidance for the TSA and CMS contracts had been overly and improperly optimistic, and made without any real basis or "visibility." Indeed, Bendza stated that the Company would be making significant changes to its guidance process, and specifically stated that going forward, the Company would only provide guidance when it had "a high degree of visibility." In so doing, Bendza made clear that Telos' prior forecast did ***not*** meet this standard, and the change meant that there would be "a shift in terms of the philosophy of guidance here." Significantly, as a result of this "shift," the Company would no longer forecast specific revenue from the TSA or CMS

contracts. In sum, Bendza admitted that the Company's prior guidance was entirely speculative, lacked a sufficient factual basis, and was bereft of any "visibility."

91. In reaction to these startling disclosures, on November 15, 2021, Telos stock price plunged by more than 28 percent, falling from $24.38 per share to close at $17.54 per share—a one-day decline of $6.84 per share that wiped out hundreds of millions of dollars in shareholder market capitalization.

92. Analysts excoriated management for providing—and consistently reaffirming—inflated revenue guidance on the two most important contracts in the Company's history, and for repeatedly misleading investors regarding the commencement of these contracts. A Wedbush Securities analyst expressed disbelief that Telos "***management [could] be so off in terms of miscalculating the timing of deals as well as just the complexity***." Wedbush also noted the "head scratching challenges management would have in forecasting and executing on these government deals which have now negatively tainted the Telos story." Condemning the Company, Wedbush summed up the Company's reversal, as follows: "In a nutshell, ***the credibility of the Telos story is a major question mark*** for the Street after this disastrous quarter/guidance/ communication on the conference call."

93. Needham & Co. similarly questioned management's credibility and integrity. During the November 15, 2021 earnings call, Needham & Co. analysts asked whether Telos could provide "a concise and clear explanation of why TSA has slipped as much as it has? Is it just simply because of the hacks that happened in the first half? What are – what is the mechanics that's causing the slippage?" Apparently dissatisfied with the response blaming the delay on the heightened security protocols implemented by the TSA, the Needham analyst chastised the Company in a November 16, 2021 report, titled: "TLS: More Questions Than Answers As ***Credibility Is Shredded***." The report commented that "[t]he sharply lowered estimates for

CY4Q21 and CY22 offered on the CY3Q earnings call sharply damaged perceptions and caused those that have taken the time to understand the company to question their thinking and management's credibility." The report further declared that "***it will take a long time for management to rebuild its credibility and to prove out the growth opportunity***."

94. In that vein, D.A. Davidson & Co. issued a report on November 15, 2021, stating that "TSA & CMS were delayed again & management's credibility in terms of forecasting when the projects will launch is shot, in our view." As a result of Telos management's utter "inability to accurately forecast when the [TSA] project will go live," D.A. Davidson was "thus not baking in ***any*** TSA revenue contribution in our revised numbers until Q2'2[2]."

95. The fallout from these disclosures continued on February 28, 2022, when Telos announced that the Company had "identified material weaknesses" in its internal controls and that it had begun its remediation process. As a result, the Company needed to postpone filing its 2021 Form 10-K due to "delays in completing our year-end closing and financial reporting process, primarily due to the delay in completing our assessment of internal control over financial reporting required by Section 404 of the Sarbanes-Oxley Act."

96. In response to these revelations, Telos stock price fell from a close of $11.42 on February 28, 2022, to a close of $9.17 on March 4, 2022, a decline of nearly 20%.

97. Among the material weaknesses ultimately identified by Telos management in the 2021 Form 10-K were: (1) "Management did not maintain appropriately designed entity-level controls impacting the control environment and monitoring activities to prevent or detect material misstatements to the consolidated financial statements. Specifically, the Company did not have sufficient qualified resources to effectively design, operate and oversee internal control over financial reporting, which contributed to the failure in the effectiveness of certain controls"; and (2) "Management did not maintain appropriately designed and implemented controls

over . . . [r]ecording of revenue in accordance with ASC Topic 606, 'Revenue from Contracts with Customers.'"

98. Telos' systemic and material weaknesses in its system of internal controls over financial reporting resulted in its failure to apply ASC 606—revenue recognition standard—in providing revenue guidance to the market. Indeed, approximately two weeks after the Company's announcement of material weaknesses in its internal controls over financial reporting, on March 16, 2022, the Company disclosed that the revenue guidance for the TSA contract was massively overstated as a result of this fundamental accounting deficiency. Specifically, the Company explained that: "We have determined Telos to be an 'Agent,' [as opposed to a principal] as defined by ASC 606, as it relates to the per-applicant fee for service collected by Telos and paid to the TSA and FBI as part of Telos' upcoming TSA PreCheck enrollment services offering. In accordance with ASC 606, Telos is to record revenue from applicants for this service net of the fees paid to the TSA and FBI [as opposed to gross] as part of the arrangement."

99. During the accompanying earnings call held that same day, Defendant Bendza admitted that Telos had completely failed to conduct the obvious and critical analysis required by ASC 606, and improperly ***assumed*** that the Company was a principal and thus able to report (and forecast) revenues on a gross basis. Bendza attempted to explain this glaring failure to apply ASC 606 as follows: "In our past communications regarding the TSA PreCheck program, we have estimated the size of the revenue opportunity based on gross revenue accounting, ***assuming*** Telos would be treated as the principle to the transaction with the TSA PreCheck applicant for accounting purposes under ASC 606." Bendza went on to admit that the Company had only recently "engaged an independent third party" and "worked closely with our auditors" in order to conduct the threshold agent/principal and net/gross revenue determination. Bendza concluded that "through this process, we have determined ***Telos to be an agent as defined by ASC 606*** as it relates to the

per-applicant fee for service collected by Telos and paid to the TSA and FBI as part of Telos' enrollment services offering." This reversal had a catastrophic impact on Telos' top-line revenue, *i.e.*, the Company's most important financial metric for investors. According to Bendza, "in accordance with ASC 606, Telos will record revenue from applicants for this service, net of the fees paid to the TSA and the FBI as part of the arrangement. Under net revenue accounting, ***revenue recognition is 64% lower than gross revenue recognition on new enrollments and 61% lower on renewals***."

100. Analyst were stunned. On the earnings call, Alexander Henderson of Needham & Co. made clear Wall Street's view that the failure to so much as undertake this basic step prior to disclosing revenue estimates to investors was inexcusable, asking pointedly, "***[s]houldn't [the accounting] have been vetted pre-IPO? And shouldn't it have been consistent with what you had -- was doing anyway? So shouldn't you have known that before you IPO-ed?***" Tellingly, the question went unanswered. Neither Defendant Bendza nor any other member of Telos management addressed why such a basic accounting determination had not been vetted before the IPO or the SPO—when the Company's officers and directors dumped over $233 million in the personally held shares, including over $66 million in sales by Defendants Wood and Nakazawa.

101. Analyst BMO Capital Markets, in a report issued immediately after the March 16, 2022 earnings call, similarly expressed shock that the Company had not engaged in the agent versus principal analysis required under ASC 606. The report echoed the sentiment from the Needham & Co. analyst during the earnings call, remarking, as follows: "***We are unclear why the net versus gross rev rec was not assessed previously***."

102. Analysts' concerns regarding Telos' failure to analyze the TSA contract (and the CMS contract) to determine its principal/agent status were entirely warranted. ASC 606 was adopted years before Telos' IPO—on January 1, 2018—and it is a fundamental first step when

recognizing revenues for a contract, such as the TSA contract, where there are three or more parties involved (in this case, the TSA, Telos, and the TSA PreCheck customer).

103. Not only is the agent/principal analysis fundamental to revenue recognition, but the outcome of this determination can have a dramatic impact on revenue reporting and guidance. As D.A. Davidson emphasized in an analyst report dated March 16, 2022, on a per transaction basis, the Company's failure to apply ASC 606 caused its forecasted revenues to decline by an average of 64% for new enrollments, and 61% for renewals.

104. Making matters worse, during the March 16, 2022 earnings call, Defendant Bendza admitted that there were further delays to the TSA contract service launch, stating that: "***Here we are in mid-March [2021], we have not received the Authority to Operate [on the TSA contract] yet***." Bendza's disclosure represented a marked departure in both tone and substance from management's prior statements throughout the Class Period, including as recently as November 15, 2021, when Executive VP of Security Solutions, Mark Griffin, aggressively claimed that "we fully expect still to get our authority to operate this year and revenue to start ramping as early as January."

105. Analysts seized on the Company's 180-degree about-face, noting that management had assured investors the TSA contract would go live in 2021 only a few months ago. For example, a D.A. Davidson analyst discussed the Company's backtracking, as follows: "on TSA, on the Q3 call, it was mid-November, and you said you expected to get the ATO by the end of the year. So kind of a 6-week window where you expected to get it. And now, if I look at the low end of your guidance assumptions, 0 from TSA, you're essentially saying, here we sit in March and it could fall at any point in the year. So how do you go from expecting to get it within 6 weeks to now not really being able to point us to when you expect to get it over the next 9 months?" Mark Griffin, now EVP of Security Solutions, evaded the question and provided the following meaningless

response: "because it's a government ATO process" and "they're controlling the process." As a Needham & Co. analyst succinctly stated, management's explanation for the increased delay with the TSA contract compared to its prior representations "hardly seem[] reasonable."

