IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| THE FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, *et al.*, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:22-cv-00135 (AJT/IDD) |
| TELOS CORPORATION, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## ORDER

In this putative class action securities fraud case, Plaintiffs allege Defendants misled investors about the status and prospects of key government contracts. In response to the Amended Complaint, Defendants have filed their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("the Motion") [Doc. No. 53]. The Court held a hearing on the Motion on September 14, 2022, following which the Court took the Motion under advisement. For the reasons stated below, the Motion is GRANTED and this action DISMISSED.

## I. Background

The Amended Complaint alleges the following:

The named Plaintiffs, Firemen's Retirement System of St. Louis, Alaska Electrical Pension Fund, and International Union of Operating Engineers Local 793 Pension Plan, are defined benefit pension plans that manage assets on the behalf of plan participants. [Doc. No. 36] at 11. They bring this action on behalf of themselves and all similarly situated class members who allegedly suffered damages as a result of the actions attributed to the Defendants. *Id*. at 15.

Defendant Telos Corporation ("Telos") is a publicly traded company that specializes in cybersecurity, with its principal place of business in Ashburn, Virginia. *Id*. at 12-15, 17. The remaining Defendants are several of Telos' executives and its board of directors.[1] Telos' services include providing "products and services to the government, military, and Fortune 500 companies[,]" *id*., including a digital identity services platform called IDTrust 360 that purchasers can use to, among other functionalities, track and identify persons in a variety of places (such as airports). *Id*. at 17-18.

In July 2020, Telos announced that it was selected by the Transportation Security Administration ("TSA") to provide support for the TSA Precheck[2] enrollment services (the "TSA contract"). *Id*. at 18. In October 2020, Telos was awarded a large contract with the Centers for Medicare and Medicaid Services ("CMS") (the "CMS contract"). *Id*.

On November 19, 2020, Telos launched an initial public offering (the "IPO") that listed 17.2 million shares of common stock for sale on the NASDAQ. *Id*. at 20 ¶ 50. In its IPO Registration Statement, Telos indicated that it expected to see substantial revenue growths attributed to the TSA and CMS contracts. *Id*. at 20 ¶ 51. Specifically, the registration stated that the TSA and CMA contracts "collectively may grow from a base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively." *Id.* However, at and around the time of the initial IPO, two major world events would eventually affect the realization of these revenues from the TSA and CMS contracts, *viz.*, the global coronavirus pandemic and a massive cybersecurity breach

---

[1] These defendants include John B. Wood, Telos' Chairman; Michele Nakazawa, the CFO prior to July 21, 2021; and Mark Bendza, the CFO after July 21, 2021, and Board members Bernard C. Bailey, David Borland, Maj. Gen. John W. Maluda, Robert J. Marino, Bonnie L. Carroll, Frederick D. Schaufeld, Andrew R. Siegel, and William H. Alderman.

[2] Enrollees in TSA Precheck pay a fee in order to expedite security checks at airports after the individual's identity is verified.

involving the SolarWinds Orion products resulting in unauthorized access to federal agencies. *Id*. at 21-22 ¶¶ 54-55. On January 14, 2021, Telos' chairman, Defendant John Wood, in response to questions about the SolarWinds breach, stated that in the future federal agencies were "going to increase spend[ing] associated with cyber security." *Id*. at 22 ¶ 56.

On March 25, 2021, Telos issued a press release on the financial results of the year 2020. *Id*. at 22 ¶ 57. The press release contained statements that Telos would attain revenues of between $283 and $295 million in the year 2021, and that Telos expected to attain total revenues of $1.5 billion and $2 billion from the 10-year TSA and 10-year CMS contracts, respectively. *Id*. On the same day, Telos held a fourth quarter 2020 earnings call where Chairman Wood stated that Telos has "visibility to almost $1 billion of annual revenue within 5 years." *Id*. at 23 ¶ 58. Wood also made statements that he expected the implementation of the TSA contract to be "on track," and that the expectations had not changed since the IPO. *Id*. at 23 ¶ 59.

Plaintiffs allege that these optimistic predictions were based on a misapplication of Generally Accepted Accounting Principles ("GAAP") that caused a significant over-estimation of the company's future revenues. *Id*. at 24-25 ¶ 63. Under ASC 606, the authoritative standard governing corporate revenue calculated under GAAP, a *principal* to a contract can recognize revenue equal to the full consideration of the good or service received from the customer, while, in contrast, an *agent* should only recognize revenues equal to a net basis, which is equal to the full consideration received minus the costs the company pays out to generate the consideration. *Id*. at 26 ¶ 67. Plaintiffs allege that Telos had mistakenly assumed it was a principal in the TSA contract, while in actuality Telos should have been considered an agent, *id*. at 25 ¶ 65, and that this faulty assumption led to an overvaluation of future revenues by as much as 175 percent, *id*. at 28 ¶ 70.