106. In reaction to these further revelations, Telos stock plunged by over 11 percent, falling from a close of $10.27 per share on March 15, 2022 to a close of $9.11 per share on March 16, 2022, a decline of 11%.

107. Analysts readily linked the decline on March 16, 2022 to the disclosures discussed above. For example, a Colliers Securities report on March 16, 2022 noted that: "The stock traded off after the print as a result of two key items: 1) TSA PreCheck is now expected in FY'22 and not the end of March. 2) Telos is an Agent as defined by ASC 606, not a principal, which calls for an adjustment revenue execrations." Importantly, the market was unable to, on its own, determine the accounting treatment being applied by Defendants to forecast revenues under the TSA. As Colliers Securities noted in a April 1, 2022 report regarding to the March 16, 2022 disclosures, "this is the first time management has provided a detailed financial view of the TSA transactions."

## VI. EXCHANGE ACT VIOLATIONS

### A. Defendants' Materially False and Misleading Statements and Omissions

#### 1. IPO Registration Statement

108. The Class Period begins on November 19, 2020, when Telos conducted its IPO and became a publicly traded company. The IPO Registration Statement highlighted the import of and the timing for the commencement of the TSA and CMS contracts—Telos' two largest contracts—and provided detail on the specific amount of revenue the contracts would generate during 2021 and 2022. The Company represented that "[w]e expect our growth to accelerate beginning in 2021 and 2022 due to, among other factors, recent contract awards" with the TSA and CMS "that are significant to our business." More specifically, the Company represented that:

> ***[W]e believe these programs collectively may grow from a base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively.*** For these reasons, we anticipate these recent contract awards, combined with our organic growth as well as other opportunities for business expansion, to contribute to rapidly accelerating revenue growth beginning in 2021 and 2022.

109. The above statements identified in ¶108 from the IPO Registration Statement regarding the launch dates of the TSA and CMS contracts and the importance and expected revenue to be derived from these contracts were materially false and/or misleading and failed to disclose that these contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented at the end of 2020 and in 2021. In fact, the government's focus on containing the COVID-19 pandemic and remediating the widespread cybersecurity attacks were significantly delaying the commencement of the TSA and CMS contracts, thereby reducing their associated revenue. Moreover, Defendants' statements regarding the expected revenue the TSA and CMS contracts would generate were materially false and greatly inflated, due to Defendants' failure to perform the critical evaluation necessary to recognize revenue for the contracts under ASC 606. As a result, Defendants' revenue guidance for these contracts was overstated by up to 175%.

### 2. 2020 Annual Report, Press Release and Conference Call

110. After the markets closed on March 25, 2021, Telos filed its Annual Report on Form 10-K for the full year ended December 31, 2020. The Form 10-K contained certifications signed by Defendants Wood and Nakazawa pursuant to the Sarbanes-Oxley Act of 2002 ("SOX certifications") attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Telos' disclosure controls and procedures, and the disclosure of any material changes to the Company's internal controls over financial reporting. These certifications set forth as follows:

> 1. I have reviewed this [] report on Form 10-K of Telos Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant***, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are***

> ***reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

111. The Form 10-K also contained a Certification pursuant to 18 U.S.C. §1350, signed by Defendants Wood and Nakazawa that certified: "(1) The Report ***fully complies*** with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, ***in all material respects, the financial condition and results of operations of the Company***."

112. The above statements identified in ¶¶110-111 were materially false and/or misleading and failed to disclose material adverse facts relating to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that there were significant and widespread material weaknesses in the Company's internal controls over financial reporting and, as a result, its internal control over financial reporting and disclosure controls were ineffective. As a result, the Company's financial reporting and disclosures with respect to its future revenue was grossly inflated due to the Company's material weakness, and specifically, its failure to conduct the proper analysis to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606. As a result, Defendants' revenue guidance for these contracts was overstated by up to 175%.

113. In the Company's Form 10-K, Defendants also made clear how critical the TSA and CMS contracts were to the Company's outlook, stating, in pertinent part: "A small number of our large customer contracts, including ***the TSA PreCheck™ enrollment program and our program with CMS, are expected to comprise a significant portion of our future revenue.***" This statement, however, lacked a reasonable factual basis because Telos failed to disclose that it had

not conducted the required ASC 606 analysis and, as a result, as the Company belatedly admitted, the true revenue generated from the contracts was 64% less than what the Company had represented to investors throughout the Class Period.

114. With respect to the timing of the TSA contract, in the Form 10-K, the Company also represented that Telos was "***preparing to launch services under this program in early 2021***." Telos made this announcement despite having no factual basis for such a projection. Indeed, the widespread security cyber-attacks were deprioritizing the commencement of the TSA contract and, as the Company later admitted, it lacked the requisite "visibility" to make a determination regarding the timeline for this contract.

115. On March 25, 2021, the Company filed a press release on Form 8-K which reported financial results for the three and twelve months ended December 31, 2020 and provided the financial outlook for the first quarter of 2021 and full-year 2021. For the first quarter 2021, the Company projected "***[r]evenue in the range of $49 million to $52 million***." For the full-year 2021, the Company projected "***[r]evenue in the range of $283 million to $295 million***, an improvement of 57% to 64% compared to 2020." The Company further represented that the TSA contract was "anticipated to generate ***revenue in excess of $1.5 billion***" over the course of its 10-year duration, while revenues under the CMS contract had a "***$2 billion ceiling***."

116. That same afternoon, Telos held its earnings call for the fourth quarter of 2020. During the call, Defendant Wood underscored the Company's positive prospects which he attributed in large part to the TSA and CMS contracts. Wood represented, in pertinent part, as follows: "With the growth trajectory of our Xacta and Telos Ghost solutions, driven by increased direct sales and channel partnerships, ***coupled with the multibillion-dollar TSA PreCheck and CMS contracts***, we believe we have visibility to almost $1 billion of annual revenue within 5 years." Defendant Nakazawa similarly reported that, "Moving on to our financial outlook for the

first quarter of 2021. ***We currently expect revenue in the range of $49 million and $52 million***. . . . For the full year of 2021, ***we currently expect revenue in the range of $283 million and $295 million***, an improvement of 57% to 64% compared to 2020. . . ."

117. During the same earnings call, Defendant Wood also addressed the expected launch of the TSA and CMS contracts and reassured the market that the Company's major contracts would not be jeopardized. With regard to the CMS contract, Wood explained that "[o]bviously, with the COVID vaccination rolling out, that's kind of put the health care industry in sort of a tizzy. But we ***still see very strong results for us for the second half of the year as we had expected through the IPO process***." Wood also responded to a question about whether the TSA contract was "on track" and whether Telos considered itself to be in a leadership position because of its technology. In response, Wood affirmed:

> ***We are on track***. We do think with the customer wanting us to certify and get the authority to operate through the use of Xacta, that, that does give us a leg up over the other competitors who have to use Xacta as well. And so ***we do think we're on track***. And I think ***what we shared during the IPO is still an appropriate metric in terms of the growth path***.

118. Defendant Wood also emphasized that "we try and be as ***conservative*** as we can" in providing guidance, that "our guidance is the ***most prudent forecast*** for our business at this time," and that "***our guidance is good***."

119. In response to these positive statements, the next day, Telos stock price closed $6.96 per share higher than the previous day, closing at a price of $37.71 per share.

120. The above statements identified in ¶¶114-118, regarding the launch dates of the TSA and CMS contracts, expected revenue from these contracts and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) the TSA

and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented at the end of 2020 and in 2021; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) the government's focus on combating the COVID-19 pandemic and the cybersecurity outbreaks that required immediate remediation were negatively impacting the timing for the performance of the TSA and CMS contracts and reducing their associated revenue, or at a minimum, created uncertainties or risks around the timing and potential revenue from such contracts; and (4) Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were overstated by up to 175%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented; (2) there were material weaknesses in the Company's internal control over financial reporting; (3) Telos would be forced to dramatically reduce its revenue estimates by approximately two-thirds; and (4) Defendants' statements about Telos' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

### 3. May 17, 2021 Quarterly Report, Press Release and Conference Call

121. On May 17, 2021, Telos filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2021. The Form 10-Q contained SOX certifications signed by Defendants Wood and Nakazawa, and a Certification pursuant to 18 U.S.C. §1350. *See supra* ¶¶110-111. The statements set forth above were materially false and misleading for the reasons set forth in ¶112 above.

122. On May 17, 2021, the Company also filed a press release on Form 8-K, which reported the financial results of the Company for the quarter ended March 31, 2021, and provided

a financial outlook for the full-year 2021. For the full-year 2021, the Company reaffirmed the following guidance: "***Revenue in the range of $283 million to $295 million***, an improvement of 57% to 64% compared to 2020."