A week after Telos released its estimated revenues for 2021, the company announced a second public offering (the "SPO") where additional common stock was offered for sale. *Id*. at 29 ¶ 72. Unlike during the IPO, during the SPO, Telos' executive management team was permitted to sell their personal shares in the company *Id*. Subsequently, "[c]ompany insiders sold more than 7 million shares" of Telos stock, with the Chairman and CFO, Defendants Wood and Nakazawa, selling 20% and 45% of their personal holdings in the company. *Id*.

During Telos' next two earnings calls, on May 19, 2021 and August 16, 2021, company representatives continued to affirm their previous guidance on expected revenue and made statements that generally indicated they expected the company to see positive long-term growth. *Id*. at 31, 33-34 ¶¶ 80, 84. Chairman Wood also made statements that he still expected service to begin on the TSA and CMS contracts and that the company would generate long-term revenues from these contracts. *Id*. at 33 ¶ 84.

During the next earnings call, held on November 15, 2021, Telos began to offer revised estimates of the revenue it expected to earn during the remainder of the year. *Id*. at 34-35 ¶ 88. More specifically, Telos informed investors that it no longer expected to earn revenue from the TSA contract until 2022 and that the CMS contract would not return revenue until after 2022. *Id*.

Several months later, on February 28, 2022, Telos announced that the company had identified the following "material weaknesses" in its internal controls and as a result would be forced to delay releasing its 2021 10-K financial filing:

> (1) "Management did not maintain appropriately designed entity-level controls impacting the control environment and monitoring activities to prevent or detect material misstatements to the consolidated financial statements. Specifically, the Company did not have sufficient qualified resources to effectively design, operate and oversee internal control over financial reporting, which contributed to the failure in the effectiveness of certain controls"; and (2) "Management did not maintain appropriately designed and implemented controls over . . . [r]ecording of

revenue in accordance with ASC Topic 606, 'Revenue from Contracts with Customers.'"

*Id*. at 37-38 ¶¶ 95, 97.

On March 16, 2022, Telos announced that it had uncovered the mistakes in applying GAAP that had led to errors in calculating the revenue the company would receive. *Id*. at 38 ¶ 98. On the same day, Defendant Bendza, acting as CFO, announced that the company was working with independent third parties and auditors to correct their accounting deficiencies and that Telos had still not received authority to act under the TSA contract. *Id*. at 38 ¶ 99; 40 ¶ 104.

Plaintiffs allege that based on the conduct of Telos and the other named Defendants, Telos stock was artificially inflated and that after the company revealed deficiencies in its accounting practices and the delays to its major contracts, Telos' stock dramatically dropped in price, causing the named Plaintiffs along with proposed class members to suffer an economic loss from their purchase of Telos stock. *Id*. at 71 ¶ 190.

The Plaintiffs attribute the rise and fall of Telos' stock to the following misrepresentations:

- Statement 1: On November 19, 2020, the IPO registration statement contained projections of revenue growth of between $75 million and $80 million. [Doc. No. 36] at 42.

- Statement 2: On March 25, 2021, the company 10-K form contained certifications of the company's financial controls including a statement that the writer had "designed such internal control over financial reporting… to provide reasonable assurance regarding the reliability of financial reporting and preparation of financial statements of external purposes in accordance with generally accepted accounting principles…" [Doc. No. 36] at 44.

- Statement 3: The March 2021 10-K form also stated, "the TSA PreCheck enrollment program and our program with CMS, are expected to comprise a significant portion of our future revenue." *Id*. The 10-K form also stated that Telos expected to launch the TSA and CMS programs in 2021 and gave estimates of the revenue the company would achieve in 2021 and the next ten years. *Id*. at 42-45 ¶¶ 111-114.

- Statement 4: On March 25, 2021, Telos filed a press release that gave estimates of the expected revenue in the first quarter of 2021 and the revenue anticipated from the entire TSA and entire CMS contracts. *Id*. at 45 ¶ 115.

- Statement 5 - 7: On a March 25, 2021 earnings call, Chairman Wood stated on an earnings call that, "[w]ith the growth trajectory of our Xacta and Telos Ghost solutions, driven by increased direct sales and channel partnerships, coupled with the multibillion-dollar TSA PreCheck and CMS contracts, we believe we have visibility to almost $1 billion of annual revenue within 5 years." *Id*. at 45-46 ¶ 116 (Statement 5); CFO Nakazawa gave revenue projections for the upcoming year. *Id*. (Statement 6); and Chairman Wood stated that he expected to see "very strong results" for the rest of the year and told investors that the TSA contract was "on track." *Id*. at 46 ¶ 117 (Statement 7).

- Statement 8: On the May 17, 2021 quarterly report, Telos presented estimates of future revenue.