123. Following the close of the markets on May 17, 2021, Telos held its earnings call for the first quarter of 2021. In her prepared remarks, Defendant Nakazawa reaffirmed Telos' full-year 2021 guidance, stating that the Company, "expect[s] ***revenue in the range of $283 million and $295 million***, an improvement of 57% to 64% compared to 2020." Defendant Wood again highlighted the opportunity that both the TSA and CMS contracts presented to Telos, stating, "the way to view it, though, going forward is we intend to see a ***significant ramp*** in the second half of the year ***due to those 2 10-year multibillion-dollar contracts that we talked about during the IPO***."

124. During the call, Defendant Wood was directly questioned about whether "there [is] anything that changed with regard to [his] confidence or [his] ability—or [his] visibility into the back half of the year" given that the Company did not "roll through the upside [of its good results] into the annual outlook." In response, Wood assured analysts, "***No, there's nothing that's changed***. It's really just being—it's been driven into our heads that we have to meet or exceed our numbers, so I can – we can tell you guys that ***we feel very confident about the year***." Wood contended that Telos was "***just trying to be conservative***."

125. Defendant Wood was also asked when he anticipated "to be live on [TSA PreCheck and CMS]." In response, Wood stated, "[i]n the case of PreCheck, I think ***we're looking at the end of June . . . to be officially approved***. In the case of CMS, ***we're thinking Q3 to be approved***."

126. Several analysts raised questions about what impact the Biden administration's increased commitment to cybersecurity would have on the TSA contract. In response to one such question, Defendant Wood not only quelled concern, but presented these developments in a

positive light, stating, as follows: "As these hacks become very public both commercially and in the government, we're seen as part of the mission, so I think that has changed pretty dramatically for us. As we have more and more offerings that we'll be conveying to the market and sharing with the market, you'll see why we're getting to become much more part of the mission, if you will. . . . So from our point of view, ***what it does is it helps accelerate the sales cycle and make the opportunities larger***."

127. As part of his closing remarks, Defendant Wood reaffirmed the Company's full-year revenue guidance stating, as follows: "I just wanted to say, everybody, we really appreciate your support. ***We're working very hard to make sure that we meet or exceed -- most likely we hope to exceed*** -- I shouldn't say it like that. My guys are all shaking their heads, but I'm what -- ***I'm supposed to say we continue to reaffirm the FY guidance we have given***."

128. The above statements identified in ¶¶122-127, regarding the launch dates of the TSA and CMS contracts, expected revenue from these contracts and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) the TSA and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented at the end of 2020 and in 2021; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) the government's focus on combating the COVID-19 pandemic and the cybersecurity outbreaks that required immediate remediation were negatively impacting the timing for the performance of the TSA and CMS contracts and reducing their associated revenue, or at a minimum, created uncertainties or risks around the timing and potential revenue from such contracts; and (4) Defendants had failed to

perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were overstated by up to 175%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented; (2) there were material weaknesses in the Company's internal control over financial reporting; (3) Telos would be forced to dramatically reduce its revenue estimates by approximately two-thirds; and (4) Defendants' statements about Telos' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

### 4. May 19, 2021 - Needham & Co. 16th Virtual Technology & Media Conference

129. On May 19, 2021, Defendant Wood and Richard Tracy participated in the Needham & Co. 16th Virtual Technology & Media Conference. During the conference, Wood was asked for confirmation regarding the timing of the TSA contract. In response, Wood once again assured the market that approval was imminent, stating, "***[w]e expect that [TSA] approval to be the end of June for us***, which will be ahead of the other two vendors. So from our point of view, we see about – we estimated at the IPO last year, I think, between 400,000 and 500,000 transactions in the latter half of the year." He continued by reassuring the market that the increase in travel "helps us get some comfort that ***the numbers that we provided as it relates to TSA PreCheck are, in fact, going to be higher***."

130. The above statements identified in ¶129, regarding the launch dates of the TSA contract, and expected revenue from the TSA contract, were materially false and/or misleading for the reasons set forth in ¶128.

### 5. June 23, 2021 - Northland Capital Markets SMB and Travel Conference

131. On June 23, 2021, Defendant Wood participated in the Northland Capital Markets SMB and Travel Conference. During the conference, Wood was asked about the timeline of the

TSA and CMS contracts. In response, Wood announced minor delays, but assured investors that the Company would get its approval to operate from the TSA in the next quarter and reaffirmed overall guidance:

> Yes. So our -- ***what we posed as it relates to the IPO is that we expected that during the second half of 2021, we would see somewhere around 400,000 transactions for TSA PreCheck between the beginning of Q3 and the end of Q4***.
>
> * * *
>
> ***We will get our approval to operate in the third quarter. We don't see any risk as it relates to the 400,000 transactions***.
>
> * * *
>
> ***So what we did an over abundance of caution is we push our activity from -- on CMS from Q3 to Q4, but we factored in other business that we've been awarded into Q3, so we feel very strong there. We're still good for the year as it relates to the numbers that we shared with Wall Street both in terms of at the IPO time frame and then also recently when we upped our guidance both in terms of revenue as well as profitability***.

132. With respect to the TSA contract for the calendar year 2021, and the 400,000 registrants estimated in the back half of the year, Defendant Wood made clear that was a conservative estimate, and the number of registrants would grow exponentially in 2022:

> [F]or our investment community is it's a grand total of 6 million new enrollments and $2 million renewals, which over time as the number of total participants in PreCheck increases, that means that the total number of renewals will also increase. So 8 million is not a stagnant number. That 8 million will go more towards 11 million over three to four years. ***And then my team is expecting about 40% share of that over time, but for purposes of planning for 2021, given everything that's going on with the craziness in the world as we plan on 400,000 transactions for the latter half of 2021.***

133. When asked about expectations for 2022, Defendant Wood again described the TSA contract in positive terms, stating, in pertinent part, as follows: "[w]e budgeted a significantly less than that. ***I think for '22 we budgeted 650,000 transactions I think in total. But I think the opportunity is much higher than that***."

134. The above statements identified in ¶¶131-133, regarding the launch dates of the TSA and CMS contracts, expected revenue from the TSA and CMS contracts, and expected overall revenue, were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) the TSA and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented during 2021; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) the government's focus on combating the COVID-19 pandemic and the cybersecurity outbreaks that required immediate remediation were negatively impacting the timing for the performance of the TSA and CMS contracts and reducing their associated revenue, or at a minimum, created uncertainties or risks around the timing and potential revenue from such contracts; and (4) Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were overstated by up to 175%. As a result of the above: (1) the guidance reaffirmed by Defendants was not "still good" as represented; (2) contrary to Defendants' statement that, "We don't see any risk as it relates to the 400,000 transactions" under the TSA contract in the third quarter 2021, there was in fact significant risk that the Company would not obtain approval to operate under the TSA contract in the third quarter of 2021 and thus would not perform any revenue-generating transactions in that quarter; (3) there were material weaknesses in the Company's internal control over financial reporting; (4) Telos would be forced to dramatically reduce its revenue estimates by approximately two-thirds; and (5) Defendants' statements about Telos' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

### 6. August 16, 2021 Quarterly Report, Press Release and Conference Call

135. On August 16, 2021, Telos filed its quarterly report on Form 10-Q for the quarterly period ended June 30, 2021. The Form 10-Q contained SOX certifications signed by Defendants Wood and Nakazawa, and a Certification pursuant to 18 U.S.C. §1350. *See supra* ¶¶110-111. The statements set forth above were materially false and misleading for the reasons set forth in ¶112 above.

136. On August 16, 2021, the Company also filed a press release on Form 8-K, which reported the Company's financial results for the quarter ended June 30, 2021, and provided a financial outlook for the full-year 2021. For the full-year 2021, the Company confirmed revenue ***in the range of $283 million to $295 million***, an improvement of 57% to 64% compared to 2020.

137. After the close of the markets on August 16, 2021, Telos held its earnings call for the second quarter of 2021. While in late June Defendant Wood had stated that Telos would get approval for TSA PreCheck contract in the third quarter, Telos now admitted that would not occur, but again assured investors that approval would occur in the fourth quarter. Indeed, during his prepared remarks, the newly installed CFO, Defendant Bendza, stated that there would be "***sequential revenue growth from the third quarter to the fourth quarter primarily drive[n] by TSA PreCheck***." Bendza also noted that Telos had previously told the market that there would be $8 million in revenue in the third quarter and $30 million in revenue in the fourth quarter from TSA PreCheck, and now there would be "no revenues from that program in the third quarter and approximately $25 million in the fourth quarter." In addition, Bendza addressed the CMS contract, and noted that, while the Company would not see any revenue from that contract in 2021, it would generate substantial revenue in 2022. Bendza stated, in pertinent part, as follows:

> [Telos] previously assumed approximately $8 million of revenues from [CMS] in each of the third and fourth quarters, but we're now assuming no revenues from that program this year. ***So, overall we are assuming approximately $30 million of***

> ***revenues from [CMS and TSA PreCheck] will be recognized in 2022 instead of during the second half of 2021***.