- Statements 9-11: On a May 17, 2021 earnings call, Chairman Wood stated that "the way to view it, though, going forward is we intend to see a significant ramp in the second half of the year due to those 2 10-year multibillion-dollar contracts that we talked about during the IPO." Wood also stated that "nothing has changed" about the

annual outlook and that he was "very confident about the year." *Id*. at 48 ¶¶ 123-124 (Statement 9). Wood also stated that he expected the TSA contract to be approved by the end of June and for the CMS contract to be approved in the third quarter of that year, *id*. at 48 ¶ 125 (Statement 10); and that he believed the SolarWinds hack was an opportunity for Telos and that "what it does is it helps accelerate the sales cycle and make the opportunities larger" and "We're working very hard to make sure that we meet or exceed—most likely we hope to exceed—I shouldn't say it like that. My guys are all shaking their heads, but I'm what—I'm supposed to say we continue to reaffirm the FY guidance we have given." *Id*. at 49 ¶¶ 126; 127 (Statement 11).

- Statement 12: On May 19, 2021, Wood participated in a conference where he stated he expected the TSA contract to be approved in June, that he expected to see an increase in transactions in the latter half of the year, and that the number of expected TSA transactions was "going to be higher." *Id*. at 50 ¶ 129.

- Statement 13: On June 23, 2021, Wood announced that he expected to see transactions from TSA beginning in the third and fourth quarter of the year. Wood also stated that "[w]e will get our approval to operate in the third quarter. We don't see any risk as it relates to the 400,000 transactions." Wood also explained that the Company did not include CMS in its third quarter revenue projections, but the Company did expect to increase its revenue projections for the third and fourth quarter of that year. *Id*. at 50-51 ¶ 131. Wood further stated that he expected the number of transactions from TSA to increase in the coming year. *Id*. at 51 ¶¶ 132-133.

- Statement 14: On August 16, 2021, Telos released a financial disclosure form that estimated revenue for 2021. [Doc. No. 36] at 53 ¶ 135.

- Statement 15: On an August 16, 2021 earnings call, CFO Bendza stated that there would be "sequential revenue growth from the third quarter to the fourth quarter primarily drive[n] by TSA PreCheck." *Id*. at 53 ¶ 137 (alteration in original). Bendza also stated that they expected revenue in the fourth quarter of the year from TSA and no revenue from CMS. Bendza also stated that revenue would be recognized in 2022 from the TSA and CMS contracts and that "the value of these programs and our out year expectations have not changed. These remain multibillion-dollar profitable long-term programs." *Id*. at 54 ¶ 138.

- Statement 16: On August 25, 2021, Wood stated the launch date for the TSA contract would be pushed from the third to the fourth quarter. *Id*. at 56 ¶ 143.

- Statement 17: On September 9, 2021, Wood gave an estimate of the total value of the TSA contract, that the TSA contract would be pushed back by one fiscal quarter and that the CMS contract was being pushed back while the government focused on getting people vaccinated for the coronavirus. *Id*. at 56-57 ¶ 146.

- Statement 18: On November 15, 2021, Bendza gave an update on the adjustments to the revenue estimates for 2021 and made statements about the company's shift in philosophy for financial guidance and stated that the company expected to get "authority to operate this year and revenue to start ramping as early as January." *Id*. at 57-58 ¶¶ 150-151.

- Statement 19: On November 15, 2021, Mark Griffin, the President and General Manager of Telos Management Solutions, LLC stated "the TSA is still indicating and is working with us daily, and were here at our facility last week working through, we

fully expect still to get our authority to operate this year and revenue to start ramping as early as January." *Id*. at 58 ¶ 152.

Plaintiffs also contend that Defendants violated SEC Regulation S-K by failing to disclose known material risks pursuant to Item 303 and Item 503. *Id*. at 70-71, ¶¶ 195-203.

Based on these alleged misrepresentations or omissions, the four-count Amended Complaint alleges the following violations by Telos and the Defendants:

- Count 1 (against Telos and the Executive Defendants): violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5

- Count 2 (against the Executive Defendants): violation of section 20(a) of the Exchange Act

- Count 3 (against Telos, Wood, Nakazawa, and the Director Defendants): violation of Section 11 of the Securities Act

- Count 4 (against Wood, Nakazawa, and the Director Defendants): violation of Section 15 of the Securities Act

The Defendants have filed a Motion to Dismiss all counts of the Amended Complaint for failure to state a claim in accordance with Federal Rule of Civil Procedure 12(b)(6). [Doc. No. 53].

## II.

A Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is read in conjunction with the pleading standards outlined in Federal Rule of Civil Procedure 8. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. This rule does not require a pleading to contain "detailed factual allegations," but at the same time a pleading must have "more than labels and conclusions," while "a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Dismissal of a complaint is appropriate when the "well-plead facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While the well-plead facts within a complaint are considered to be true, unsupported conclusions are not afforded the same presumption of veracity. *Id*. at 678. In addition, for a pleading that alleges fraud or mistake—such as a complaint made pursuant to the Exchange Act—a plaintiff must "allege with particularity the circumstances constituting fraud or mistake" in accordance with Federal Rule of Civil Procedure 9(b). *See Cozzarelli v. Inspire Pharms, Inc.*, 549 F.3d 618, 629 (4th Cir. 2008).