138. Significantly, in his statement, Defendant Bendza, repeatedly downplayed the significance of the delays to these contracts and assured the market that they were only "short-term" delays that had no impact on the value of the contracts. Specifically, Bendza explained, as follows:

> Keep in mind, these are ***short-term customer driven delays*** that impact the initial timing of revenue at the beginning of these programs during the second half of 2021. ***The value of these programs and our out year expectations have not changed***. ***These remain multibillion-dollar profitable long-term programs***.

139. When asked about the TSA contract delay on the earnings call, Defendant Wood blamed the TSA and minimized any concerns that the contracts would not be approved in the near-term. According to Wood, the delay was "driven by virtue of the fact that we've had . . . a bunch of different cybersecurity hacks. And that has caused the TSA to take a step back to make sure that their own systems fundamentally won't have a problem by any third parties coming after them." Significantly, Wood again put a positive spin on these developments and reiterated that "[t]hese government actions ***haven't changed anything for Telos in the near term***. However, in the long term, they will provide the Company with far more opportunities and will grow our pipeline."

140. Importantly, throughout these remarks, Defendant Wood consistently maintained that work on the TSA contract would commence in 2021, stating that "[Telos] remain[s] ***confident in our service launch in 2021***." And, when asked by an analyst whether Telos would still "hit the original expectations for TSA Pre[Check] and [CMS] in '22," Wood responded, "***Correct, correct, yes***."

141. The Company also reaffirmed its guidance for full-year 2021 on the call, with Defendant Wood noting that other business was covering the delayed revenue from the TSA and CMS contracts. According to Wood, had the contracts been "up and running," the Company would

have raised guidance, but "***in an overabundance of being cautious***," Telos was reaffirming its previously issued guidance.

142. The above statements identified in ¶¶136-141, regarding the launch dates of the TSA and CMS contracts, expected revenue from these contracts and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) the TSA and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to commence as represented; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) the government's focus on combating the COVID-19 pandemic and the cybersecurity outbreaks that required immediate remediation were negatively impacting the timing for the performance of the TSA and CMS contracts and reducing their associated revenue, or at a minimum, created uncertainties or risks around the timing and potential revenue from such contracts; and (4) Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were overstated by up to 175%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented; (2) there were material weaknesses in the Company's internal control over financial reporting; (3) Telos would be forced to dramatically reduce its revenue estimates by approximately two-thirds; and (4) Defendants' statements about Telos' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

**7. August 25, 2021 - BMO 2021 Technology Summit**

143. On August 25, 2021, Defendant Wood participated in the BMO 2021 Technology Summit during which he was asked to comment on the TSA pushout. He provided the following explanation: "So, in the case of TSA, essentially what happened was with all the ransomware attacks, their own security people really wanted to do their own assessment of their own systems first, to make sure that their own systems weren't could be subject to any attack. ***That pushed us from Q3 to Q4.***" Wood further noted that: "The reason for the push-out had to do with the administration's focus, very high level focus on getting everybody vaccinated in America."

144. Defendant Wood's statement identified in ¶143, regarding the launch dates of the TSA contract, was materially false and/or misleading for the reasons set forth in ¶109.

**8. September 9, 2021 - D.A. Davidson 20th Annual Software and Internet Conference**

145. On September 9, 2021, Defendant Wood participated in the D.A. Davidson 20th Annual Software and Internet Conference, during which he was asked about his confidence in a fourth quarter 2021 launch, and the all-in revenue potential from the TSA contract. In response, Wood stated: "The bigger point I want to make though for our investor community which I'm a significant investor as well is that this is a ***10-year contract and when you think about our share of that 10-year contract, we estimate it to be around $1.7 billion, which generates almost $800 million in profit to us over that period of time***."

146. Regarding TSA and CMS contracts, and the related pushouts, Defendant Wood offered similar explanations and reassurances. In that vein, Wood stated, in pertinent part, as follows: "Let me just answer that same question as it relates to TSA first. The push from ***Q3 to Q4 is because TSA want to make sure their own systems would not be subject to ransomware***. So, they had to take their own systems through security checks, which ***caused that one quarter delay. That was it***." He continued by explaining that "in the case of CMS, what's causing that

delay is the COVID vaccination. The COVID vaccination is taking the highest priority inside of the administration, getting as many people vaccinated as possible. So that's basically what's dealing -- what's causing that push out, if you will, into the first quarter." He went on to add that, "***CMS basically is a -- does have a ceiling. I think the ceiling is $3.5 billion or $4 billion I think roughly and then the -- but TSA has no ceiling***."

147. Defendant Wood's statements identified in ¶¶145-146, regarding the launch dates of the TSA and CMS contracts, and expected revenue from the TSA contract, were materially false and/or misleading for the reasons set forth in ¶128.

**9. November 15, 2021 Quarterly Report, Press Release and Conference Call**

148. On November 15, 2021, the Company filed a press release on Form 8-K, which reported financial results of the Company for the quarter ended September 30, 2021, and provided a financial outlook for the full-year 2021. For the full-year 2021, the Company downgraded revenue estimates, from a range of $283 million to $295 million, to $240 million to $245 million.

149. On November 15, 2021, Telos filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2021. The Form 10-Q contained SOX certifications signed by Defendants Wood and Nakazawa, and a Certification pursuant to 18 U.S.C. §1350. *See supra* ¶¶110-111. The statements set forth above were materially false and misleading for the reasons set forth in ¶112 above.

150. Prior to the market open on November 15, 2021, Telos held its earnings call for the third quarter of 2021. During his prepared remarks, new CFO, Defendant Bendza set forth the Company's updated guidance as follows:

> Our original 2021 guidance reflected sales of $283 million to $295 million, year-over-year growth of 57% to 64% and adjusted EBITDA of $33 million to $36 million. ***We are updating our 2021 guidance with sales of $240 million to $245 million, year-over-year growth of 33% to 36%*** and adjusted EBITDA of $18 million to $19 million.

151. Defendant Bendza also discussed changes the Company was making to its guidance process under his new leadership and acknowledged flaws in Telos' previous process. Bendza assured investors that "I've only recently taken over the forecasting guidance process here. What -- how I'm thinking about ***guidance going forward***, again, ***is that we will guide based on what we have a high degree of visibility into at a point in time***. And then as things become more imminent, as things materialize, we'll pull them into the guidance over the course of the year. So there's going to be a ***shift in terms of the philosophy of guidance here***, at least from my perspective."

152. With respect to timing of the TSA contract, Mark Griffin, the President and General Manager of Telos Management Solutions, LLC, stated that the Company still expected to realize revenues associated with the TSA contract explaining, in pertinent part, as follows: "And where we're at right now is, as we indicated earlier, both by Mark and John, the ***TSA is still indicating and is working with us daily***, and were here at our facility last week working through, ***we fully expect still to get our authority to operate this year and revenue to start ramping as early as January***."

153. The above statements identified in ¶¶150-152, regarding the launch dates of the TSA contract, expected revenue from this contract and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) the TSA and CMS contracts, which constituted a majority of the Company's future revenues, were not on track to generate revenues for the Company; (2) Defendants lacked a reasonable basis and sufficient visibility to provide and affirm the Company's 2021 guidance in the face of the uncertainty surrounding the TSA and CMS contracts; (3) the government's focus on combating the COVID-19 pandemic and the cybersecurity outbreaks that required immediate remediation were negatively

impacting the timing for the performance of the TSA and CMS contracts and reducing their associated revenue, or at a minimum, created uncertainties or risks around the timing and potential revenue from such contracts; and (4) Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were overstated by up to 175%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented; (2) there were material weaknesses in the Company's internal control over financial reporting; (3) Telos would be forced to dramatically reduce its revenue estimates by approximately two-thirds; and (4) Defendants' statements about Telos' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

### B. Additional Scienter Allegations

154. As alleged herein, the Executive Defendants acted with scienter in that they knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

#### 1. The Crucial Importance the TSA and CMS Contracts to the Company's Growth Supports a Strong Inference of Scienter

155. The Executive Defendants' knowledge of the delays to both the TSA and CMS contracts is supported by the critical importance of these contracts to the Company. Indeed, throughout the Class Period, Defendants made crystal clear to investors that these contracts were absolutely critical to the Company's success, and repeatedly assured investors both that commencement of work under the contracts was imminent, and that the contracts would generate billions of dollars in revenue for Telos, including over two hundred million dollars in revenues

within just the first two years. Given the impact of these contracts to Telos and being in "near daily" communication with the TSA, the Executive Defendants obviously knew that approval was entirely uncertain and that they had no basis to make any specific representations as to the timing of when work under these contracts would begin, nor when any associated revenues would be recognized.