Along with the pleading standards that underly all motions to dismiss, the Private Securities and Litigation Reform Act of 1995 ("PSLRA") has created a heightened pleading standard for complaints made pursuant to the Securities Exchange Act of 1934. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-321 (2007). Any private securities complaint which alleges a false statement or omission attributed to a defendant must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and if the allegation is made on belief, "any facts on which that belief is formed." 15 USC § 78u-4(b)(1). Such a complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for causes of action that require a state of mind. 15 USC § 78u-4(b)(2)(A). A complaint which pleads securities fraud will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote omitted).

## III.

In the first count of the Amended Complaint, the Plaintiffs have alleged violations of Section 10(b) of the Securities Exchange Act and SEC Regulation 10b-5. [Doc. No. 36] at 78. A claim under these provisions requires the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018) (quoting *Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Related to the claim brought under section 10(b), Count 2 of the Amended Complaint alleges a claim under section 20(a) which imposes liability "on each person liable under any provision of this chapter or of any rule or regulation thereunder." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014) (quoting 15 USC § 78t(a)). A claim under section 20(a) will necessarily fail if a complaint does not plead a plausible section 10(b) claim that survives a motion to dismiss. *Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.¸* 576 F.3d 172, 192 (4th Cir. 2009).

Count 3 of the Amended Complaint alleges violations of Section 11 of the Securities and Exchange Act which prohibits making false statements or omissions in the registration statement a company must file before offering securities. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015) ("Section 11 of the Act promotes compliance with these disclosure provisions by giving purchasers a right of action against an issuer or designated individuals...for material misstatements or omissions in registration statements."). Count 4 of the Amended Complaint brings a claim under section 15 of the Securities Act which

creates liability for "controlling persons" who through agency, agreement, understanding or who otherwise controls a person liable under section 11 or 12 of the Act. 15 USC § 77o.

IV.

### A. Rule 10b-5 claims (Count I)

**(1) None of the statements are actionable under the safe harbor provision, the 'bespeaks caution" doctrine, or because the statements are puffery.**

The Securities and Exchange Act creates a safe harbor which precludes liability for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 USC § 78u-5. As defined by statute, a forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share... or other financial items" is protected in the safe-harbor provision. 15 USC § 78u-5(i)(1)(A). The statute also exempts from liability "statements about the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 USC §78u-5(i)(1)(B).

In addition to forward looking statements, liability will not attach to statements that are immaterial because they constitute "puffery" or are too vague to convey any significance. *See, e.g. In re Cable & Wireless, PLC, Sec. Litig.*, 332 F. Supp. 2d 896, 900 (E.D. Va. 2004) (finding statements that lack materiality are "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."); *Xia Bi v. McAuliffe*, 927 F.3d 177, 183 (4th Cir. 2019) ("Similarly, courts have long accepted that immaterial boasting and exaggerations, often called puffery, do not normally constitute actionable fraud.") In addition, as the Fourth Circuit has recognized, "it is not actionable for a company to give positive descriptions

of what it reasonably believes to be its strengths." *Boykin v. K12, Inc.*, 2022 U.S. App. LEXIS 32287 at *10 (4th Cir. 2022).

Securities fraud claims are also subject to the "bespeaks caution" doctrine. *Paradise Wire & Cable Define Ben. Pension Plan v. Weil*¸ 918 F.3d 312, 319 (4th Cir. 2019). Under this doctrine, an alleged misrepresentation or omission may nevertheless be rendered non-actionable by providing specific warnings that would negate its materiality. *Id*. ("While general warnings may not negate the materiality of misrepresentations or omissions, specific warnings that are tailored to address the alleged misrepresentation or omission may negate their materiality when the total mix of information would not be significantly altered by the disclosures sought by the plaintiffs.") (references omitted).

In assessing the adequacy of a securities fraud complaint, courts must consider the alleged misrepresentations and omissions as detailed in the Amended Complaint as well as the referenced public documents, such as disclosures made to the Securities and Exchange Commission. *See Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") (references omitted).

Statements 1, 3-10, and 12-19 all relate to Telos' predictions or expectations about its future revenue or future operational growth, including statements about when Telos expected the TSA and CMS contracts to begin yielding revenue, and therefore constitute forward-looking statements. All of these forward-looking statements are also "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 USC § 78u-5. For example, Telos' annual 10-K registration states:

We are dependent on a few key customer contracts for a significant portion of our future revenue, and a significant reduction in services to one or more of these contracts would reduce our future revenue and harm our anticipated operating results. [Doc. No. 55-1] at 12.

Our systems and the third-party systems upon which we and our customers rely are also vulnerable to damage or interruption from catastrophic occurrences such as earthquakes, floods, fires, power loss, telecommunication failures, cybersecurity threats, terrorist attacks, natural disasters, public health crises such as the COVID-19 pandemic, geopolitical and similar events, or acts of misconduct. *Id*. at 11.