156. The IPO Registration Statement underscored the paramount importance of these contracts, stating as follows:

> We expect our growth to accelerate beginning in 2021 and 2022 due to, among other factors, ***recent contract awards that are significant to our business***. Notable recent awards include an expanded contract with a U.S. government agency for our Telos Ghost® managed intelligence support solution and contract wins under the [TSA] PreCheck™ enrollment program and a program with [CMS]. We believe the Telos Ghost contract will generate approximately $4 million to $5 million of incremental revenue in 2021 and represents a platform for potential further growth through military and civilian government units during and after 2021.
>
> The TSA PreCheck™ enrollment program – a 10-year contract on which we are one of three vendors – is ***expected to launch in early 2021***. TSA estimates the market for TSA PreCheck™ enrollments is 2 million to 5 million travelers annually over the term of the contract, and we believe that ***the share of those enrollments we may secure on an average annual basis over that term should grow to approximately 30% to 40% of those travelers***. We anticipate charging $85 for each TSA PreCheck™ membership transaction, with the possibility that additional revenue may be generated from co-marketing efforts. The CMS program – a 10-year indefinite delivery/indefinite quantity contract under which we anticipate providing services beginning in 2021 – involves our FBI-certified biometric enrollment solution. CMS estimates that approximately 1.5 million healthcare workers will obtain background checks annually under the program, and we believe we are well-positioned to secure this work over the 10-year contract term. Based on these and other assumptions, ***we believe these programs collectively may grow from a base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively***. For these reasons, we anticipate these recent contract awards, combined with our organic growth as well as other opportunities for business expansion, to contribute to rapidly accelerating revenue growth beginning in 2021 and 2022.

157. Further, at numerous times during the Class Period (*see, e.g.*, ¶¶57, 58, 77, 87, 115, 116, 123, 138, 145, 146) the Executive Defendants referred to the TSA and CMS contracts as

***billion dollar plus opportunities***, or otherwise highlighted the critical roles these "10-year multibillion-dollar contracts" played in the Company's financial outlook and long-term growth.

158. The fact that the TSA and CMS contracts were crucially important to Telos' financial performance and growth—a point the Executive Defendants repeatedly emphasized and touted to investors during the Class Period—supports a strong inference of the Executive Defendants' scienter with respect to the uncertainties and delays as to the commencement of the contracts, as well as the amount of revenue that could be recognized under the contracts.

### 2. Defendants' Repeated, Specific, and Emphatic Statements About the TSA and CMS Contracts Further Support a Strong Inference of Scienter

159. Further evidencing scienter is the fact that the Executive Defendants spoke repeatedly, specifically, and emphatically during the Class Period about the status of the TSA and CMS contracts, including the expected timing of their commencement, and the revenues these contracts would generate.

160. The Executive Defendants' in-depth statements regarding the TSA and CMS contracts, including in response to specific questions by analysts, support a strong inference that Executive Defendants were aware of or, at the very least, were reckless in not knowing about the timeframe of the TSA and CMS contracts, which were the linchpin of the Company's growth story and projected to be a major source of Telos' future revenues. Indeed, the Executive Defendants represented that they were in near daily communication with the TSA regarding that contract, and otherwise held themselves out as highly knowledgeable regarding both contracts.

161. For example, during a March, 25, 2021 earnings call, Defendant Wood was asked whether the TSA contract was "on track" and whether Telos considered itself to be in a leadership position because of its technology. In response, Wood affirmed, as follows:

> ***We are on track***. We do think with the customer wanting us to certify and get the authority to operate through the use of Xacta, that, that does give us a leg up over

> the other competitors who have to use Xacta as well. And so ***we do think we're on track***. And I think ***what we shared during the IPO is still an appropriate metric in terms of the growth path***.

162. Similarly, during a May 17, 2021 earnings call, Defendant Wood was asked when he anticipated "to be live on [TSA PreCheck and CMS]." In response, Wood stated, "[i]n the case of PreCheck, I think ***we're looking at the end of June . . . to be officially approved***. In the case of CMS, ***we're thinking Q3 to be approved***." Wood continued, "[the CMS work] may start a little bit later in third quarter than we were thinking [due to prioritization of the COVID vaccine rollout over all else], but I think the – we had so much upside planned into that contract vehicle, anyway, that ***we don't worry about that at all***."

163. Defendants made similar statements regarding the TSA and CMS contracts being on track throughout the Class Period. *See, e.g.*, ¶¶72, 87, 88, 117.

164. The Executive Defendants also repeatedly issued and confirmed guidance (*see, e.g.*, ¶¶58, 77, 116, 122, 123, 127, 131, 136, 141), that was made without a reasonable basis because the Company never undertook the proper analysis under ASC 606 with respect to the CMS and TSA contracts to determine if Telos was a principal or agent and whether revenue could be recognized on a gross or net basis.

165. The Executive Defendants' repeated insistence that the TSA and CMS contracts were on track was, at minimum, reckless because they either knew that the contracts would be delayed due to the ongoing national cybersecurity issues and ongoing COVID-19 pandemic or failed to undertake an investigation prior to speaking on these topics. In that vein, the Executive Defendants' repeated issuance of unsupported revenue guidance further bolsters the inference of scienter.

### 3. Defendants' and Other Insiders' Massive Stock Sales Reinforce a Strong Inference of Scienter

166. Defendants were motivated to engage in their fraudulent course of conduct in order to allow high-level Telos officers and directors, as well as other Company insiders, to sell shares of their personally-held Telos common stock at inflated prices, which yielded them gross proceeds of more than ***$341 million*** during the short 16-month Class Period. Of this amount, a staggering $66.7 million of gross proceeds were realized by Defendants Woods and Nakazawa ***alone***.[3]

167. The April 1, 2021 $300 million SPO was accomplished, almost entirely, through the sale of common stock held by Telos insiders. Notably, 86% of proceeds went to selling shareholders and over 50% (over $150 million) went to high-level executive insiders, including Defendants Wood and Nakazawa.

168. Shares of Telos common stock were priced at $17 per share during the November 2020 IPO, but just six months later, SPO shares were priced at $33—nearly double the IPO price—which resulted in a windfall to the selling insiders.

169. With the stock price inflated as a result of the Defendants' false and misleading statements, Defendant Wood sold over 1.1 million shares for proceeds of nearly $37 million and Defendant Nakazawa sold over 655,000 shares for proceeds of nearly $22 million. In total, Wood and Nakazawa sold 1.77 million shares for proceeds of $58.4 million in the SPO.

170. In addition, at least ten other separate high-level executive or director insiders, including the Chief Operating Officer and the General Counsel, participated in the SPO, and sold an additional 2.89 million shares for proceeds of over $95 million, as provided below.

[3] Lead Plaintiffs' counsel relied on publicly-available trading data that Company insiders filed with the SEC on Forms 4 to evaluate their selling activity. Accordingly, the Forms 4 filed with the SEC by Company insiders during the Class Period are hereby incorporated by reference.

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| **Defendants** | | **1,805,888** | **$59,594,304** |
| Wood, John B. | Chief Executive Officer | 1,114,669 | $36,784,077 |
| Nakazawa, Michele | Chief Financial Officer | 655,507 | $21,631,731 |
| Bailey Ph.D., Bernard C. | Director | 35,712 | $1,178,496 |
| **Other Insiders** | | **5,235,021** | **$172,755,693** |
| Porter/Toxford Corp. | Longtime Owner, Controlling Shareholder and Consultant | 2,000,000 | $66,000,000 |
| Williams, Edward L. | Chief Operating Officer | 812,959 | $26,827,647 |
| Malloy, Brendan D. | General Manager Cyber Ops. and Defense | 459,065 | $15,149,145 |
| Other Non-Executive Employees | Various | 378,836 | $12,501,588 |
| Wright J.D., Jefferson V. | General Counsel | 347,285 | $11,460,405 |
| Wood, Emmett J. | Executive VP Marketing and Strategy | 308,941 | $10,195,053 |
| Griffin, Mark D. | Executive VP Security Solutions | 249,437 | $8,231,421 |
| Easley, David S. | Controller, VP of Finance and Accounting | 228,958 | $7,555,614 |
| Tracy, Richard P. | Chief Security Officer | 213,258 | $7,037,514 |
| Pisani, Rinaldi D. | Sr. Vice President – Sales | 196,073 | $6,470,409 |
| Fagan Jr., Kenneth F. | Vice President | 40,209 | $1,326,897 |
| **Grand Total** | | **7,040,909** | **$232,349,997** |

171. After the SPO, the massive insider selling continued. Eight high level executives or directors, including Defendant Nakazawa, continued to sell post-SPO, selling over 3.5 million shares for proceeds of nearly $109 million. The latest sale occurred on November 5, 2021 and was made by the firm's general counsel (one week before the November 12, 2021 disclosure). The chart below details post-SPO insider sales:

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| **Defendants** | | **285,094** | **$9,280,857** |
| Nakazawa, Michele | Chief Financial Officer | 249,445 | $8,259,701 |
| Bailey Ph.D., Bernard C. | Director | 35,649 | $1,021,156 |
| **Other Insiders** | | **3,275,577** | **$99,382,734** |
| Porter/Toxford Corp. | Longtime Owner, Controlling Shareholder and Consultant | 1,000,000 | $29,500,000 |
| Williams, Edward L. | Chief Operating Officer | 600,000 | $17,822,358 |
| Malloy, Brendan D. | General Manager Cyber Ops. and Defense | 551,198 | $16,088,740 |
| Wood, Emmett J. | Executive VP Marketing and Strategy | 300,000 | $9,939,690 |
| Wright J.D., Jefferson V. | General Counsel | 320,000 | $9,520,388 |
| Tracy, Richard P. | Chief Security Officer | 214,379 | $7,093,243 |
| Pisani, Rinaldi D. | Sr. Vice President – Sales | 200,000 | $6,450,323 |
| Maluda, John W. | Director | 60,000 | $1,996,400 |
| Fagan Jr., Kenneth F. | Vice President | 30,000 | $971,592 |
| **Grand Total** | | **3,560,671** | **$108,663,591** |

172. The extensive insider selling was so suspicious that management was specifically questioned about it during an investor earnings call. For example, on the August 16, 2021 earnings call, management was asked about a recent string of insider selling. Defendant Wood tried to explain away the selling as due to the purported timing of Rule 10b5-1 plans and a purported desire to diversify investments by long-term employees claiming that "[i]t's not a question about the company or its condition."

173. The over 10 million shares sold by Telos' officers and directors during the Class Period – accounting for $341 million in proceeds—were highly unusual in both amount and timing, *i.e.*, shortly after Telos went public and when Defendants were repeatedly misleading investors about the TSA and CMS contracts. The chart below details the total Class Period insider sales:

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| **Defendants** | | **2,090,982** | **$68,875,161** |
| Wood, John B. | Chief Executive Officer | 1,114,669 | $36,784,077 |
| Nakazawa, Michele | Chief Financial Officer | 904,952 | $29,891,432 |
| Bailey Ph.D., Bernard C. | Director | 71,361 | $2,199,652 |
| **Other Insiders** | | **8,510,598** | **$272,138,427** |
| Porter/Toxford Corp. | Longtime Owner, Controlling Shareholder and Consultant | 3,000,000 | $95,500,000 |
| Williams, Edward L. | Chief Operating Officer | 1,412,959 | $44,650,005 |
| Malloy, Brendan D. | General Manager Cyber Ops. and Defense | 1,010,263 | $31,237,885 |
| Wright J.D., Jefferson V. | General Counsel | 667,285 | $20,980,793 |
| Wood, Emmett J. | Executive VP Marketing and Strategy | 608,941 | $20,134,743 |
| Tracy, Richard P. | Chief Security Officer | 427,637 | $14,130,757 |
| Pisani, Rinaldi D. | Sr. Vice President – Sales | 396,073 | $12,920,732 |
| Other Non-Executive Employees | Various | 378,836 | $12,501,588 |
| Griffin, Mark D. | Executive VP Security Solutions | 249,437 | $8,231,421 |
| Easley, David S. | Controller, VP of Finance and Accounting | 228,958 | $7,555,614 |
| Fagan Jr., Kenneth F. | Vice President | 70,209 | $2,298,489 |
| Maluda, John W. | Director | 60,000 | $1,996,400 |
| **Total** | | **10,601,580** | **$341,013,588** |

174. Accordingly, the Defendants—in particular, the Executive Defendants—were highly motivated to perpetuate the fraud so that they could capitalize on Telos' inflated share price. The extensive insider selling by numerous other senior executives and members of the Company's Board of Directors bolsters the strong scienter inference.

#### 4. Suspicious Executive Departures Further Support a Strong Inference of Scienter

175. The timing and circumstances of Defendant Nakazawa's resignation—shortly after she dumped $21 million of shares in the SPO and just weeks before the first disclosure of delays in the TSA and CMS contracts—further supports the inference of scienter.

176. Until her resignation on July 19, 2021, Defendant Nakazawa, as CFO of Telos, was responsible for the Company's financial reporting and spoke regularly about the Company's financial performance and revenue guidance. During her tenure, Nakazawa signed the IPO Registration Statement, all of Telos' Class Period annual and quarterly reports, and participated on earnings conference calls in which Defendants disseminated materially false and misleading statements regarding the status of the Company's contracts with the TSA and CMS and their associated revenue. Her sudden resignation – just weeks before the first announcement of delays in the TSA and CMS contracts – supports a strong inference of scienter.

177. The announced retirement of Chief Operating Officer ("COO") Ed Williams on November 16, 2021, who had served as COO for 18 years, and sold over $44 million of his personally-held shares during the short 16-month Class Period, including over $26 million in the SPO, is similarly suspicious. His sudden resignation, the same day as the revelation of the truth regarding the delays of the TSA and CMS contracts, supports a strong inference of scienter.

#### 5. The Obvious and Crucial Requirement to Assess Whether Telos Was a "Principal" or "Agent" Under GAAP Before Issuing Revenue Guidance Further Supports a Strong Inference of Scienter

178. ASC 606 is the authoritative GAAP standard governing how companies record revenue (and, by extension, provide revenue forecasts), including revenues associated with contracts that involve three parties. Pursuant to the express terms of ASC 606, any arrangement where more than one party is involved in transferring goods or services to an end consumer requires an evaluation of whether a party is a "principal" or an "agent" in accordance with

ASC 606 guidance. This required evaluation is both obvious and critical and must occur ***prior*** to recognizing revenue under ASC 606. ASC 606 makes clear why the distinction between a "principal" and an "agent" is so fundamentally important to investors—and why it is absolutely essential for any public company to undertake this assessment. Indeed, if a company is considered a "principal" under ASC 606, it is entitled to recognize revenue for the contract on a "gross" basis, reflecting the full amount of consideration it is entitled to for the service or good transferred to the customer. If the Company is considered an "agent'" however, it may only recognize revenue on a "net" basis, which subtracts the costs the Company must pay out in order to generate that revenue.

179. As Defendants would later admit, the failure to even undertake this most basic, fundamental and rudimentary test led to a staggering overstatement of the Company's guidance: indeed, the erroneous gross revenue figures that Telos consistently affirmed were approximately ***two-thirds*** higher than the appropriate net revenue figures.

180. Importantly, ASC 606 was not new GAAP to Telos, as it had adopted ASC 606 on January 1, 2018, over two years before it went public. Moreover, the TSA and CMS contracts were the typical types of agreements governed by ASC 606 because there were three parties involved in all transactions and Telos did not control all aspects of the transaction. Thus, Defendants had specific knowledge that Telos' service would be directed by and for the benefit of TSA and CMS which should have alerted Telos of the need to, at minimum, conduct an ASC 606 analysis to determine how to properly account for revenue from these contracts.

### 6. The Sharp Analyst Reaction to the Company's Complete Reversal in its Guidance for the TSA and CMS Contracts Further Support a Strong Inference of Scienter

181. As the immediate and harsh analyst reaction to Telos' abandonment of its timelines and drastic reduction in revenue guidance makes clear, the Company's failure to communicate transparently with the market destroyed its credibility. Indeed, analysts excoriated management

for providing—and consistently reaffirming—inflated revenue guidance on the two most important contracts in the Company's history, and for repeatedly misleading investors regarding the commencement of these contracts. A Wedbush Securities analyst expressed disbelief that Telos "management [could] be so off in terms of miscalculating the timing of deals as well as just the complexity." Wedbush also noted the "head scratching challenges management would have in forecasting and executing on these government deals which have now negatively tainted the Telos story." Condemning the Company, Wedbush summed up the Company's reversal, as follows: "In a nutshell, ***the credibility of the Telos story is a major question mark*** for the Street after this disastrous quarter/guidance/ communication on the conference call."

182. Needham & Co. similarly questioned management's credibility and integrity. During the November 15, 2021 earnings call, Needham & Co. analysts asked whether Telos could provide "a concise and clear explanation of why TSA has slipped as much as it has? Is it just simply because of the hacks that happened in the first half? What are – what is the mechanics that's causing the slippage?" Apparently dissatisfied with the response blaming the delay on the increased security protocols implemented by the TSA, the Needham analyst chastised the Company in a November 16, 2021 report, titled: "TLS: More Questions Than Answers As ***Credibility Is Shredded***." The report commented that "[t]he sharply lowered estimates for CY4Q21 and CY22 offered on the CY3Q earnings call sharply damaged perceptions and caused those that have taken the time to understand the company to question their thinking and management's credibility." The report further concluded that "***it will take a long time for management to rebuild its credibility and to prove out the growth opportunity***."