If our judgment or estimates relating to our critical accounting policies are based on assumptions that change or prove to be incorrect, our results of operations could fall below expectations of securities analysts and investors resulting in a decline in our stock price. The preparation of our consolidated financial statements in conformity with GAAP requires management to make judgments, estimates, and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. *Id*. at 14.

The disputed earnings calls with investors (which are integral to the Amended Complaint) were also presented with cautionary language, such as the initial disclaimer in the May 17, 2021 earnings call:

Before we get started, we want to emphasize that some of our statements on this call are forward-looking statements and made under the safe harbor provisions of the federal securities laws. These statements are based on current expectations and assumptions that are subject to risks and uncertainties... In addition, during today's call, we will discuss non-GAAP financial measures which we believe are useful as supplemental and clarifying measures to help investors understand Telos' financial performance. These non-GAAP financial measures should be considered in addition to and not as a substitute for or in isolation from GAAP results.

[Doc. No. 55-8] at 5. Likewise, in the August 16, 2021 earnings call, Chairman Wood explained with respect to the launch of the TSA contract that "[w]hile we do not control the decision-making time line within TSA, we do control our readiness to move out once the authority to operate is issued." [Doc. No. 55-14] at 161.

Statement 2 is a certification by Defendant John Wood, Telos' then Chairman, that Telos has "reasonable financial controls" pertaining to its accounting procedures.[3] It was made "based on [Wood's] knowledge" in conjunction with the company's 10-K filings and was also accompanied by both cautionary and qualifying language. *See* [Doc. No. 55-1] at 18 ("In particular, we make certain estimates and assumptions related to the adoption and interpretation of these principles including the recognition of our revenue and the accounting of our stock-based compensation expense with respect to our consolidated financial statements. If these assumptions turn out to be incorrect, our revenue or our stock-based compensation expense could materially differ from our expectations, which could have a material adverse effect on our financial results.") As such, it is presented in the context of clear disclaimers that indicate the exact risks that eventually materialized and therefore falls within the bespeaks caution doctrine.

Statements 7 and 11, which discuss Telos' expectations of "strong results" or that the sales cycle will "accelerate" or the hope "to meet or exceed" financial guidance, are the sort of vague, optimistic statements that are "expressions of enthusiasm" containing both "superlatives" and optimism that play an important role in the ordinary course of corporate business and constitute non-actionable puffery. *See Xia Bi*, 927 F.3d at 183.[4]

---

[3]*See* EDGAR, https://www.sec.gov/Archives/edgar/data/320121/000114036121009988/ex31_1k.htm (last visited February 1, 2023) (10-K certification of John B. Wood). Based on the briefings, the only "internal controls" at issue are those pertaining to Telos' accounting practices, discussed *infra* at 16-17, 19; and Plaintiffs do not allege any specific deficiencies with respect to any other category of internal controls *See e.g. Harrington v. Tetraphase Pharms. Inc.*, 2017 U.S. Dist. LEXIS 71274 at *36 (D. Mass. 2017) ("[Plaintiffs'] argument is essentially that the internal controls were inadequate so the certifications were false. Plaintiffs fail to plead with any particularity how the internal controls were inadequate or which internal controls were inadequate.") (references omitted).

[4] The last alleged basis for Rule 10b-5 liability, omissions under Regulation S-K, Items 303 and 503, is discussed *infra* at 22-23 with respect to scienter.

**(2) Plaintiffs fail to allege sufficient facts establishing that any of the forward-looking statements were made with actual knowledge of their falsity.**

To demonstrate that any of the above described forward looking statements are actionable, the Plaintiffs must plead particularized factual allegations that demonstrate the statement was "made or approved by such [executive officer] with actual knowledge by the officer that the statement was false or misleading." 15 USC § 78u-5(c)(1)(B)(ii)(II); *see also In re DXC Tech. Co. Sec. Litig.*, 2020 U.S. Dist. LEXIS 103676 at *15 (June 2, 2020) (*ref.*, *In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 651-652 (D. Md. 2000)).

Here, Plaintiffs argue that the Amended Complaint adequately pleads the Defendants had actual knowledge that the implementation of the TSA and CMS contracts would be delayed by the COVID-19 pandemic and cybersecurity threats and that Telos had failed to conduct the proper accounting inquiry before issuing its revenue guidance. *Id.* at 23-24. In that regard, they point to Telos' alleged statement that it was "in near daily communication with the TSA[,]" *Id.* at 59-60 ¶ 155, CFO Bendza's alleged admission that Telos failed to conduct an analysis and simply assumed it was an agent in the TSA contract as defined by the accounting standards, [Doc. No. 36] at 38-39 ¶ 99, that Telos admitted that its internal controls were not "appropriately designed," and that the Company lacked "sufficient qualified resources" devoted to those accounting controls. *Id.* at 37-38 ¶ 97. None of these allegations, either individually or collectively, adequately plead that any Defendant had actual knowledge that any of the relied upon statements were false. In effect, Plaintiffs contend that actual knowledge of falsity can be establish from nothing more than the fact of what happened—the events themselves. Specifically, with respect to the accounting assumptions,[5] and the revenue projections based on that accounting assumption, Plaintiffs find the