183. In that vein, D.A. Davidson & Co. issued a report on November 15, 2021, stating that "***TSA & CMS were delayed again & management's credibility in terms of forecasting when the projects will launch is shot***." As a result of Telos management's utter "inability to accurately

forecast when the [TSA] project will go live," D.A. Davidson was "thus not baking in ***any*** TSA revenue contribution in our revised numbers until Q2'2[2]."

184. Just as Telos' announcement of the change in revenue guidance shocked the market, the Company's failure to properly recognize revenue and apply basic accounting undermined the Company's credibility. Needham & Co. made clear Wall Street's view that the failure to so much as undertake this basic step prior to disclosing revenue estimates to investors was inexcusable, asking pointedly, "***[s]houldn't [the accounting] have been vetted pre-IPO? And shouldn't it have been consistent with what–you had -- was doing anyway? So shouldn't you have known that before you IPO-ed?***" An analyst report from BMO Capital Markets echoed the sentiment from the Needham & Co. analyst during the earnings call, remarking, as follows: "***We are unclear why the net versus gross rev rec was not assessed previously***."

**C. Loss Causation**

185. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Telos common stock and operated as a fraud or deceit on purchasers of Telos common stock. When the truth about Telos' misrepresentations was revealed, the price of the Company's common stock fell precipitously. As a result of their purchases of Telos common stock at artificially inflated prices during the Class Period, Lead Plaintiffs and other Exchange Act Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

186. Approximately two months after their listing on NASDAQ, Telos common stock reached a Class Period high of $40.21 per share on January 20, 2021, and then continued to trade at artificially inflated prices before losing 77% of its value to close at $9.11 per share at the end of the Class Period after the truth about the TSA and CMS contracts emerged. In total, nearly $2 billion of shareholder value was destroyed during the Class Period, including over $1 billion

following the first corrective disclosure on November 15, 2021 and the final corrective disclosure on March 16, 2022.

187. On November 15, 2021, after repeatedly telling investors that revenue from TSA and CMS contracts would materialize in 2021 and 2022, Defendant Bendza shocked investors when he disclosed that "only one of the two large government contracts" would begin generating revenue in 2022. On this news, the Company's stock price plummeted 28% in a single day on massive volume that was more than 15 times the average volume since the start of the Class Period. Specifically, the price of Telos stock fell from a close of $24.38 per share on Friday, November 12, 2021, to close at $17.54 per share on Monday, November 15, 2021, a decline of $6.84 per share that destroyed $325 million in shareholder market capitalization.

188. On February 28, 2022, following market close, Defendants disclosed that the Company had "identified material weaknesses that will be described in its Form 10-K and has begun the remediation process to address the identified material weaknesses." As a result of these material weaknesses, Telos needed to postpone filing its 2021 Form 10-K. In particular, the Company cited "delays in completing our year-end closing and financial reporting process, primarily due to the delay in completing our assessment of internal control over financial reporting required by Section 404 of the Sarbanes-Oxley Act." On this news, Telos stock price fell from a close of $11.42 on February 28, 2022, to a close of $9.17 on March 4, 2022 for a total decline of $2.25.

189. Then, on March 16, 2022, the Company admitted to further delays in the TSA contract and stunned investors yet again by disclosing it had failed to conduct a bedrock accounting test to determine whether Telos was an agent or a principal in the TSA and CMS contracts, and therefore had massively overstated the Company's projected revenue under the contracts. On the accompanying conference call, Bendza disclosed that, under ASC 606, "revenue recognition is

64% lower than gross revenue recognition on new enrollments and 61% lower on renewals." These disclosures caused the price of Telos stock to decline another 11% when markets opened that morning, falling from a close $10.27 on March 15, 2022, to close at $9.11 on March 16, 2022, on volume that was over three and a half times the average Class Period volume prior to the disclosure.

190. The declines in the price of Telos common stock after the truth came to light were the direct result of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the Company's stock price declines negate any inference that the losses suffered by Lead Plaintiffs and other members of the Exchange Act Class were caused by unrelated changes in market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The following graphic shows the performance of a $100 investment in Telos common stock from November 19, 2020, through the end of the Class Period, as compared an equity market index and an industry peer group index. One hundred dollars invested in an index fund or a software and services index would be worth $122.14 or $115.41, respectively, compared to only $44.90, if invested in Telos.




### D. Presumption of Reliance (Fraud-On-The-Market Doctrine)

191. The market for Telos common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Telos common stock traded at artificially inflated and/or maintained prices during the Class Period. Lead Plaintiffs and other members of the Exchange Act Class purchased the Company's common stock relying upon the integrity of the market price of Telos common stock and market information relating to Telos and have been damaged thereby.

192. At all relevant times, the market for Telos common stock was an efficient market for the following reasons, among others:

(a) Telos was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Telos filed periodic public reports with the SEC and/or the NASDAQ;

(c) Telos regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) According to the Company's Form 10-K filed March 25, 2021, there were more than 64 million shares of common stock issued and outstanding as of December 31, 2020, demonstrating a very active and broad market for Telos common stock; and/or

(e) Telos was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

193. As a result of the foregoing, the market for Telos common stock promptly digested current information regarding Telos from all publicly available sources and reflected such information in Telos stock price. Under these circumstances, all purchasers of Telos stock during the Class Period suffered similar injury through their purchase of Telos stock at artificially inflated prices and a presumption of reliance applies.

194. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Exchange Act Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### E. Omissions Based on Violations of Items 303 and 503 of Regulation S-K

#### 1. Item 303

195. The SEC created specific rules governing the content of disclosures by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K and Form 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

196. Pursuant to Item 7 of Form 10-K and Item 2 of Form 10-Q, Telos' Class Period SEC filings were required to furnish certain information required under Item 303(a)(3) of Regulation S-K including, among other things: (a) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations; and (b) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

197. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported

financial information not to be necessarily indicative of future operating results or of future financial condition."

198. The following were known trends, events, or uncertainties that were having, and were reasonably likely to have, a negative impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2020 Form 10-K, the first quarter 2021 Form 10-Q, and the second quarter 2021 Form 10-Q: (a) that Telos' commencement of the TSA PreCheck contract would be delayed as a result of the ongoing security and ransomware breaches throughout 2021; and (b) that Telos' commencement of the CMS contract would be similarly delayed as a result of the federal government's focus on the COVID-19 pandemic.

199. The foregoing facts were required to be disclosed pursuant to Item 303 because they were, among other things: (i) "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and/or (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

**2. Item 503**

200. Pursuant to Item 1A of Form 10-K, Telos' Class Period Forms 10-K were required to furnish certain information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the [securities] speculative or risky."

201. Pursuant to Item 1A of Form 10-Q, Telos' Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503].

202. Defendants failed to comply with Item 503 by failing to adequately disclose risk factors or material changes in risk factors in these SEC filings.

203. Specifically, as required under Item 503, Defendants failed to disclose in the 2020 Form 10-K, the first quarter 2021 Form 10-Q, and the second quarter 2021 Form 10-Q, the following risks, or material changes in risks: (a) that Telos' commencement of the TSA PreCheck contract would be delayed as a result of the ongoing security and ransomware breaches throughout 2021; and (b) that Telos' commencement of the CMS contract would also be delayed as a result of the federal government's focus on the COVID-19 pandemic.

**F. Inapplicability of the Statutory Safe Harbor**

204. The statutory safe harbor provided under the Private Securities Litigation Reform Act of 1995 for "forward-looking statements" under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory safe harbor. 15 U.S.C. §78u-5(b)(2)(A).

205. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Telos who knew that the statement was false when made. In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

**G. Undisclosed Adverse Facts**

206. The market for Telos common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Telos common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Exchange Act Class purchased Telos common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Telos and have been damaged thereby.

207. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Telos common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Telos' business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants'

materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Exchange Act Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

### H. Exchange Act Counts

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against Telos and the Executive Defendants)**

208. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

209. During the Class Period, Telos and the Executive Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Telos common stock; and (iii) caused Lead Plaintiffs and other members of the Exchange Act Class to purchase Telos common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the above-named Defendants, took the actions set forth herein.

210. The above-named Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Telos common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The above-named Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

211. The above-named Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Telos' business, operations, and prospects, as specified herein. The above-named Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Telos' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Telos and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

212. Each of the Executive Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Executive Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Executive Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Executive Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the

Executive Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

213. The above-named Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Telos' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by the above-named Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

214. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Telos common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the above-named Defendants, or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Exchange Act Class purchased Telos common stock during the Class Period at artificially high prices and were damaged thereby.

215. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Exchange Act Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Exchange Act Class and the marketplace known the truth regarding the problems that Telos was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their Telos common stock, or if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

216. By virtue of the foregoing, the above-named Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

217. As a direct and proximate result of the above-named Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**
**(Against the Executive Defendants)**

218. Lead Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

219. The Executive Defendants acted as controlling persons of Telos within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and

misleading. Each of the Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Further, Defendants Wood and Nakazawa signed the Company's 2020 Annual Report on Form 10-K and First Quarter of 2021 Form 10-Q for 2021 and Defendants Wood and Bendza signed the Company's Second Quarter of 2021 Form 10-Q and Third Quarter of 2021 Form 10-Q.