---

[5] Some courts have held that accounting assumptions are by definition not statements of fact. *Cf.*, *Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015) ("In the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated GAAP, carping about Defendants' application of GAAP

required actual knowledge in the change in accounting treatment of that projected revenue. But there are no specific factual allegations from which that actual knowledge can be inferred. For instance, there is no allegation that Defendants had been exposed to the accounting issue and ignored it. *See Yates,* 744 F.3 at 890 ("actual exposure to the accounting problem" is a prerequisite to finding scienter). Moreover, there is no allegation that the accounting adjustment changed the profitability of the revenue that would be eventually obtained from the contracts. *See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 616, 642 (D. Md. 2012) (a change in methodology not affecting the economics of the underlying transaction "does not lead to the inference that the Defendants acted with scienter."). In a similar vein, Plaintiffs contend, in effect, that Defendants knew that the contracts would not materialize as projected, because they were, in fact, delayed. But there are no factual allegations that would support that inference. For instance, there are no allegations that TSA or CMS said or did something, or that Telos learned something, that establishes actual knowledge that the contracts would be delayed or that there were plans to delay implementation of the contract based on the impact on the government of two world events which Plaintiffs themselves describe as unprecedented. [Doc. No. 36] at 22 ¶ 56; [Doc. No. 59] at 15. In short, Plaintiffs' conclusory "fraud by hindsight" allegations do not meet the heightened pleading standards of Federal Rule of Civil Procedure 9. *See Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) ("Where fraudulent projections are alleged, the plaintiff must therefore identify in the complaint with specificity some reason why the discrepancy

---

amounts to no more than a naked assertion devoid of further factual enhancement; it does not permit the Court to infer that the Defendants committed accounting fraud.") (internal citations and quotation marks omitted).The Court assumes, without deciding that Telos' certification, Statement 2, sufficiently alleges a "Statement" for the purpose of determining whether the Amended Complaint adequately alleges actual knowledge of falsity with respect to Statement 2 and the accounting assumptions used to project the challenged revenue projections.

between a company's optimistic projections and its subsequently disappointing results are attributable to fraud.") (citations omitted).

In summary, the Amended Complaint does not adequately allege any statements or omissions actionable under Rule 10b-5.

### (3) Plaintiffs have failed to adequately allege the requisite scienter.

The Amended Complaint also fails to allege the requires level of scienter to support their Rule 10b-5 claims.

As the Supreme Court explained in *Tellabs*, 551 U.S. at 314:

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [15 USC §78u-4(b)(2)] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as 'strong'... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

In substance, a plaintiff is required to plead that the offending conduct was carried out in a manner that is "intentionally or severely reckless." *See Maguire Fin., LP v. PowerSecure Int'l Inc.*, 876 F.3d 541, 547 (4th Cir. 2017) ("To survive a motion to dismiss, the facts alleged must give rise to a strong inference that [defendant] intentionally or recklessly deceived, manipulated or defrauded investors.")

The Plaintiffs argue that there are sufficient allegations that, when taken together, sufficiently allege the required level of Defendants' scienter, including the failure to have in place the proper accounting standards, the failure to disclose delays in the contracts, the magnitude of the difference between the projected and actual revenues, and the sales of stock by company executives and employees during the SPO. [Doc. No. 59] at 31.

As an initial matter, the repeated references to the large increase in stock price throughout the Amended Complaint is not a strong indication that the Defendants behaved intentionally or with a severe reckless disregard for the truth, as the desire to increase share price does not lead to an inference of scienter on the part of the Defendants. *Boykin*, 2022 U.S. App. LEXIS 32287 at *18 ("Yet the unvarnished wish to increase [defendant's] share price is precisely the kind of generalized motive shared by all companies that is insufficient to plead scienter under the PSLRA.") (internal quotations omitted) (quoting *In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743, 754 (4th Cir. 2021)).

Similarly, and as discussed above, the fact that accounting treatment of projected revenue was changed does not establish the required scienter. *See Yates*, 744 F.3d at 887-888 (finding failure to disclose improper accounting issues led to an inference that "defendants were continuing to assess the scope of the problem before deciding on an appropriate course of action.") And like the defendants in *Yates*, Telos' eventual disclosure of its accounting controls supports "a strong inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform the investing public." *Id*. at 888 (quoting *Matrix Capital*, 576 F.3d at 189); *see also Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 505 (E.D. Va. 2018) (finding when "red flags" are disclosed to the public it "negates or significantly undercuts any inference of scienter.") (*ref.*, *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015)). Likewise, and as discussed above, there are no non-conclusory allegations from which to conclude that any of the Defendants possessed knowledge that the TSA and CMS contracts would be delayed. Even assuming, without deciding, that these contracts were core parts of the business, there is likewise no plausible inference to be drawn from anything alleged that any of the Defendants could or would have knowledge of how a global pandemic would unfold, how government agencies would react to unprecedented

cyberattacks, or how any of these world-changing events would impact future operations of the company. The mere fact that Defendants were wrong in some of their outlooks and expectations does not establish the required inference of scienter. *See In re Triangle Corp.*, 988 F.3d at 754 ("That the defendants were ultimately wrong is not enough to support an inference of scienter." (quoting *Yates*, 744 F.3d at 887)).