220. In particular, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

221. As set forth above, Telos and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VII. SECURITIES ACT VIOLATIONS

### A. Summary of the IPO

222. Lead Plaintiffs, and specifically Firemen's Retirement System, bring claims arising under the Securities Act, 15 U.S.C. §§77k and 77o, against Telos, Defendant Wood, Defendant Nakazawa, and the Director Defendants based on materially false and misleading statements and omissions in the IPO Registration Statement. The Securities Act claims asserted herein are brought on behalf of only those Class members who purchased or otherwise acquired shares of Telos common stock pursuant and/or traceable to the Company's IPO in November 2020. The Securities

Act claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act claims, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct.

223. On October 6, 2020, Telos filed the IPO Registration Statement, which was declared effective on November 18, 2020. On November 20, 2020, Telos filed a Prospectus on Form 424B4, which incorporated and formed part of the IPO Registration Statement. The IPO was originally planned to offer 12.35 million shares. Ultimately, however, the Company offered and sold 17.2 million shares of Telos common stock at $17.00 per share, inclusive of the underwriter's exercise of their over-allotment option. In all, Telos raised gross proceeds of $292.6 million from the sale of common shares in connection with its IPO.

### B. Defendants' Materially False and Misleading Statements and Omissions in the IPO Registration Statement

224. The IPO Registration Statement addressed the timing of and revenues forecasted for the TSA and CMS contracts. Both the IPO Registration Statement and the Prospectus describe the TSA contract as "a 10-year contract on which we are one of three vendors [that] is expected to launch in early 2021." The same documents state in regard to the CMS contract that Telos "anticipate[d] providing services beginning in 2021." The IPO Registration Statement further provided that: "we believe these programs collectively may grow from a base of approximately $11 million in revenue in 2020 to between ***$75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively***."

225. The IPO Registration Statement was signed and caused to be filed by Defendant Wood, Defendant Nakazawa, and the Director Defendants.

226. These above-referenced statements in the IPO Registration Statement were negligently prepared, and as a result were untrue and misleading when made and were not prepared in accordance with the rules and regulations that govern their preparation.

227. The statements that the TSA and CMS contracts would begin generating revenue in 2021 lacked a basis in fact. At the time, the government was focused on stemming the spread of COVID-19 and remediating widespread cybersecurity attacks. These circumstances caused substantial delays in the commencement of the TSA and CMS contracts, and Defendants negligently relied on baseless speculation when providing their estimates on service launch dates.

228. Likewise, the statements providing revenue guidance for the TSA and CMS contracts also lacked a basis in fact. Before recognizing any revenues under these contracts, the Company was required, under ASC 606, to determine whether it was a "principal" or "agent" in the transactions contemplated by these contracts, and thus whether revenue was recognizable on a gross or net basis. Telos failed to undertake this foundational analysis, and merely assumed that it was a "principal" when in fact it was an "agent." This negligent omission resulted in the subsequent reduction of projected revenue by up to 64% per transaction.

## C. Securities Act Counts

### COUNT III

### Violation of Section 11 of the Securities Act (Against Telos, Wood, Nakazawa and the Director Defendants)

229. For purposes of this Count, Lead Plaintiffs incorporate by reference those allegations concerning the IPO Registration Statement, and the Securities Act Class only. Any allegations of fraud are hereby disclaimed and are not incorporated by reference in this Count. Specifically, Lead Plaintiffs incorporate the allegations in ¶¶1-2, 5-21, 28-56, 63-71, 74-76, 86, 88-107, 195-203, 222-228 only.

230. This Count is brought pursuant to Section 11 of the Securities Act (15 U.S.C. §77k), on behalf of the Securities Act Class against Defendants Telos, Wood, Nakazawa and the Director Defendants. For purposes of this Count, Lead Plaintiffs do not claim that the above-named Defendants committed intentional reckless misconduct or acted with scienter or fraudulent intent.

231. The IPO Registration Statement was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein accurate and omitted to state material facts required to be stated therein.

232. Lead Plaintiffs and other members Securities Act Class purchased or otherwise acquired Telos common stock pursuant and/or traceable to the IPO, and, at the time of their purchases, Lead Plaintiffs and other members of the Securities Act Class were unaware of the facts concerning the wrongful conduct alleged.

233. The above-named Defendants were responsible for the contents and dissemination of the IPO Registration Statement.

234. Defendant Telos was the registrant for the Offering. As such, Telos is strictly liable to Lead Plaintiffs and the Securities Act Class under Section 11 of the Securities Act for the materially inaccurate statements contained in the IPO Registration Statement and its failure to be complete and accurate.

235. Defendants Wood and Nakazawa, and the Director Defendants, signed the IPO Registration Statement either personally or through an Attorney-in-Fact and caused its issuance. The above-named Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the IPO Registration Statement. The above-named Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the IPO Registration Statement inaccurate. By virtue of the above-named Defendants' failure to exercise reasonable

care, the IPO Registration Statement contained inaccurate misrepresentations and/or omissions of material fact. As such, the Defendants named in this Count are liable to Lead Plaintiffs and the Securities Act Class.

## COUNT IV

### Violation of Section 15 of the Securities Act (Against Wood, Nakazawa and the Director Defendants)

236. For purposes of this Count, Lead Plaintiffs incorporate by reference those allegations concerning the IPO Registration Statement, and the Securities Act Class only. Any allegations of fraud are hereby disclaimed and are not incorporated by reference in this Count. Specifically, Lead Plaintiffs incorporate the allegations in ¶¶1-2, 5-21, 28-56, 63-71, 74-76, 86, 88-107, 195-203, 222-228 only.

237. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiffs and the Securities Act Class, against Defendant Wood, Defendant Nakazawa, and the Director Defendants. This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

238. At all relevant times, Defendant Wood, Defendant Nakazawa, and the Director Defendants were controlling persons of Telos within the meaning of Section 15 of the Securities Act. As set forth herein, by reason of their positions of control and authority as officers and/or directors of Telos, Wood, Nakazawa, and the Director Defendants had the power to directly or indirectly control or influence Telos to engage in the acts described herein, including by causing Telos to conduct the November 2020 IPO pursuant to the IPO Registration Statement, and exercised the same.

239. Specifically, Defendants Wood and Nakazawa each served as an executive officer of Telos prior to and at the time of the November 2020 IPO. As such, at all relevant times Wood and Nakazawa each participated in the operation and management of Telos, including participating

in the preparation and dissemination of the IPO Registration Statement, and/or otherwise participated in the process necessary to conduct the November 2020 IPO. By virtue of their positions as officers of Telos, and/or their status as signatories of the Registration Statement, Wood and Nakazawa each had the power to control, and did control, Telos in its conduct of the November 2020 IPO, including controlling the contents of the IPO Registration Statement, which contained materially untrue statements. As officers of a publicly owned company, Wood and Nakazawa had a duty to disseminate accurate and truthful information with respect to Telos' business operations, growth, and financial condition.

240. Similarly, each of the Director Defendants served as directors on Telos' Board at the time the November 2020 IPO was conducted. As directors of a publicly traded company, Director Defendants had a duty to disseminate accurate and truthful information with respect to Telos' operations at the time of the November 2020 IPO. Each Director Defendant signed the Registration Statement disseminated to the investing public and were Directors of the Company at the time the November 2020 IPO was conducted. Thus, the Director Defendants controlled the contents and dissemination of the IPO Registration Statement.

241. No one among Defendant Wood, Defendant Nakazawa, and the Director Defendants conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the IPO Registration Statement were true, were without omissions of material fact, and were not misleading. By reason thereof, each among Wood, Nakazawa, and the Director Defendants is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Section 11, to the Class members who purchased or otherwise acquired Telos common stock pursuant and/or traceable to the IPO Registration Statement.

242. As a direct result of the aforementioned conduct, members of the Securities Act Class suffered damages in connection with their purchases of Telos common stock pursuant and/or traceable to the Company's IPO Registration Statement.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D. Awarding such other relief as this Court deems appropriate.

## IX. JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: June 15, 2022

THE OFFICE OF CRAIG C. REILLY
CRAIG C. REILLY, VSB #20942

*/s/ Craig C. Reilly*
CRAIG C. REILLY

209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: 703/549-5354
703/549-5355 (fax)
craig.reilly@ccreillylaw.com

*Liaison Counsel for the Class*

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL RUDMAN
WILLIAM J. GEDDISH
AVITAL O. MALINA
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: 631/454-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
wgeddish@rgrdlaw.com
amalina@rgrdlaw.com

SAXENA WHITE P.A.
DAVID R. KAPLAN
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: 858/997-0860
858/369-0096 (fax)
dkaplan@saxenawhite.com

STEVEN SINGER
CRAIG MAIDER
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: 914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
cmaider@saxenawhite.com

*Attorneys for Lead Plaintiffs and Lead Counsel for the Class*