In some cases, scienter can be inferred from stock sales by company insiders. But to support such an inference, there must be evidence to establish that the stock sales were unusual or suspicious. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 611 (4th Cir. 2021) ("insider-trading allegations will only support an inference of scienter [where] the timing and amount of the defendants trading were unusual or suspicious.") In determining whether such an inference can be drawn, courts have compared the sales of stock during the class period to periods before or after the class period to determine if a pattern of increased activity could support an inference of scienter. *See e.g., id*. at 611.

Here, Plaintiffs allege that during the class period Defendants Wood, Nakazawa and Bailey sold roughly 2 million shares that generated approximately $69 million in proceeds, and that other non-defendant "insiders" sold approximately 8.5 million shares for a total of $272 million in proceeds. [Doc. No. 36] at 65 ¶ 173. They also allege that Defendant Nakazawa resigned shortly after she sold her shares and that the "sudden resignation" and retirement of non-defendant Ed Williams as Chief Operating Officer, was announced "the same day as the revelation of the truth regarding the delays of the TSA and CMS contracts." *Id.* at 66 ¶¶ 175-177.

Because the insiders' sales were carried out shortly after an SPO, there is no other trading period with which to compare in order to infer a suspicious pattern; and from what appears uncontested from the briefing, one defendant purchased shares during the class period, another

sold his shares pursuant to a Rule 10b-5 trading plan, and the percentage of shares sold for each Defendant is far below what the Fourth Circuit has found insufficient to infer scienter. *See Yates,* at 890-891 (A former CFO's sale of 78% of company shares, a board chairman's sale of 37% of shares, and CEO's sale of 28% were not suspicious) (*ref.*, *Teacher's Ret. Sys. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (commenting on sale that constituted 82%, 92% and 100% of the defendants' holdings)). In short, no inference of scienter can be drawn as to any Defendant from either Nakazawa's or William's resignation or the sales by non-defendants; and the Defendants' individual sales of stock, in and of themselves, do not allow a sufficiently strong inference that the Defendants had the intent to realize a profit based on fraud. *See e.g. Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (holding generalized financial motives are insufficient to plead scienter); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 476 (M.D.N.C. 2004) (finding personal financial motives during an SPO "may be probative when combined with other indica of intent, they are attributable to corporate officers generally, and as such are insufficient in themselves to establish scienter.") (citations omitted). Rather, the stronger, more cogent inference is that the individuals who sold stock wanted to capitalize on their newly liquid assets. *See Tellabs*, 551 U.S. at 326 ("In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").

Nor can scienter be inferred from the drop in stock. Courts must examine each of Plaintiffs' allegations of scienter holistically to determine whether the "Defendants knowingly or recklessly defrauded investors" or whether "the more compelling inference is that the Defendants merely acted negligently or non-fraudulently." *KBC Asset Mgmt. NV*, 19 F.4th at 608. Like the Defendants in *KBC Asset Mgmt. NV.*, there is also a "plausible" and "innocent narrative" that readily explains

the drop in Telos' stock price at the end of the class period, *id*. at 613, namely, that two large scale world events, the pandemic and the cybersecurity threats, occurred at the same time a mistaken accounting assumption was discovered by the company, and that the repercussions from these three events each independently affected the future projections and predictions of the company. The link Plaintiffs draw between these three events is largely speculative and insufficient to demonstrate any of the Defendants' acted with the requirements of scienter. In addition, the statements relied upon in the Amended Complaint also demonstrate that the Defendants continued to disclose delays, risks, and newly discovered weaknesses. *See KBC Asset Mgmt. NV*, 19 F.4th at 613 ("[W]hen defendants disclose risks and newly discovered weaknesses to investors this counts against an inference of scienter.") (*ref.*, *Yates*, 744 F.3d at 892-893; *In re Triangle*, 988 F.3d at 755-756). In short, the most cogent alternative explanations to the events giving rise to this civil action is that because of events, and the repercussions from events, all beyond Defendants' control or knowledge, Telos' future predictions were rendered inaccurate. At most, this establishes that Telos acted negligently or non-fraudulently, not that Telos acted intentionally or severely recklessly.

Finally, Plaintiffs contend in support of their Rule 10b-5 claim that Defendants violated SEC Regulation S-K by failing to disclose known material risks pursuant to Item 303 and Item 503. As this Court has previously concluded, these omissions do not create an independent cause of action and a Rule 10b-5 claim based on these alleged omissions must also allege the required degree of scienter and be pled with particularity in accordance with Fed. R. Civ. P. 9(b). *In re Maximus, Inc. Secs, Litig*, 2018 U.S. Dist. LEXIS 146068 at *45-46 (E.D. Va. August 27, 2018) (Item 303 violations are not a *per se* material omission for the sake of 10b-5 claims and therefore "Item 303 omissions must still be material and made with scienter.") (citing *Stratte-McClure v.*

*Morgan Stanley*, 776 F.3d 94, 103-104 (2d Cir. 2015), *ref.*, *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000)); *see also Iron Workers Local 16 Pension Fund v. Hillb Rogal & Hobbs Co.*, 432 F. Supp. 571, 583 (E.D. Va. 2006) ("[T]here is no private right of action under SEC Regulation S-K.") As with the other relied upon statements and omissions, Plaintiffs have failed to allege facts that raise a sufficient inference of scienter with respect to any material omissions under either Item 303 or 503 of SEC Regulation S-K.

**(B) Section 11 claim (Count III).**

The Plaintiffs have alleged that the Defendants have violated §11 of the Securities Act based on inaccurate and untrue statements of material facts and omissions contained in Telos' IPO registration statement. [Doc. No. 36] at 85 ¶ 231. Plaintiffs argue that they are not required to plead scienter or meet the heightened pleading standards of Rule 9(b) because the Amended Complaint presents the claims separately from the claims of fraud and does not incorporate the allegations of fraud by reference. [Doc. No. 59] at 38.

While Section 11 does not require that Defendants possessed the requisite intent, the law within this Circuit, as within others, has established that when Section 11 claims sound in fraud, those claims must meet the particularity requirements of Rule 9(b):

> Although claims under Sections 11 and 12(a)(2) may not have fraud as an element, Rule 9(b) refers to "alleging fraud," not to causes of action or elements of fraud. When a plaintiff makes an allegation that has the substance of fraud, therefore, he cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability. Allowing a plaintiff to do so would undermine one of the primary purposes of Rule 9(b): protecting defendants from the reputational harm that results from frivolous allegations of fraudulent conduct.

*Cozzarelli,* 549 F.3d at 629 (*ref.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)); *see also Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013) ("Section 11 does not have a scienter or reliance requirement... unless a §11 claim sounds

in fraud."). Like the plaintiffs in *Cozzarelli*, the Plaintiffs here have alleged the same allegations as their fraud claims while adding a "conclusory disclaimer" that their claims are not for fraud. But merely relabeling the allegations within the Amended Complaint is not sufficient to avoid the applicable pleading requirement. *Cozzarelli*, at 629 ("[T]he complaint also claims that the false statements in the prospectuses support plaintiff's Exchange Act counts. But plaintiffs cannot make that claim with a straight face without also admitting that the complaint alleges the prospectuses to be fraudulent.").

For the above reasons, Plaintiffs' Section 11 claims, which sound in fraud, do not meet the pleading requirements of Federal Rule of Civil Procedure 9 and therefore cannot survive the Motion to Dismiss.

### (C) Section 20(a) and Section 15 Claims (Count II and IV)

The Amended Complaint makes claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act, which creates liability for persons who have control over an individual who violates Section 10(b) or Section 11, respectively. As the Amended Complaint fails to state a claim against any Defendant under Section 10(b) or Section 11, no Defendant can be liable based a controlling persons' liability. *See In re Maximus, Inc.*, 2018 U.S. Dist. LEXIS 146068 at *54-55; *Plymouth County Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 557 (M.D.N.C. 2013).

### V.

### (A) Request to file a Second Amended Complaint.

In a footnote, the Plaintiffs have requested leave to file a Second Amended Complaint should the Court grant the Defendants' Motion to Dismiss. [Doc. No. 59] at 38 n. 27. The Plaintiffs have not tendered a proposed Second Amended Complaint, have not formally moved to file such

an amended complaint and based on the current record have not identified a reasonable basis that a good faith amendment would cure the deficiencies in the Amended Complaint. *See Cozzarelli*, 549 F.3d at 630. For this reason, Plaintiffs' informal request for leave to amend is DENIED, without prejudice to their filing a motion for leave to file a Second Amended Complaint, with the proposed Second Amended Complaint attached to the motion, should there be a good faith basis for such a motion.

**VI.**

For the above reasons, it is hereby

ORDERED that the Defendants' Motion to Dismiss [Doc. No. 53] be, and the same hereby is, GRANTED and this action is DISMISSED; and it is further

ORDERED that Plaintiffs file any motion for leave to file a second amended complaint within 21 days of the date of this Order.

The Clerk is directed to forward copies of this Order to all counsel of record.

Anthony J. Trenga
United States District Judge

February 1, 2023
Alexandria, Virginia