UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| THE FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, ALASKA ELECTRICAL PENSION FUND and INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 793 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TELOS CORPORATION, JOHN B. WOOD, MICHELE NAKAZAWA, MARK BENDZA, BERNARD C. BAILEY, DAVID BORLAND, MAJ. GEN. JOHN W. MALUDA, ROBERT J. MARINO, BONNIE L. CARROLL, FREDERICK D. SCHAUFELD, ANDREW R. SIEGEL, and WILLIAM H. ALDERMAN,<br><br>Defendants. | Civil Action No. 1:22-cv-00135-AJT-IDD<br><br>CLASS ACTION<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 10

A. Lead Plaintiffs ..... 10

B. Defendants ..... 11

1. Telos and the Executive Defendants ..... 11

2. The Director Defendants ..... 13

IV. CLASS ACTION ALLEGATIONS ..... 14

V. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 16

VI. SUBSTANTIVE ALLEGATIONS ..... 17

A. Telos and Its Business ..... 17

B. Telos Goes Public After Landing Its Two Biggest Contracts and Touts Them As Huge Sources of Immediate and Long-Term Revenues ..... 20

C. After the IPO, Telos Reaffirms Its "Conservative" Revenue Guidance and Issues Additional Guidance of Billions of Dollars of Revenues Over the Contracts' Duration ..... 22

D. Unbeknownst to Investors, Defendants' Statements Regarding Revenue from the TSA and CMS Contracts Lacked Any Factual Basis ..... 23

E. Telos Conducts a Secondary Public Offering Enabling Insiders to Dump Their Personal Telos Shares at Inflated Prices ..... 31

F. Defendants Continue to Mislead Investors Regarding the TSA and CMS Contracts and Their Related Revenues ..... 32

G. The Truth Begins to Emerge ..... 36

VII. SECURITIES ACT VIOLATIONS ..... 41

A. Defendants' Materially False and Misleading Statements and Omissions in the IPO Registration Statement ..... 41

COUNT I ..... 43

**Page**

Violation of Section 11 of the Securities Act (Against Telos, Wood, Nakazawa and the Director Defendants)................43

COUNT II ........................................................................................45

Violation of Section 15 of the Securities Act (Against Wood, Nakazawa and the Director Defendants)...........................45

VIII. Exchange Act Violations ........................................................................................47

A. Defendants' Materially False and Misleading Statements and Omissions...........47

1. IPO Registration Statement........................................................................47

2. 2020 Annual Report, Press Release and Conference Call .........................48

3. May 17, 2021 Quarterly Report, Press Release and Conference Call.......................................................................................................52

4. August 16, 2021 Quarterly Report, Press Release and Conference Call.......................................................................................................53

5. August 25, 2021 – BMO Virtual Technology Summit.............................55

6. September 9, 2021 – D.A. Davidson 20th Annual Software and Internet Conference.....................................................................................56

7. November 15, 2021 Quarterly Report, Press Release and Conference Call ........................................................................................56

8. November 16, 2021 – Needham Virtual Security, Networking, & Communications Conference....................................................................58

B. Additional Scienter Allegations............................................................................59

1. Management's Continued Focus on ASC 606 and Repeated Acknowledgement that It Was the Company's Most Critical Accounting Policy Supports A Strong Inference of Scienter ....................59

2. The Obvious and Crucial Requirement to Assess Whether Telos Was a "Principal" or "Agent" Under GAAP Before Issuing Revenue Guidance Further Supports a Strong Inference of Scienter ........61

3. The Crucial Importance of the TSA and CMS Contracts to the Company's Growth Supports a Strong Inference of Scienter...................62

**Page**

4. The Sharp Analyst Reaction to the Company's Complete Reversal in its Guidance for the TSA and CMS Contracts Further Support a Strong Inference of Scienter ....................63

5. Defendants' and Other Insiders' Massive Stock Sales Reinforce a Strong Inference of Scienter ....................63

6. Suspicious Executive Departures Further Support a Strong Inference of Scienter ....................67

C. Loss Causation ....................67

D. Presumption of Reliance (Fraud-On-The-Market Doctrine) ....................70

IX. Exchange Act Counts ....................72

COUNT III ....................72

Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against Telos and the Executive Defendants) ....................72

COUNT IV ....................75

Violation of Section 20(a) of the Exchange Act (Against the Executive Defendants) ....................75

X. PRAYER FOR RELIEF ....................76

XI. JURY TRIAL DEMAND ....................76

Lead Plaintiffs Firemen's Retirement System of St. Louis, Alaska Electrical Pension Fund, and International Union of Operating Engineers Local 793 Pension Plan (collectively, "Lead Plaintiffs") bring this action individually and on behalf of all persons and entities that purchased Telos Corporation ("Telos" or the "Company") common stock: (i) pursuant and/or otherwise traceable to the October 6, 2020 registration statement, as amended ("IPO Registration Statement" or "Registration Statement") for the Company's initial public offering ("IPO"); and (ii) during the period of November 19, 2020 to March 16, 2022, inclusive (the "Class Period"), and were damaged thereby. Lead Plaintiffs are pursuing remedies against Defendants under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§77k and 77o ("Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) ("Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon the investigation of their undersigned counsel, conducted under Lead Plaintiffs' supervision, which includes, without limitation: (a) review and analysis of Telos' public filings with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Telos; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Telos' website concerning the Company's public statements; (d) reports by securities analysts; (e) accounting rules, regulations, and guidance; (f) consultation with expert consultants; (g) review of other publicly available information concerning Defendants; and (h) additional materials and data concerning Telos, its industry, and customers as identified herein. Lead Plaintiffs' investigation is ongoing and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I. INTRODUCTION

1. Telos focuses its business on developing and implementing cyber, cloud, and enterprise security technology and products. Telos was a private company for over fifty years before going public in November 2020, only months after being awarded two "multibillion-dollar" government contracts. Specifically, in July 2020, Telos announced that it was one of three vendors chosen by the U.S. Transportation Security Administration ("TSA") for a contract to provide TSA PreCheck enrollment services that Defendants claimed would inject ***$1.7 billion in revenues*** over ten years. Three months later, in October 2020, Telos announced that it had been awarded another ten-year, ***multibillion-dollar contract*** with the Centers for Medicare & Medicaid Services ("CMS"). These contracts were by far the largest in Telos' history, and analysts immediately highlighted that the significant top-line revenue streams to be generated by the TSA and CMS contracts were an absolutely critical metric for investors—declaring them "***[t]he first tenet of our investment thesis***" and a "***Key Catalyst[]***" for Telos' growth and success.[1]

2. On November 19, 2020, Telos went public, selling over 17 million shares at an offering price of $17 per share. From its inception as a public company, and throughout the Class Period, Defendants repeatedly emphasized the importance of the TSA and CMS contracts and assured investors that these contracts would quickly generate "***rapidly accelerating revenue growth***"—further supporting the Company's top-line revenue growth story. Indeed, to bolster interest in Telos' IPO, Defendants took the highly unusual step of including specific revenue guidance for the contracts in the offering materials—touting that the two contracts alone were expected to deliver revenues of "***between $75 million and $80 million***" in 2021 and "***in excess of $135 million***" in 2022. These amounts were extraordinarily material to investors, as they represented a staggeringly high percentage of the company's total annual revenue and were

[1] All emphasis added unless otherwise noted.

responsible for the vast majority of the Company's anticipated growth. Indeed, the amount of revenue the Company expected to record in 2022 from the two contracts alone was equal to ***75%*** of the total annual revenue Telos recorded in all of 2020 ($179.9 million) and nearly ***85%*** of the total annual revenue the Company booked for all of 2019 ($159.2 million). Fueled by the highly favorable revenue guidance for the TSA and CMS contracts, the IPO was an enormous success and generated significant investor demand.

3. After the IPO, Defendants continued to relentlessly reiterate and expand upon their highly bullish revenue guidance for the contracts. During Telos' first earnings call on March 25, 2021, Defendant John B. Wood ("Wood"), the Company's CEO, trumpeted the TSA and CMS contracts as the linchpin in Telos securing "***almost $1 billion of annual revenue within 5 years***." When an analyst questioned Wood as to whether there were "an[y] issues whatsoever relative to . . . the way you're accounting for revenues or anything along those lines that the accountants had any issues with," Wood assured investors that "***[t]here was absolutely no issue***" from an accounting perspective relating to the revenue forecasts. To the contrary, Telos' senior management, including Defendants Wood and Michele Nakazawa ("Nakazawa"), the Company's then-CFO, repeatedly assured the market that the Company's revenue forecasts were based on a solid foundation, describing their guidance as not only "***good***," but "***conservative***" and "***the most prudent forecast for our business***." While the Company and investors were focused on the Company's top-line revenue growth, Defendant Wood also boasted to investors that the Company estimated the TSA contract alone would generate $800 million in ***profits***—a massive amount for a company of Telos' size.

4. Defendants' assurances had the desired effect on the market. Fueled by Defendants' representations, Telos stock price soared after the IPO, reaching a Class Period high of $40.21 on January 20, 2021. Company insiders took full advantage. Less than six months after

taking Telos public, and with the Company's stock price still trading near record highs, Telos completed a secondary public offering ("SPO") in April 2021 at an offering price of $33 per share—nearly ***twice*** the IPO price. In connection with that SPO, Company insiders dumped massive amounts of their personal holdings of Telos shares at fraud-inflated prices. Defendants Wood and Nakazawa, who had been with the Company for approximately 20 and 30 years, respectively, sold 20% and 45% of their holdings in the SPO, collectively realizing proceeds of more than ***$58 million***. And the insider selling continued after the SPO. In all, Telos insiders realized a staggering ***$341 million*** in proceeds during the short 16-month Class Period—more than the Company's ***entire valuation*** as of the IPO. The extensive insider selling was so suspicious that analysts specifically questioned management about it during investor conference calls, forcing Wood to reassure investors that "[i]t's not a question about the Company or its condition." Three months later, Telos announced—without explanation—Nakazawa's sudden resignation as CFO, after serving in the position for nearly 17 years and cashing out nearly half of her personal holdings in the SPO.

5. As was ultimately revealed, however, Defendants' highly material statements about the amount of revenue the two most important contracts in the Company's history would generate were utterly false from the moment they were issued. Indeed, as detailed below, Defendants' revenue forecast violated Generally Accepted Accounting Principles ("GAAP"), and grossly overstated the amount of revenue the Company could ever recognize from the contracts. As Defendants ultimately admitted, when GAAP was properly applied, the forecasted revenues were reduced by a staggering 64%. Defendants' admissions meant both that: (1) the statements in the IPO Registration Statement about the amount of revenue the two contracts would produce were dramatically false (for example, rather than generating revenue of $75-$80 million from the

contracts in 2021, Telos could only generate revenue of $27-$28.8 million); and (2) the Company's repeated assurances that these were "multibillion dollar" contracts was pure fiction.

6. As Defendants ultimately admitted, prior to issuing the revenue guidance for the TSA and CMS contracts, Telos failed to undertake a fundamental, basic, and critical assessment pursuant to GAAP—an assessment they were required to take before making their revenue forecasts. Specifically, Accounting Standards Codification 606 ("ASC 606") requires that in any arrangement where more than one party (*i.e.*, a third party) is involved in transferring goods or services to an end consumer, a company must undertake an initial evaluation of whether a party is a principal or agent under the contract. This threshold determination is hugely consequential, as a principal recognizes revenues on a ***gross*** basis, whereas an agent recognizes revenues on a ***net*** basis. Despite explicitly adopting ASC 606 two years earlier, Telos failed to undertake this most fundamental test in issuing revenue guidance for the critically important TSA and CMS contracts, and instead simply "assumed" the Company was a principal under these contracts—when, in reality, it was an agent. As a result, Defendants' revenue guidance for the TSA and CMS contracts was grossly overstated from the moment it was issued and not compliant with GAAP.

7. Significantly, there is no doubt that Defendants were intimately familiar with ASC 606, and that ***they knew that the TSA and CMS contracts—and more broadly, all the Company's contracts—were required to comply with ASC 606***. Indeed, within months of ASC 606 being promulgated in 2016, management: (i) told investors that the Company had formed an "internal working group" of highly experienced professionals around ASC 606, and added additional resources to support "evaluation" and "adoption" of the new standard; (ii) repeatedly updated investors on the progress of the internal working group; and (iii) informed investors of the Company's ultimate decision to adopt ASC 606 and apply it when assessing revenues retrospectively and prospectively for ***all*** of the Company's contracts.

8. Further, both before and during the Class Period, Telos management—including Defendants Wood, Nakazawa, and Mark Bendza ("Bendza," the CFO that replaced Nakazawa)—represented to investors that ASC 606 was the Company's ***most critical accounting policy***. Indeed, in each and every Annual Report filed during the Class Period, Telos management identified—in a dedicated and critically important disclosure required by the SEC for over ***40 years***—ASC 606 as the first of the Company's "most critical accounting policies used in the preparation of our consolidated financial statements." Management's identification of ASC 606 at the very beginning of the Management Discussion and Analysis Section ("MD&A Section") as first and foremost among the Company's "most critical accounting policies" was highly significant, as the purpose of the MD&A Section is—in the SEC's words— meant to give investors "***an opportunity to look at the company through the eyes of management***," by disclosing "***the most relevant information***" "***in one section of a filing***" with a "***particular emphasis on the registrant's prospects for the future***." Furthermore, throughout the Class Period, Defendants ***certified to investors*** that Telos was timely disclosing truthful material facts about its business, accurately reporting its financial condition, and maintaining effective internal controls over financial reporting—including the critical ASC 606.

9. The truth about Defendants' grossly overstated revenue guidance for the TSA and CMS contracts, and Defendant Wood's repeated statements about the profits those revenues would purportedly generate, began to emerge in the second half of 2021. On November 15, 2021, during the Company's third quarter 2021 earnings call, Defendants shocked the market by disclosing that, rather than being "on track" to realize upwards of $75 million in revenues under the TSA and CMS contracts in 2021, neither contract had generated a ***single penny*** in revenue. In response to these revelations, Telos stock price plunged more than 28 percent, declining $6.84 per share in a single day. Analysts excoriated Defendants, reporting that management's "***credibility [was] shredded***."

10. On February 28, 2022, Telos hinted that more bad news was coming, when, after the markets closed, it disclosed that the Company was being forced to delay filing its 2021 Form 10-K due to "material weaknesses" in the Company's internal controls over financial reporting. In response, Telos stock price tumbled nearly 20 percent over the next four trading days.

11. Then, on March 16, 2022—nearly a year and a half after the Company went public—the full truth about the so-called "multibillion dollar" TSA and CMS contracts was finally and belatedly revealed. On that day, Telos was forced to admit that it had provided the market with materially false and misleading revenue guidance for the TSA and CMS contracts since its inception as a public company. Indeed, Telos admitted that it had never even bothered to undertake the foundational evaluation required by ASC 606 to determine whether Telos was a principal or agent, and instead, merely "***assum[ed]***"—incorrectly and without a reasonable basis—that Telos would be treated as the principal to the transaction. The impact of the Company's failure to undertake this fundamental accounting analysis was enormous. According to the Company's calculations, once Telos conducted the test required by ASC 606, the amount of revenue that could be booked under the TSA contract was reduced by nearly ***two-thirds***—eviscerating the Company's top line growth story.

12. In response to this stunning news, the stock fell another 11%, and analysts castigated management for its failure to undertake the basic agent/principal determination under ASC 606, noting that such a failure was inexcusable. As one analyst cogently noted in rebuking Defendants Wood and Bendza during the Q&A portion of the March 16, 2022 earnings call: "***Shouldn't that have been vetted pre-IPO?*** And shouldn't it have been consistent with what you had -- was doing anyway? ***So shouldn't you have known that before you IPO-ed?***" Still another

analyst opined, "We are unclear why the net versus gross rev rec was not assessed previously." Tellingly, analysts' questions went unanswered.

13. The fact that Telos' CEO and CFO refused to answer this basic and critical question spoke volumes. Indeed, management's failure to explain why the Company's admittedly "most critical" accounting policy for revenue recognition had not been "vetted" when issuing revenue guidance for the two largest and most important contracts in Company history, made clear to the market that the Company had not conducted the requisite test. Had the Company vetted ASC 606's critical "principal" versus "agent" test before the IPO, *i.e.*, by actually undertaking an informed analysis and exercising reasonable accounting judgment, it obviously would have said so. Defendants' silence in the face of such specific, public questioning was a contemporaneous admission that the evaluation had not been done, and that Defendants instead chose to provide investors with factually baseless revenue guidance that was grossly overstated from the moment it was issued—a fact which multiple analysts' reports issued after the call made crystal clear.

14. On that same call, Telos management attempted to minimize the misstatements by claiming that the approximate ***two thirds*** reduction in revenue guidance supposedly did not affect the profitability of the contracts. However, that statement was false and blatantly contradicted what Telos had told investors during the Class Period. Indeed, during the Class Period, Defendant Wood explicitly told investors that the TSA contract would generate $1.7 billion in revenue and ***$800 million in profit*** over a ten-year period. However, Defendants' admissions that they had overstated the amount of revenue they could record from the TSA contract meant that the Company could really only hope to generate roughly $612 million in revenue over from the contract over 10 years (and not $1.7 billion)—***meaning that it was mathematically impossible for the Company to ever generate anything close to $800 million in profits***. Indeed, even assuming every penny of revenue from the contract could be booked as profit, Defendants' admissions meant that the

Company had materially overstated the amount of profit it could record by nearly ***$200 million***, or almost ***25%***.

15. Telos' shareholders have been significantly harmed by Defendants' material misrepresentations and omissions. As of the filing of this Complaint, Telos stock trades in the single digits—less than ***75%*** of the company's IPO price. This action seeks redress on behalf of Telos' aggrieved investors.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. §77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 22 of the Securities Act (15 U.S.C. §77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this District.

19. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

20. Lead Plaintiff the Firemen's Retirement System of St. Louis (the "Firemen's Retirement System") is a defined benefit pension plan with over $400 million in assets under management for the benefit of approximately 2,000 participants and their beneficiaries. As set forth in its previously filed certification (ECF No. 36-3), incorporated by reference herein, the Firemen's Retirement System purchased Telos common stock during the Class Period, including shares traceable to the IPO Registration Statement, and suffered damages as a result of the federal securities law violations alleged herein. Specifically, but not exclusively, the Firemen's Retirement System purchased 10,000 shares of Telos common stock between the IPO and SPO, and suffered significant losses and damages as a result of such purchases.

21. Lead Plaintiff Alaska Electrical Pension Fund is a multiemployer defined benefit pension plan with over $2 billion in assets under management for the benefit of over 10,000 participants. As set forth in its previously filed certification (ECF No. 36-1), incorporated by reference herein, Alaska Electrical Pension Fund purchased Telos common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

22. Lead Plaintiff International Union of Operating Engineers Local 793 Pension Plan is a multiemployer defined benefit pension plan with over $2.71 billion in assets under management for the benefit of approximately 14,500 active members, 7,000 retired members and 11,670 deferred vested members. As set forth in its previously filed certification (ECF No. 36-2), incorporated by reference herein, International Union of Operating Engineers Local 793 Pension Plan purchased Telos common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

**B. Defendants**

**1. Telos and the Executive Defendants**

23. Defendant Telos maintains its principal executive offices in Ashburn, Virginia. Telos common stock has traded on the NASDAQ under the ticker symbol "TLS" since its IPO on November 19, 2020.

24. Defendant John B. Wood has served as the Company's Chairman, President, and CEO since 1992. Wood was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

25. Defendant Michele Nakazawa served as the Company's CFO from 2004 until her "resignation" in July 2021. Nakazawa signed the materially false and misleading IPO Registration Statement.

26. Defendant Mark Bendza replaced Defendant Nakazawa as CFO, and has served as the Company's Executive Vice President and CFO since July 2021.

27. Defendants Wood, Nakazawa, and Bendza are collectively referred to herein as the "Executive Defendants."

28. The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Telos' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Further, the Executive Defendants signed reports that Telos filed with the SEC during the Class Period, including the Company's 2020 Annual Report on Form 10-K, which was signed by Defendants Wood and Nakazawa, the Company's First Quarter of 2021 Form 10-Q for 2021, which was signed by Wood and Nakazawa, the Company's Second Quarter of 2021 Form 10-Q, which was signed

by Wood and Bendza, and the Company's Third Quarter of 2021 Form 10-Q, which was signed by Wood and Bendza, and thus were responsible for statements made therein. Because of their positions and access to material non-public information available to them, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

29. The Executive Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Executive Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Executive Defendants were able to and did, directly or indirectly, control the conduct of Telos' business.

30. The Executive Defendants also participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, as well as other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

31. As senior executive officers and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Executive Defendants had a duty to promptly disseminate accurate and truthful information with respect to Telos' financial condition and performance, growth, operations, compliance with applicable laws, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially

misleading or untrue, so the market price of Telos common stock would be based on truthful and accurate information. The Executive Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. Telos and each Executive Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Telos common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Telos' financial performance, business, prospects and operations, as well as the intrinsic value of Telos common stock; (b) enabled the Executive Defendants to sell approximately $66.7 million worth of their personal Telos common stock at artificially inflated prices; and (c) caused Lead Plaintiffs and the Class to purchase Telos common stock at artificially inflated prices.

**2. The Director Defendants**

33. Defendant Bernard C. Bailey ("Bailey") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

34. Defendant David Borland ("Borland") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

35. Defendant Maj. Gen. John W. Maluda ("Maluda") was a director of Telos at the of the time IPO and signed the materially false and misleading IPO Registration Statement.

36. Defendant Robert J. Marino ("Marino") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

37. Defendant Bonnie L. Carroll ("Carroll") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

38. Defendant Frederick D. Schaufeld ("Schaufeld") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

39. Defendant Andrew R. Siegel ("Siegel") was a director of Telos at the time of the IPO and signed the materially false and misleading IPO Registration Statement.

40. Defendant William H. Alderman ("Alderman") was a director of Telos at the time IPO and signed the materially false and misleading IPO Registration Statement.

41. Defendants Bailey, Borland, Maluda, Marino, Carroll, Schaufeld, Siegel and Alderman are collectively referred to herein as the "Director Defendants."

## IV. CLASS ACTION ALLEGATIONS

42. Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased Telos common stock: (i) pursuant or otherwise traceable to the IPO Registration Statement, seeking to pursue remedies under the Securities Act (the "Securities Act Class"); and (ii) during the Class Period, seeking to pursue remedies under the Exchange Act (the "Exchange Act Class," and together with the Securities Act Class, the "Class").

43. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. For instance, throughout the Class Period, Telos common stock actively traded on the NASDAQ (an open and efficient market) under the ticker symbol "TLS." Millions of Telos shares were traded publicly during the Class Period on the NASDAQ. As of March 1, 2023, Telos had more than 67 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records

maintained by Telos or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that are complained of herein.

46. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

47. Common questions of law and fact exist as to members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act by the acts and omissions alleged herein;

(b) whether the IPO Registration Statement misrepresented or omitted material information in violation of the Securities Act;

(c) whether Defendants violated the Exchange Act by the acts and omissions alleged herein;

(d) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Telos, in violation of the Exchange Act;

(e) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Telos, in violation of the Exchange Act;

(f) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading, in violation of the Exchange Act;

(g) whether the market price of Telos common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations and omissions complained of herein in violation of the Exchange Act; and

(h) the extent to which the members of the Class have sustained damages and the proper measure of damages.

48. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

49. The statutory safe harbor provided under the Private Securities Litigation Reform Act of 1995 for "forward-looking statements" under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. For example, the alleged misstatements relating to the Company's revenue guidance and forecasted profits from the TSA and CMS contracts were, as the Company admitted, false and materially overstated from the moment they were issued. Indeed, due to Telos' failure to perform ASC 606's fundamental, obvious, and crucial agent/principal evaluation, even if Telos fully captured all available revenue from every transaction at every location during each year of the contract term, the Company would still generate only approximately one-third of the total revenue and hundreds of millions of dollars less in profits than what Defendants Telos and Wood represented.

50. In addition, the forward-looking statements were contradicted by existing undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks, including that Telos had utterly failed to perform the ASC 606's fundamental agent/principal assessment prior to issuing its false revenue guidance.

## VI. SUBSTANTIVE ALLEGATIONS

### A. Telos and Its Business

51. Telos markets itself as offering technologically advanced, software-based security solutions that protect organizations against evolving, sophisticated and pervasive cybersecurity threats. The Company bills its services as protecting its customers' personnel, information, and digital assets so they can pursue their corporate goals with confidence in their security and privacy, and provides products and services to the government, military, and Fortune 500 companies.

52. Telos' products fall into two general categories: (1) Security Solutions; and (2) Secure Networks. Among its Security Solutions offerings is Telos ID, which encompasses IDTrust360, a digital identity services platform used to mitigate cyber threats by integrating biometrics, credentials, and other identity-centric data. According to the Company, IDTrust360's key capabilities include that it: (a) supports touchless, live scan, and wet fingerprint card scanning; (b) identifies, prioritizes, and mitigates threats to protect enterprise resources; (c) tracks criminal history, terrorist watchlists, vetting, and payment processing; (d) aligns with federal agency guidelines for digital identity, enrollment, and identity proofing; (e) provides facial recognition, live scan, and no-touch fingerprint scanning and matching; and (f) provides access and appointment scheduling via mobile, web, kiosk, and client apps.

53. IDTrust360 relies heavily on third-party government agencies to deliver its service and utilizes information gathered from several U.S. federal agencies and commercial intelligence

sources to provide both business-to-business and business-to-consumer security solutions. It is this access to third-party databases, such as the FBI and Department of Homeland Security watch lists, that makes IDTrust360 such a marketable tool.

54. In July 2020, Telos announced that it was one of three vendors selected by the TSA to provide TSA PreCheck enrollment services, as well as background check services, using the IDTrust360 platform. The services under this agreement were to include the creation of customized biometric and identity trust technology to work with TSA systems to screen individual, fee-paying applicants who wish to avoid long security lines by signing up for TSA PreCheck. In addition, Telos was to vet non-travelers who need access to secure locations in an airport, including aviation workers.

55. Approximately three months later, in October 2020, Telos announced a ten-year, multibillion-dollar contract with CMS using IDTrust360. The services to be performed under the CMS agreement included providing technology and service solutions to detect, prevent, and proactively deter fraud, waste, and abuse in the Medicare and Medicaid programs. For example, Telos was to confirm the credentials of 1.5 million healthcare providers who are required to undergo FBI-based non-criminal history checks annually (including identity verification, fingerprinting, and continuous monitoring).

56. On the heels of securing the TSA and CMS contracts, Telos touted both contracts as substantial sources of immediate and long-term revenue growth, which supported the Company's top-line revenue growth story. As discussed below, with the TSA and CMS contracts in place, Defendants initially told the market at the time of the IPO that they expected annual revenue of approximately $283 million in 2021, with the two contracts accounting for $75-$85 million of that amount (as much as 28.2%). These estimates represented dramatic revenue growth compared to the Company's prior performance. Indeed, Telos' revenue estimates for 2021

represented growth of 57%, compared to the Company's reported annual revenues of approximately $180 million in 2020 and $159 million in 2019. Moreover, Telos' five year revenue estimate of $1 billion represented extraordinary growth of over ***450%***, as provided below:




57. Moreover, as discussed below, after the IPO, Telos expanded on their highly favorable three year revenue projections for the TSA and CMS contracts with even more bullish revenue forecasts covering the full 10-year contract duration. In multiple investor conferences, Defendants Wood, Nakazawa, and Bendza touted anticipated revenues under the 10-year CMS contract of up to $2 billion, and forecasted revenues under the 10-year TSA contract of $1.7 billion.

### B. Telos Goes Public After Landing Its Two Biggest Contracts and Touts Them As Huge Sources of Immediate and Long-Term Revenues

58. The Class Period begins on November 19, 2020, when Telos shares were first listed on the NASDAQ.[2] In the IPO, the Company sold 17.2 million shares of common stock at a price of $17.00 per share, raising gross proceeds of over $292 million. None of the Company's officers or directors were permitted to sell shares in the IPO. Instead, as is customary in initial public offerings, Telos' officers and directors were subject to a 180-day lockup on any sales of their personal Telos holdings.

59. In going public, Telos emphasized and the market recognized that the TSA and CMS contracts were not only the largest contracts in the Company's history, but also that the substantial revenues that were to be generated under the contracts were absolutely critical to the Company's growth and success. The IPO Registration Statement and other offering documents made it clear that the TSA and CMS contracts were to provide immediate, substantial, and unprecedented sources of revenue growth. For example, the IPO Registration Statement stated that the Company expected accelerated growth due to "recent contract awards that are significant to our business" and explicitly referred to Telos' "contract wins" with the TSA and CMS. The IPO Registration Statement represented that these contracts were expected to launch promptly and "collectively may grow from a ***base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively***." The IPO Registration Statement underscored the paramount importance of these contracts to the investment thesis that Telos was a growth stock, concluding that "[f]or these reasons, we anticipate ***these recent contract awards***, combined with our organic growth as well as

---

[2] Prior to Telos' initial public offering in 2020, the Company had one series of preferred stock that traded over-the-counter and was issued by C3 Inc., a separate company. Additionally, Telos had a sufficient amount of Class A and Class B common stock outstanding to make it a reporting company under SEC rules, prior to its public listing on NASDAQ.

other opportunities for business expansion, to contribute to ***rapidly accelerating revenue growth beginning in 2021 and 2022***."

60. Significantly, the IPO Registration Statement ***did not say a single word about how much profit or income the two contracts would ever generate***. The reason for this was simple: given that Telos was a new issuer, Defendants understood that revenue growth was what investors wanted to see, and Defendants understood that the "billions" of dollars in top-line revenue the contracts would supposedly generate was what would attract investors to buy the Company's stock.

61. Fueled by the representations regarding the TSA and CMS contracts, the IPO was an enormous success and generated significant investor demand. The offering was upsized by more than 20%, from an originally planned offering of 12.35 million shares to 14.9 million shares. Moreover, the underwriters exercised their "greenshoe" over-allotment option to sell additional shares. In total, the IPO encompassed a total of 17.2 million shares and raised gross proceeds of $292.6 million.

62. Securities analysts credited Defendants' bullish statements in the IPO Registration Statement regarding the substantial and rapidly accelerating revenue streams from the TSA and CMS contracts, which supported the Company's top-line growth story. For example, a BMO Capital Markets Report dated December 14, 2020, stated: "We believe Telos' multiple can move higher based on ***growing revenue*** and cost execution as captured in our forecast," specifically, by "execut[ing] on business largely already captured in existing contracts." The BMO analyst emphasized Telos' "***high revenue visibility***" for these two major contracts as a "***Key Catalys***t[]," stating: "Management forecasts IDTrust360 as Telos' largest revenue sub-segment through FY22, primarily due to two very large contracts with the Transportation Security Administration (TSA) and the Centers for Medicare and Medicaid Services (CMS)." A D.A. Davidson & Co. Report,

also dated December 14, 2020, hailed Telos' purported accelerated revenue growth as "***[t]he first tenet of our investment thesis***," noting that revenues will be "***largely driven by the TSA PreCheck and CMS [] wins***." A Northland Capital Market Report, from the same day, similarly centered on Telos' revenue growth, underscored that in the first two contract years, "***the TSA and CMS will drive revenue growth acceleration from mid-teens to 40+%, representing stage 1***."

**C. After the IPO, Telos Reaffirms Its "Conservative" Revenue Guidance and Issues Additional Guidance of Billions of Dollars of Revenues Over the Contracts' Duration**

63. On March 25, 2021, the Company issued a press release reporting Telos' financial results for the fourth quarter and full year of 2020, which included a highly favorable financial outlook. For the first quarter 2021, the Company estimated revenue in the range of $49 million to $52 million. For the full-year 2021, the Company estimated revenue in the range of $283 million to $295 million, which the Company noted was an improvement of 57% to 64% compared to 2020. The Company also boasted that it anticipated revenues under the 10-year TSA contract in excess of $1.5 billion, and that the 10-year CMS contract provided an additional $2 billion revenue "ceiling."

64. That same afternoon, Telos held its fourth quarter 2020 earnings call during which Defendant Wood highlighted the TSA and CMS contracts, and stated that the Company had "visibility to almost $1 billion of annual revenue within 5 years." Defendant Nakazawa confirmed the guidance for both the first quarter and full-year of 2021. Wood assured investors that Telos' revenue forecasts were based on a solid foundation and emphasized that "we try and be as conservative as we can" in providing guidance, and that the guidance was not only "good," it was "the most prudent forecast for our business at this time."

65. During the same call, Needham and Co. analyst Alexander Henderson sought clarity from Defendant Wood as to why the Company's first earnings release as a public company

was delayed, asking "Was there an[y] issues whatsoever relative to . . . the way you're accounting for revenues or anything along those lines that the accountants had any issues with?" Defendant Wood brushed aside Henderson's concerns, responding "There was absolutely no issue relating [to] . . . revenues."

66. Defendants' positive statements had their intended effect of reassuring the market regarding the tremendous revenue growth purportedly attendant to the TSA and CMS contracts. The next day, March 26, 2021, Telos stock price closed $6.96 per share higher than the previous day, increasing over 22% to close at $37.71 per share.

67. Analysts applauded Defendants' statements and raised their ratings on Telos shares. For example, on March 26, 2021, a Needham & Co. Report specifically cited the TSA contract when raising its price target, saying that Telos "looks like a strong re-opening play on rebounding travel with its IDTrust business associated with TSA Pre volumes . . . ." Northland Capital Markets echoed that sentiment, coming away from the earnings call projecting TSA revenues "to start flowing within our 3Q21 expectations and potentially earlier." D.A. Davidson relayed the takeaway that "the large wins with TSA PreCheck and CMS will begin contributing in the back half of the year."

### D. Unbeknownst to Investors, Defendants' Statements Regarding Revenue from the TSA and CMS Contracts Lacked Any Factual Basis

68. As discussed more fully below, Defendants' statements concerning the expected revenues from the TSA and CMS contracts were materially false and lacked any reasonable basis. In particular, Defendants' revenue guidance was based on gross revenues that vastly overstated the amount of revenue that could ever be recorded from these contracts under GAAP. Remarkably, as was eventually disclosed at the end of the Class Period, ***for years***, beginning with Telos' inception as a public company in 2020, Defendants failed to apply a critical threshold inquiry required by ASC 606 for determining whether revenues under the contracts should be recorded on

a gross or net basis, and simply "assumed" that gross revenues should be recorded. Significantly, as Defendants would later admit, the failure to even undertake this most basic, fundamental and rudimentary test led to a staggering overstatement of the Company's guidance: indeed, the erroneous gross revenue figures that Telos consistently affirmed were almost ***double*** the appropriate net revenue figures.

69. ASC 606 is the authoritative GAAP standard governing how companies record revenue (and, by extension, provide revenue forecasts), including revenues associated with contracts that involve three parties (such as the TSA and CMS contracts). Pursuant to the express terms of ASC 606, any arrangement where more than one party is involved in transferring goods or services to an end consumer requires an evaluation of whether a party is a "principal" or an "agent" in accordance with ASC 606 guidance. This required evaluation is both obvious and critical and must occur prior to recognizing revenue under ASC 606.

70. According to Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net)* ("ASU 2016-08"), issued in March 2016, "[t]he core principle of the guidance in Topic 606 is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." ASU 2018-16, *Summary*. The principal versus agent assessment is a two-step process that consists of: (1) identifying the specified good(s) or service(s) to be provided to the end consumer (under ASC 606, assessing if the good or service is "distinct"); and (2) assessing whether the reporting entity (intermediary) controls the specified good or service before it is transferred to the end consumer. ASC 606-10-55-36, ASC 606-10-55-36A.

71. Pursuant to ASC 606, an entity is the ***principal*** in a transaction with an end consumer if it ***controls*** the specified good or service before it is transferred to the end consumer. ASC 606-10-55-37. An entity is an ***agent*** if it ***does not control*** the specified good or service before it is transferred to the end consumer. ASC 606-10-55-38. "Control" is defined in ASC 606 as the ability to direct the use of, and obtain substantially all of the remaining benefits from, an asset. ASC 606-10-25-25. ASC 606 provides examples of how an entity that is a principal may control a good or service before it is transferred to the end consumer. When another party is involved in providing goods or services to a customer (*e.g.*, TSA PreCheck enrollment services), an entity that is a principal obtains control of any one of the following:

(a) A good or another asset from the other party that it then transfers to the customer.

(b) A right to a service to be performed by the other party, which gives the entity the ability to direct that party to provide the service to the customer on the entity's behalf.

(c) A good or service from the other party that it then combines with other goods or services in providing the specific good or service to the customer.

ASC 606-10-55-37A.

72. The ASC further makes clear why the distinction between a "principal" and an "agent" is so fundamentally important and why it is absolutely essential for any public company to undertake this assessment. Indeed, if a company is considered a "principal" under ASC 606, it is entitled to recognize revenue for the contract on a "gross" basis, reflecting the full amount of consideration it is entitled to for the service or good transferred to the customer. If the Company is considered an "agent" however, it may only recognize revenue on a "net" basis, which subtracts the costs the Company must pay out in order to generate that revenue. ASU 2016-08 makes the point crystal clear: "[w]hen another party is involved in providing goods or services to a customer,

an entity is required to determine whether the nature of its promise is to provide the specified good or service itself (***that is, the entity is a principal***) or to arrange for that good or service to be provided by the other party (***that is, the entity is an agent***). When (or as) an entity that is a principal satisfies a performance obligation, the entity recognizes revenue in the ***gross*** amount of consideration to which it expects to be entitled in exchange for the specified good or service transferred to the customer. When (or as) an entity that is an agent satisfies a performance obligation, the entity recognizes revenue ***in the amount of any fee or commission*** to which it expects to be entitled in exchange for arranging for the specified good or service to be provided by the other party." ASU 2018-16, *Summary*.

73. Here, by the Company's own admission, there was no question that Telos' contracts with the TSA and CMS were subject to ASC 606. Indeed, the Company acknowledged that there was never any question that ASC 606 required an initial evaluation to determine whether Telos was a principal in these transactions or an agent of the TSA or CMS. As set forth above, this bedrock determination was critical to the proper accounting treatment under ASC 606, as principals recognize revenues on a gross basis, whereas agents recognize revenues on a net basis.

74. Importantly, Telos repeatedly represented to investors that it was intimately familiar with ASC 606, and it specifically stated that ASC 606 was the Company's "***most critical accounting polic[y]***" and applied to ***all*** of the Company's contracts. Indeed, within months of ASC 606's issuance, Telos explicitly assured investors in its public securities filings: (i) that the Company had formed an "internal working group" of highly experienced professionals around ASC 606, and added additional resources to support "evaluation" and "adoption" of the new standard; (ii) repeatedly updated investors on the progress of the internal working group; and (iii) informed investors of the Company's ultimate decision to adopt ASC 606 and apply it when assessing revenues retrospectively and prospectively for ***all*** of the Company's contracts.

75. Specifically, in Forms 10-Q filed with the SEC on August 22 and November 14, 2017, respectively, Telos alerted investors to a significant new "Accounting Pronouncement" issued by FASB in May 2016, titled "Topic 606." The Form 10-Qs assured investors that, in response to the new across-the-board accounting standard for recognizing revenue from contracts with customers, the Company had formed "an internal working group of personnel with knowledge of the issues addressed by the new standard, including adding new resources" to evaluate its contracts pursuant to ASC 606. Then, on April 1, 2019, Telos issued its 2019 Form 10-K which informed investors that the Company had officially adopted ASC 606 as of January 1, 2018, specifically identifying the FASB's guidance on the very accounting issue underlying Plaintiffs' claims in this case: "***Principal versus Agent Considerations (Reporting Revenue Gross versus Net)***." In that same filing, Telos identified ASC 606 as the very ***first*** among the Company's "***most critical accounting policies***" and made clear that ASC 606 applied not only to the TSA and CMS contracts, but to ***all*** the Company's contracts.

76. Removing any doubt that Telos's senior management, including the Executive Defendants, were intimately familiar with ASC 606 and its hugely consequential "principal versus agent" test, the Executive Defendants expressly identified and specifically discussed ASC 606 in the ***MD&A Section*** of each Annual Report filed during the Class Period. The MD&A Section is an incredibly important disclosure that the SEC has required reporting companies to include in their public securities filings for over 40 years. Its purpose is to provide investors "***an opportunity to look at the company through the eyes of management***" concentrated in one, easily understandable section, with an emphasis on the company's current financial condition and future prospects. As the SEC explained in a formal Commission statement on the highly material MD&A disclosure requirement:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because numerical presentations and brief accompanying

> footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. ***MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company***.

77. The same SEC bulletin reiterated the importance of the MD&A Section in providing investors with the views of "***management***" regarding "***the most relevant information***" using "***language . . . that investors can be expected to understand***," "***with particular emphasis on the registrant's prospects for the future***."[3] Moreover, as recently as January 2021, the SEC reiterated on its website—in an investor alert titled, "How to Read a 10-K/10-Q"—that the MD&A Section "***allows company management to tell its story in its own words***."[4] Accordingly, by specifically identifying ASC 606 as the Company's "most critical accounting polic[y]" in the MD&A Section, the Executive Defendants made it crystal clear that they not only had exposure to ASC 606's hugely consequential "principal versus agent" issue, but that this bedrock determination was highly material in "the eyes of management" when assessing the Company's "prospects for the future" in forecasting revenues for the TSA and CMS contracts.

78. Moreover, the TSA and CMS contracts were the typical types of agreements governed by ASC 606, because there were three parties involved in all transactions and Telos did not control all aspects of the transactions. In particular, the three involved entities were: (1) Telos; (2) the TSA or CMS; and (3) the applicant, each of which is a party to each transaction under the contract at issue. In the case of the TSA contract, TSA PreCheck enrollments are the product or service, and the TSA required assistance with their TSA PreCheck enrollments. Telos performed that service at the behest of TSA to facilitate the transaction between TSA and the TSA PreCheck

---

[3] SEC Release Nos. 33-8056; 34-45321; FR-61, *Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations*, available at www.sec.gov/rules/other/33-8056.htm.

[4] *See* www.sec.gov/oiea/investor-alerts-and-bulletins/how-read-10-k10-q.

applicant. Consistent with this arrangement, Telos' own website refers to its service to TSA as "third party," as follows: "Telos ID Designated Aviation Channeling (DAC) was the first third-party channeling service to be approved for operation by the TSA." Thus, Defendants had specific knowledge that Telos' service would be directed by and for the benefit of TSA and CMS, which undisputedly alerted the Company of the need to, at a minimum, conduct an ASC 606 analysis to determine how to properly account for revenue from these contracts.

79. Furthermore, throughout the Class Period, Defendants repeatedly certified the veracity and completeness of the Company's SEC filings, and certified that Defendants had created, or supervised the creation of, internal controls over financial reporting such that the Company's financial reporting was reliable and in accordance with GAAP—including ASC 606—pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"). The Sarbanes-Oxley Act of 2002 was passed in an effort to prevent a recurrence of the abusive practices that had caused billions of dollars in losses to investors in public companies. One of the cornerstones of these reforms was the requirement that a company's principal officers—typically the CEO and CFO—are required to certify in writing that they have undertaken sufficient investigation to confirm that the company has indeed established the requisite financial accounting system, that it has produced accurate financial statements that fully and fairly identify the company's financial positions, and the company's system of internal disclosures controls and procedures are effective and capable of raising any red flags and providing the signing officers with all the material information they need to know the company's true financial condition.

80. Accordingly, when a CEO and CFO sign a SOX Certification attesting that the company's internal control function over its financial reporting is effective, and that the financial statements produced by the company's accounting system are reliable and verifiable in presenting the company's true financial condition, they are implementing that crucial step of the

congressional reforms designed to restore confidence in capital markets and in individual companies' earnings reports and forecasts. This is not a mere rote exercise by which corporate officers can dodge their grave responsibilities by simply checking a box and signing on the dotted line to rubber-stamp compliance; on the contrary, Congress and the capital markets fully expect that senior management has discharged their highly critical duty by actively confirming the company's disclosure and financial controls. Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.

81. Here, in Telos' 2020 Form 10-K, Defendants Wood and Nakazawa each independently signed SOX Certifications, which represented, among other things:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.
>
> * * *
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> * * *
>
> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

82. Defendants Wood and Nakazawa made identical certifications in Telos' Form 10-K filed on March 28, 2021 and Form 10-Q filed on May 17, 2021, as did Defendants Wood and Bendza in the Company's Forms 10-Q filed on August 16 and November 15, 2021.

83. Despite the extensive evidence that Telos management was exposed to ASC 606, the Company failed to even apply what management had for years identified as its "most critical

accounting polic[y]" for revenue recognition when issuing revenue projections in the billions of dollars for the two largest and most important contracts in the Company's history. As Telos ultimately admitted, the Company did not undertake the principal/agent evaluation until late in 2021, over a year after going public. Instead, Telos improperly "assum[ed]" without any basis whatsoever, that the Company was a principal and thus could record revenues under the contracts on a gross basis, when in fact it was an agent and could only record revenue on a net basis. As a result of ignoring this obvious and critical evaluation, Defendants' revenue forecasts for the TSA and CMS contracts vastly and materially overstated the amount of revenue the Company could properly record, requiring a staggering reduction of up to 64%.

### E. Telos Conducts a Secondary Public Offering Enabling Insiders to Dump Their Personal Telos Shares at Inflated Prices

84. On April 2, 2021, less than a week after Telos executives provided the aggressive revenue guidance that was false from the moment it was issued, Telos announced an SPO. The SPO provided an opportunity for management—including Defendants Wood and Nakazawa, as well as ten other members of Telos' executive management team—to profit handsomely from the sale of their personally held shares at inflated prices. Notably, Defendants, who largely consisted of longtime Company employees with tenures of over thirty years (*e.g.*, Defendant Wood) set the SPO to occur even before the end of the traditional 180-day lock-up period following an initial public offering, which cemented the insiders' ability to dump their shares as soon as possible.

85. The SPO offered over ***9 million*** shares of Telos common stock at a price of $33 per share—nearly ***double*** the IPO price. While the Company itself only sold approximately 2 million shares, Company insiders sold more than 7 million shares, generating ***$232 million*** in gross proceeds. Defendants Wood and Nakazawa alone sold more than 1.7 million shares for gross proceeds of ***$58.4 million***. These substantial insider sales represented large portions of their respective personal holdings; Wood sold 20% of his personal holdings, while Nakazawa sold 45%

of her personal holdings. Together, their sales accounted for about 20% of ***all*** shares sold in the offering.

**F. Defendants Continue to Mislead Investors Regarding the TSA and CMS Contracts and Their Related Revenues**

86. After the SPO, Defendants continued to mislead investors regarding the purported massive amounts of revenues that the Company would generate under the TSA and CMS contracts. For example, on May 17, 2021, Telos reported its quarterly results for the first quarter of 2021 and reaffirmed its guidance for the full-year 2021, stating that it would generate revenue in the range of $283 million to $295 million. Defendant Nakazawa similarly reaffirmed Telos' full-year 2021 guidance on the accompanying first quarter 2021 earnings call and Defendant Wood assured analysts and investors that the TSA and CMS contracts would begin to generate revenue in 2021, specifically representing that "we intend to see a significant ramp in the second half of the year due to those 2 10-year multibillion-dollar contracts that we talked about during the IPO." Moreover, Defendant Wood emphasized the Company's focus on top-line revenue growth in the very first sentence of his prepared remarks, touting the Company's "43% year-over-year revenue growth." Likewise, at the outset of her prepared remarks, Defendant Nakazawa claimed to be "excited about our future revenue . . . growth for 2021 and the years ahead." Highlighting the importance of top-line revenue growth to investors, during Q&A portion of the call, Wells Fargo analyst Andrew James Nowinski pressed management for details on how "revenue maps out for the remainder of the year."

87. As June 2021 drew to a close, Telos reaffirmed its guidance estimates. On June 23, 2021, for example, Defendant Wood participated in the Northland Capital Markets SMB and Travel Conference during which he reassured investors that while the Company had not yet begun operating under the TSA contract, he did not see any risk with respect to the expected 400,000

transactions. As for the CMS contract, Wood stated that the Company pushed the "activity" from the third to fourth quarter, but the prior guidance remained unchanged.

88. Then, on July 19, 2021, Telos announced—without explanation—that Defendant Bendza was succeeding Defendant Nakazawa as CFO. Nakazawa's resignation came after she had served in the position for nearly 17 years and reaped over $21.6 million by selling nearly half of her personal holdings in the SPO.

89. As the third quarter of 2021 progressed, Defendants ***continued to reaffirm the Company's full year 2021 revenue guidance*** and reassured investors regarding the substantial ***long-term revenue streams*** that would be derived from these "multibillion dollar" contracts.

90. On August 16, 2021, the Company announced its financial results for the second quarter of 2021 and held an accompanying earnings call with analysts and investors. At the outset of the call, Defendant Wood again emphasized the Company's focus on top-line revenue growth, telling investors in his prepared remarks, "We continue to deliver revenue growth and win meaningful contracts with both federal and commercial customers." Likewise, Defendant Bendza, in his prepared remarks, underscored that the Company's second quarter results were "underpinned by strong revenue growth." And in explaining the Company's guidance, Defendant Bendza pointed out the guidance "implies year-over-year revenue growth in the range of 89% to 102% for the second half of the year and 57% to 64% for the full year. ***We are forecasting approximately 40% to 50% sequential revenue growth from the second quarter to the third quarter with additional sequential revenue growth from the third quarter to the fourth quarter primarily driven by TSA PreCheck***."

91. During the call, however, Defendant Bendza disclosed that the Company now expected "no revenues" under the TSA PreCheck program in the third quarter and only approximately $25 million in the fourth quarter (down from its prior guidance of $30 million).

Bendza also walked back the Company's prior revenue forecasts under the CMS contract, explaining that while Telos had previously forecasted $8 million in both the third and fourth quarters, Telos was now assuming no revenues from that program this year. Defendants again quelled investor concern by ***reaffirming full year 2021 revenue guidance in the range of $283 million to $295 million***. In addition, Defendant Wood ***emphasized the purported long-term benefit of the contracts***, stating: "in the long term, they will provide the Company with far more opportunities and will grow our pipeline." When asked by an analyst whether Telos would still "hit the original expectations for TSA Pre[Check] and [CMS] in 2022," Wood responded very directly, "***Correct, correct, yes***."

92. According to Defendant Wood, other Telos business would compensate for the delayed revenue from the TSA and CMS contracts. Wood explained that had the contracts been "up and running," the Company would have raised guidance, but "in an overabundance of being cautious," Telos was reaffirming its previously issued guidance. In closing, Wood underscored that the Company was on the brink of delivering substantial long-term revenues under the TSA and CMS contracts: "I'd like people to remember that we have very long-term contracts and 2022 is going to be a bang up year in my opinion."

93. Fueled by these false reassurances, Telos stock price increased by $1.25 per share the following day to close at $25.81. Analysts credited Defendant Wood's reassurances. A BMO Capital Markets Report following the news highlighted as a key point that "TLS maintained guidance due to new contract wins and expansion within existing customers." A Wedbush Securities Report echoed Wood's reassurances that Telos should see "a significant amount of revenue come in during 4Q" from the TSA contract. A Needham & Co. Report similarly stated, "As we look out to CY22 . . . ***TSA should deliver the originally forecasted Revenues with potential upside***."

94. On August 25, 2021, Defendant Wood participated in the BMO Virtual Technology Summit. Analyst Keith Bachman noted that the "number one question I got off the last earnings call was on renewals on TSA. The second was, did you get over your skis. And what I mean by that is you essentially -- you pushed out the business but you kept your guidance intact. And so, did you leave enough to make sure that you get there, right, with [] revenues for this calendar year, or this fiscal year. I think, what investors are worr[ied] about is you're still a young company, trying to get -- basically getting your sea[] legs, so to speak, as all companies do when they come out. Did you leave enough that -- I don't want to say de-risk or is there incremental risk associated with making the numbers for this year?" Defendant Wood responded, "if TSA had come in as we had expected to, ***we would have been reporting significantly up revenues*** and profits simply because the underlying pipeline is very strong. So the good news is that we've been able to cover our third quarter gaps with existing business, which is great. And that's going to show a sequential 40% to 50% growth over Q2."

95. Notably, during the same August 25, 2021 BMO conference, Wood also provided investors for the first time with an indication of the ***profitability*** underlying the projected revenues for the TSA and CMS contracts. Specifically, Wood stated that management estimated the TSA contract alone "to be worth about a billion seven to Telos" over 10 years, generating "roughly $800 million" in profits.

96. On September 9, 2021, Defendant Wood participated in the D.A. Davidson 20th Annual Software and Internet Conference during which he continued to emphasize the substantial long term revenues and profits the Company would generate under its major contracts. Specifically, Defendant Wood explained with respect to the TSA contract that "this is a 10-year contract and when you think about our share of that 10-year contract, we estimate it to be around $1.7 billion, which generates almost $800 million in profit to us over that period of time." Wood

emphasized the TSA contract "has no [revenue] ceiling," and even raised revenue expectations from $3.5 billion or $4 billion.

**G. The Truth Begins to Emerge**

97. The truth regarding Telos' massively inflated revenue guidance and total failure to vet ASC 606's critical, basic, and fundamental accounting assessment for the TSA and CMS contracts began to emerge after the third quarter of 2021. On November 15, 2021, before market open, Telos filed its quarterly report for the third quarter of 2021 and held an accompanying earnings call in which Defendants announced that, despite their repeated reaffirmations of guidance for full year 2021, Telos would dramatically reduce its full-year revenue guidance from a range of $283 million to $295 million, down to $240 million to $245 million.

98. Tellingly, on the call, Defendant Bendza also admitted that the Company's prior revenue guidance for the TSA and CMS contracts had been overly and improperly optimistic, and made without any real basis or "visibility." Indeed, Bendza stated that the Company would be making significant changes to its guidance process, and specifically stated that going forward, the Company would only provide guidance when it had "a high degree of visibility." In so doing, Bendza made clear that Telos' prior forecast did ***not*** meet this standard, and the change meant that there would be "a shift in terms of the philosophy of guidance here." Significantly, as a result of this "shift," the Company would no longer forecast specific revenue from the TSA or CMS contracts. In sum, Bendza admitted that the Company's prior guidance was entirely speculative, lacked a sufficient factual basis, and was bereft of any "visibility."

99. In reaction to these startling disclosures, on November 15, 2021, Telos stock price plunged by more than 28 percent, falling from $24.38 per share to close at $17.54 per share—a one-day decline of $6.84 per share that wiped out hundreds of millions of dollars in shareholder market capitalization.

100. Analysts excoriated management for providing—and consistently reaffirming—inflated revenue guidance on the two most important contracts in the Company's history. A Wedbush Securities analyst expressed disbelief about the "***head scratching challenges management***" had "in forecasting and executing on these government deals which have now ***negatively tainted the Telos story***." Condemning the Company, Wedbush summed up the Company's reversal, as follows: "In a nutshell, ***the credibility of the Telos story is a major question mark*** for the Street after this disastrous quarter/guidance/ communication on the conference call."

101. Needham & Co. chastised the Company in a November 16, 2021 report, titled: "TLS: More Questions Than Answers As ***Credibility Is Shredded***." The report commented that "[t]he sharply lowered estimates for CY4Q21 and CY22 offered on the CY3Q earnings call sharply damaged perceptions and caused those that have taken the time to understand the company to question their thinking and management's credibility." The report further declared that "***it will take a long time for management to rebuild its credibility and to prove out the growth opportunity***."

102. The fallout from these disclosures continued on February 28, 2022, when Telos announced that the Company had "identified material weaknesses" in its internal controls and that it had begun its remediation process. As a result, the Company needed to postpone filing its 2021 Form 10-K due to "delays in completing our year-end closing and financial reporting process, primarily due to the delay in completing our assessment of internal control over financial reporting required by Section 404 of the Sarbanes-Oxley Act."

103. In response to these revelations, Telos stock price fell from a close of $11.42 on February 28, 2022, to a close of $9.17 on March 4, 2022, a decline of nearly 20%.

104. Among the material weaknesses ultimately identified by Telos management in the 2021 Form 10-K were: (1) "Management did not maintain appropriately designed entity-level controls impacting the control environment and monitoring activities to prevent or detect material misstatements to the consolidated financial statements. Specifically, the Company did not have sufficient qualified resources to effectively design, operate and oversee internal control over financial reporting, which contributed to the failure in the effectiveness of certain controls"; and (2) "Management did not maintain appropriately designed and implemented controls over . . . [r]ecording of revenue in accordance with ASC Topic 606, 'Revenue from Contracts with Customers.'"

105. Telos' systemic and material weaknesses in its system of internal controls over financial reporting resulted in its failure to apply ASC 606—revenue recognition standard—in providing revenue guidance to the market. Indeed, approximately two weeks after the Company's announcement of material weaknesses in its internal controls over financial reporting, on March 16, 2022, the Company disclosed that the revenue guidance for the TSA contract was massively overstated as a result of this fundamental accounting deficiency. Specifically, the Company explained that: "We have determined Telos to be an 'Agent,' [as opposed to a principal] as defined by ASC 606, as it relates to the per-applicant fee for service collected by Telos and paid to the TSA and FBI as part of Telos' upcoming TSA PreCheck enrollment services offering. In accordance with ASC 606, Telos is to record revenue from applicants for this service net of the fees paid to the TSA and FBI [as opposed to gross] as part of the arrangement."

106. During the accompanying earnings call held that same day, Defendant Bendza admitted that Telos had completely failed to conduct the obvious and critical analysis required by ASC 606, and improperly ***assumed*** that the Company was a principal and thus able to report (and forecast) revenues on a gross basis. Bendza attempted to explain this glaring failure to apply

ASC 606 as follows: "In our past communications regarding the TSA PreCheck program, we have estimated the size of the revenue opportunity based on gross revenue accounting, ***assuming*** Telos would be treated as the principal to the transaction with the TSA PreCheck applicant for accounting purposes under ASC 606." Bendza went on to admit that the Company had only recently "engaged an independent third party" and "worked closely with our auditors" in order to conduct the threshold agent/principal and net/gross revenue determination. Bendza concluded that "through this process, we have determined ***Telos to be an agent as defined by ASC 606*** as it relates to the per-applicant fee for service collected by Telos and paid to the TSA and FBI as part of Telos' enrollment services offering." This reversal had a catastrophic impact on Telos' top-line revenue, *i.e.*, the Company's most important financial metric for investors. According to Bendza, "in accordance with ASC 606, Telos will record revenue from applicants for this service, net of the fees paid to the TSA and the FBI as part of the arrangement. Under net revenue accounting, ***revenue recognition is 64% lower than gross revenue recognition on new enrollments and 61% lower on renewals***."

107. Analyst were stunned. On the earnings call, Alexander Henderson of Needham & Co. made clear Wall Street's view that the failure to so much as undertake this basic step prior to disclosing revenue estimates to investors was inexcusable, asking pointedly, "***[s]houldn't [the accounting] have been vetted pre-IPO? And shouldn't it have been consistent with what you had -- was doing anyway? So shouldn't you have known that before you IPO-ed?***" Tellingly, the question went unanswered. Neither Defendant Bendza nor any other member of Telos management addressed why such a basic accounting determination had not been vetted before the IPO or the SPO—when the Company's officers and directors dumped over $233 million in the personally held shares, including over $66 million in sales by Defendants Wood and Nakazawa.

108. BMO Capital Markets, in a report issued immediately after the March 16, 2022 earnings call, similarly expressed shock that the Company had not engaged in the agent versus principal analysis required under ASC 606. The report echoed the sentiment from the Needham & Co. analyst during the earnings call, remarking, as follows: "***We are unclear why the net versus gross rev rec was not assessed previously***."

109. On the March 16 earnings call, Telos attempted to minimize the fact that it had lied to investors for years about how much revenue it would record from the TSA and CMS contracts by claiming that the massive revenue reduction supposedly did not affect the profitability of the contracts. But that statement itself is false. Indeed, while Wood had claimed during the Class Period that the TSA contract alone would generate $800 million in profits for Telos (on $1.7 billion in revenue), Defendants' admissions mean that Telos would now only record roughly $600 million in revenue under that contract—meaning that it was mathematically impossible for that contract to generate anything close to $800 million in profit. In fact, even assuming a 100% margin on the transactions (meaning every dollar of revenue generated one dollar of profit), the TSA contract would generate nearly $200 million less in profit over its term than what Defendants had claimed.

110. In reaction to these further revelations, Telos stock plunged by over 11 percent, falling from a close of $10.27 per share on March 15, 2022 to a close of $9.11 per share on March 16, 2022.

111. Analysts readily linked the decline on March 16, 2022 to the disclosures discussed above. For example, a Colliers Securities Report on March 16, 2022 noted that the stock traded off after the print as a result of two key items, one of which being that "Telos is an Agent as defined by ASC 606, not a principal, which calls for an adjustment revenue execrations." Importantly, the market was unable to, on its own, determine the accounting treatment being applied by Defendants to forecast revenues under the TSA. As Colliers Securities noted in a April 1, 2022 report

regarding the March 16, 2022 disclosures, "this is the first time management has provided a detailed financial view of the TSA transactions."

## VII. SECURITIES ACT VIOLATIONS

112. Lead Plaintiffs, and specifically Firemen's Retirement System, bring claims arising under the Securities Act, 15 U.S.C. §§77k and 77o, against Telos, Defendant Wood, Defendant Nakazawa, and the Director Defendants based on materially false and misleading statements and omissions in the IPO Registration Statement. The Securities Act claims asserted herein are brought on behalf of only those Class members who purchased or otherwise acquired shares of Telos common stock pursuant and/or traceable to the Company's IPO in November 2020. The Securities Act claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act claims, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct—including, specifically, ¶¶4, 13, 26, 30, 32, 47(f), 84-85, 100-101, 107 (specifically, allegations relating to insider stock sales), 109, 113-108, 133-194, 200, 201-218.

### A. Defendants' Materially False and Misleading Statements and Omissions in the IPO Registration Statement

113. On October 6, 2020, Telos filed the IPO Registration Statement, which was declared effective on November 18, 2020. On November 20, 2020, Telos filed a Prospectus on Form 424B4, which incorporated and formed part of the IPO Registration Statement. The IPO was originally planned to offer 12.35 million shares. Ultimately, however, the Company offered and sold 17.2 million shares of Telos common stock at $17.00 per share, inclusive of the underwriter's exercise of their over-allotment option. In all, Telos raised gross proceeds of $292.6 million from the sale of common shares in connection with its IPO.

114. The IPO Registration Statement underscored the paramount importance of these contracts, and in particular the revenues that flowed from them, stating as follows:

> We expect our growth to accelerate beginning in 2021 and 2022 due to, among other factors, recent contract awards that are significant to our business. Notable recent awards include an expanded contract with a U.S. government agency for our Telos Ghost® managed intelligence support solution and contract wins under the [TSA] PreCheck™ enrollment program and a program with [CMS]. We believe the Telos Ghost contract will generate approximately $4 million to $5 million of incremental revenue in 2021 and represents a platform for potential further growth through military and civilian government units during and after 2021.
>
> The TSA PreCheck™ enrollment program – a 10-year contract on which we are one of three vendors – is expected to launch in early 2021. TSA estimates the market for TSA PreCheck™ enrollments is 2 million to 5 million travelers annually over the term of the contract, and we believe that the share of those enrollments we may secure on an average annual basis over that term should grow to approximately 30% to 40% of those travelers. We anticipate charging $85 for each TSA PreCheck™ membership transaction, with the possibility that additional revenue may be generated from co-marketing efforts. The CMS program – a 10-year indefinite delivery/indefinite quantity contract under which we anticipate providing services beginning in 2021 – involves our FBI-certified biometric enrollment solution. CMS estimates that approximately 1.5 million healthcare workers will obtain background checks annually under the program, and we believe we are well-positioned to secure this work over the 10-year contract term. Based on these and other assumptions, ***we believe these programs collectively may grow from a base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively***. For these reasons, we anticipate these recent contract awards, combined with our organic growth as well as other opportunities for business expansion, to contribute to rapidly accelerating revenue growth beginning in 2021 and 2022.

115. Further, the IPO Registration Statement specifically represented that, "We prepare consolidated financial statements in accordance with U.S. generally accepted accounting principles[.]"

116. The IPO Registration Statement was signed and caused to be filed by Defendant Wood, Defendant Nakazawa, and the Director Defendants.

117. These above-referenced statements in the IPO Registration Statement were negligently prepared, and as a result were untrue and misleading when made and were not prepared in accordance with the rules and regulations that govern their preparation.

118. In reality, the amount of revenue the Company could ***ever*** generate from the TSA and CMS programs was materially overstated ***from the moment it was issued***. By the Company's own admission, the Registration Statement should have stated that the programs collectively could "grow from a base of approximately $3.8 million in revenue in 2020, to between $27 million and $28.8 million in revenue and in excess of $48.6 million in revenue in 2021 and 2022, respectively." Thus, the statements providing revenue guidance for the TSA and CMS contracts lacked a basis in fact, because before recognizing any revenues under these contracts, the Company was required, under ASC 606, to determine whether it was a "principal" or "agent" in the transactions contemplated by these contracts, and thus whether revenue was recognizable on a gross or net basis. Telos failed to undertake this foundational analysis, and merely assumed that it was a "principal" when in fact it was an "agent." And because Telos never engaged in the analysis required under ASC 606 with respect to the TSA and CMS contracts, its financial statements were also not prepared in accordance with GAAP, as represented in the Registration Statement.

## COUNT I

### Violation of Section 11 of the Securities Act
### (Against Telos, Wood, Nakazawa and the Director Defendants)

119. For purposes of this Count, Lead Plaintiffs incorporate by reference those allegations concerning the IPO Registration Statement, and the Securities Act Class only. Any allegations of fraud are hereby disclaimed and are not incorporated by reference in this Count, including, specifically, ¶¶4, 13, 26, 30, 32, 47(f), 84-85, 100-101, 107 (specifically, allegations relating to insider stock sales), 109, 113-108, 133-194, 200, 201-218.

120. This Count is brought pursuant to Section 11 of the Securities Act (15 U.S.C. §77k), on behalf of the Securities Act Class against Defendants Telos, Wood, Nakazawa and the Director Defendants. For purposes of this Count, Lead Plaintiffs do not claim that the above-named Defendants committed intentional reckless misconduct or acted with scienter or fraudulent intent.

121. The IPO Registration Statement was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein accurate and omitted to state material facts required to be stated therein.

122. Lead Plaintiffs and other members of the Securities Act Class purchased or otherwise acquired Telos common stock pursuant and/or traceable to the IPO, and, at the time of their purchases, Lead Plaintiffs and other members of the Securities Act Class were unaware of the facts concerning the wrongful conduct alleged.

123. The above-named Defendants were responsible for the contents and dissemination of the IPO Registration Statement.

124. Defendant Telos was the registrant for the Offering. As such, Telos is strictly liable to Lead Plaintiffs and the Securities Act Class under Section 11 of the Securities Act for the materially inaccurate statements contained in the IPO Registration Statement and its failure to be complete and accurate.

125. Defendants Wood and Nakazawa, and the Director Defendants, signed the IPO Registration Statement either personally or through an Attorney-in-Fact and caused its issuance. The above-named Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the IPO Registration Statement. The above-named Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the IPO Registration Statement inaccurate. By virtue of the above-named Defendants' failure to exercise reasonable care, the IPO Registration Statement contained inaccurate misrepresentations and/or omissions of material fact. As such, the Defendants named in this Count are liable to Lead Plaintiffs and the Securities Act Class.

## COUNT II

### Violation of Section 15 of the Securities Act (Against Wood, Nakazawa and the Director Defendants)

126. For purposes of this Count, Lead Plaintiffs incorporate by reference those allegations concerning the IPO Registration Statement, and the Securities Act Class only. Any allegations of fraud are hereby disclaimed and are not incorporated by reference in this Count, including, specifically, ¶¶4, 13, 26, 30, 32, 47(f), 84-85, 100-101, 107 (specifically, allegations relating to insider stock sales), 109, 113-108, 133-194, 200, 201-218

127. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiffs and the Securities Act Class, against Defendant Wood, Defendant Nakazawa, and the Director Defendants. This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

128. At all relevant times, Defendant Wood, Defendant Nakazawa, and the Director Defendants were controlling persons of Telos within the meaning of Section 15 of the Securities Act. As set forth herein, by reason of their positions of control and authority as officers and/or directors of Telos, Wood, Nakazawa, and the Director Defendants had the power to directly or indirectly control or influence Telos to engage in the acts described herein, including by causing Telos to conduct the November 2020 IPO pursuant to the IPO Registration Statement, and exercised the same.

129. Specifically, Defendants Wood and Nakazawa each served as an executive officer of Telos prior to and at the time of the November 2020 IPO. As such, at all relevant times, Wood and Nakazawa each participated in the operation and management of Telos, including participating in the preparation and dissemination of the IPO Registration Statement, and/or otherwise participated in the process necessary to conduct the November 2020 IPO. By virtue of their positions as officers of Telos, and/or their status as signatories of the Registration Statement, Wood

and Nakazawa each had the power to control, and did control, Telos in its conduct of the November 2020 IPO, including controlling the contents of the IPO Registration Statement, which contained materially untrue statements. As officers of a publicly owned company, Wood and Nakazawa had a duty to disseminate accurate and truthful information with respect to Telos' business operations, growth, and financial condition.

130. Similarly, each of the Director Defendants served as directors on Telos' Board at the time the November 2020 IPO was conducted. As directors of a publicly traded company, Director Defendants had a duty to disseminate accurate and truthful information with respect to Telos' operations at the time of the November 2020 IPO. Each Director Defendant signed the Registration Statement disseminated to the investing public and were Directors of the Company at the time the November 2020 IPO was conducted. Thus, the Director Defendants controlled the contents and dissemination of the IPO Registration Statement.

131. No one among Defendant Wood, Defendant Nakazawa, and the Director Defendants conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the IPO Registration Statement were true, were without omissions of material fact, and were not misleading. By reason thereof, each among Wood, Nakazawa, and the Director Defendants is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Section 11, to the Class members who purchased or otherwise acquired Telos common stock pursuant and/or traceable to the IPO Registration Statement.

132. As a direct result of the aforementioned conduct, members of the Securities Act Class suffered damages in connection with their purchases of Telos common stock pursuant and/or traceable to the Company's IPO Registration Statement.

# VIII. EXCHANGE ACT VIOLATIONS

## A. Defendants' Materially False and Misleading Statements and Omissions

### 1. IPO Registration Statement

133. The Class Period begins on November 19, 2020, when Telos conducted its IPO and became a publicly traded company. The IPO Registration Statement provided detail on the specific amount of revenue that Telos' two largest contracts would generate during 2021 and 2022. The Company represented that "[w]e expect our growth to accelerate beginning in 2021 and 2022 due to, among other factors, recent contract awards" with the TSA and CMS "that are significant to our business." More specifically, the Company represented that:

> ***[W]e believe these programs collectively may grow from a base of approximately $11 million in revenue in 2020 to between $75 million and $80 million in revenue and in excess of $135 million in revenue in 2021 and 2022, respectively.*** For these reasons, we anticipate these recent contract awards, combined with our organic growth as well as other opportunities for business expansion, to contribute to rapidly accelerating revenue growth beginning in 2021 and 2022.

134. Further, the IPO Registration Statement specifically represented that, "We prepare consolidated financial statements in accordance with U.S. generally accepted accounting principles[.]"

135. The above statements identified in ¶¶133-134 from the IPO Registration Statement regarding the expected revenue to be derived from the TSA and CMS contracts were materially false and/or misleading and failed to disclose that these contracts, which constituted a substantial percentage of the Company's future revenues, were materially false and greatly inflated, due to Defendants' failure to perform the critical evaluation necessary to recognize revenue for the contracts under ASC 606, and as such, were not in compliance with GAAP. Because of this critical omission, the Company's revenue guidance was materially overstated from the moment it was issued, and did not turn on the outcome of any future events.

### 2. 2020 Annual Report, Press Release and Conference Call

136. After the markets closed on March 25, 2021, Telos filed its Annual Report on Form 10-K for the full year ended December 31, 2020. The Form 10-K contained SOX Certifications signed by Defendants Wood and Nakazawa attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Telos' disclosure controls and procedures, and the disclosure of any material changes to the Company's internal controls over financial reporting. These certifications set forth as follows:

> 1. I have reviewed this [] report on Form 10-[] of Telos Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this [] report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this [] report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant***, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

137. The Form 10-K also contained a Certification pursuant to 18 U.S.C. §1350, signed by Defendants Wood and Nakazawa that certified: "(1) The Report ***fully complies*** with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, ***in all material respects, the financial condition and results of operations of the Company***."

138. The above statements identified in ¶¶136-137 were materially false and/or misleading and failed to disclose material adverse facts relating to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that there were significant and widespread material weaknesses in the Company's internal controls over financial reporting and, as a result, its internal control over financial reporting and disclosure controls were ineffective. As a result, the Company's financial reporting and disclosures with respect to its future revenue was grossly inflated due to the Company's material weakness, and specifically, its failure to conduct the proper analysis to determine how revenue from the TSA and CMS contracts should be accounted for

under ASC 606. As a result, Defendants' revenue guidance for these contracts was materially overstated from the moment it was issued, and required a reduction of up to 64%.

139. In the Company's Form 10-K, Defendants also made clear how critical the TSA and CMS contracts were to the Company's outlook, stating, in pertinent part: "A small number of our large customer contracts, including ***the TSA PreCheck™ enrollment program and our program with CMS, are expected to comprise a significant portion of our future revenue***." This statement, however, lacked a reasonable factual basis because Telos failed to disclose that it had not conducted the required ASC 606 analysis and, as a result, as the Company belatedly admitted, the true revenue generated from the contracts was 64% less than what the Company had represented to investors throughout the Class Period.

140. On March 25, 2021, the Company filed a press release on Form 8-K which reported financial results for the three and twelve months ended December 31, 2020 and provided the financial outlook for the first quarter of 2021 and full-year 2021. For the first quarter 2021, the Company projected "***[r]evenue in the range of $49 million to $52 million***." For the full-year 2021, the Company projected "***[r]evenue in the range of $283 million to $295 million***, an improvement of 57% to 64% compared to 2020." The Company further represented that the TSA contract was "anticipated to generate ***revenue in excess of $1.5 billion***" over the course of its 10-year duration, while revenues under the CMS contract had a "***$2 billion ceiling***."

141. That same afternoon, Telos held its earnings call for the fourth quarter of 2020. During the call, Defendant Wood underscored the Company's positive prospects which he attributed in large part to the TSA and CMS contracts. Wood represented, in pertinent part, as follows: "With the growth trajectory of our Xacta and Telos Ghost solutions, driven by increased direct sales and channel partnerships, ***coupled with the multibillion-dollar TSA PreCheck and CMS contracts***, we believe we have visibility to almost $1 billion of annual revenue within 5

years." Defendant Nakazawa similarly reported that, "Moving on to our financial outlook for the first quarter of 2021. ***We currently expect revenue in the range of $49 million and $52 million***. . . . For the full year of 2021, ***we currently expect revenue in the range of $283 million and $295 million***, an improvement of 57% to 64% compared to 2020. . . ."

142. During the same earnings call, Defendant Wood responded to a question about whether the TSA contract was "on track" to meet its revenue guidance. In response, Wood affirmed:

> ***We are on track***. We do think with the customer wanting us to certify and get the authority to operate through the use of Xacta, that, that does give us a leg up over the other competitors who have to use Xacta as well. And so ***we do think we're on track***. And I think ***what we shared during the IPO is still an appropriate metric in terms of the growth path***.

143. Defendant Wood also emphasized that "we try and be as ***conservative*** as we can" in providing guidance, that "our guidance is the ***most prudent forecast*** for our business at this time," and that "***our guidance is good***."

144. In response to these positive statements, the next day, Telos stock price closed $6.96 per share higher than the previous day, closing at a price of $37.71 per share.

145. The above statements identified in ¶¶140-143, regarding the expected revenue from these contracts and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts was materially overstated from the moment it was issued, and had to be reduced by up to 64%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented and in fact violated

GAAP and ASC 606; (2) Defendants' statements about the amount of revenue the TSA and CMS contracts would generate was materially overstated; and (3) the revenue guidance issued by the Company, which improperly included tens of millions of dollars in revenue from the contracts in violation of ASC 606, was also materially false and misleading.

**3. May 17, 2021 Quarterly Report, Press Release and Conference Call**

146. On May 17, 2021, Telos filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2021. The Form 10-Q contained SOX Certifications signed by Defendants Wood and Nakazawa, and a Certification pursuant to 18 U.S.C. §1350. *See supra* ¶¶136-137. The statements set forth above were materially false and misleading for the reasons set forth in ¶138 above.

147. On May 17, 2021, the Company also filed a press release on Form 8-K, which reported the financial results of the Company for the quarter ended March 31, 2021, and provided a financial outlook for the full-year 2021. For the full-year 2021, the Company reaffirmed the following guidance: "***Revenue in the range of $283 million to $295 million***, an improvement of 57% to 64% compared to 2020."

148. Following the close of the markets on May 17, 2021, Telos held its earnings call for the first quarter of 2021. In her prepared remarks, Defendant Nakazawa reaffirmed Telos' full-year 2021 guidance, stating that the Company, "expect[s] ***revenue in the range of $283 million and $295 million***, an improvement of 57% to 64% compared to 2020." Defendant Wood again highlighted the opportunity that both the TSA and CMS contracts presented to Telos, stating, "the way to view it, though, going forward is we intend to see a ***significant ramp*** in the second half of the year ***due to those 2 10-year multibillion-dollar contracts that we talked about during the IPO***."

149. And, as part of his closing remarks, Defendant Wood reaffirmed the Company's full-year revenue guidance stating, as follows: "I just wanted to say, everybody, we really appreciate your support. ***We're working very hard to make sure that we meet or exceed -- most likely we hope to exceed*** -- I shouldn't say it like that. My guys are all shaking their heads, but I'm what -- ***I'm supposed to say we continue to reaffirm the FY guidance we have given***."

150. The above statements identified in ¶¶147-149, regarding the expected revenue from these contracts and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were materially overstated from the moment it was issued, and required to be reduced by up to 64%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented and in fact violated GAAP and ASC 606; (2) Defendants' statements about the amount of revenue the TSA and CMS contracts would generate was materially overstated; and (3) the revenue guidance issued by the Company, which improperly included tens of millions of dollars in revenue from the contracts in violation of ASC 606, was also materially false and misleading.

### 4. August 16, 2021 Quarterly Report, Press Release and Conference Call

151. On August 16, 2021, Telos filed its quarterly report on Form 10-Q for the quarterly period ended June 30, 2021. The Form 10-Q contained SOX Certifications signed by Defendants Wood and Nakazawa, and a Certification pursuant to 18 U.S.C. §1350. *See supra* ¶¶136-137. The statements set forth above were materially false and misleading for the reasons set forth in ¶138 above.

152. On August 16, 2021, the Company also filed a press release on Form 8-K, which reported the Company's financial results for the quarter ended June 30, 2021, and provided a financial outlook for the full-year 2021. For the full-year 2021, the Company confirmed revenue ***in the range of $283 million to $295 million***, an improvement of 57% to 64% compared to 2020.

153. After the close of the markets on August 16, 2021, Telos held its earnings call for the second quarter of 2021. During his prepared remarks, the newly installed CFO, Defendant Bendza, stated that there would be "***sequential revenue growth from the third quarter to the fourth quarter primarily drive[n] by TSA PreCheck***." Bendza also noted that Telos had previously told the market that there would be $8 million in revenue in the third quarter and $30 million in revenue in the fourth quarter from TSA PreCheck, and now there would be "no revenues from that program in the third quarter and approximately $25 million in the fourth quarter." In addition, Bendza addressed the CMS contract, and noted that, while the Company would not see any revenue from that contract in 2021, it would generate substantial revenue in 2022. Bendza stated, in pertinent part, as follows:

> [Telos] previously assumed approximately $8 million of revenues from [CMS] in each of the third and fourth quarters, but we're now assuming no revenues from that program this year. ***So, overall we are assuming approximately $30 million of revenues from [CMS and TSA PreCheck] will be recognized in 2022 instead of during the second half of 2021***.

154. The Company also reaffirmed its guidance for full-year 2021 on the call, with Defendant Wood noting that other business was covering the delayed revenue from the TSA and CMS contracts. According to Wood, had the contracts been "up and running," the Company would have raised guidance, but "***in an overabundance of being cautious***," Telos was reaffirming its previously issued guidance.

155. The above statements identified in ¶¶152-154, regarding the expected revenue from these contracts and the Company's expected overall revenue were materially false and/or

misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were materially overstated from the moment it was issued, and required to be reduced by up to 64%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented and in fact violated GAAP and ASC 606; (2) Defendants' statements about the amount of revenue the TSA and CMS contracts would generate was materially overstated; and (3) the revenue guidance issued by the Company, which improperly included tens of millions of dollars in revenue from the contracts in violation of ASC 606, was also materially false and misleading.

**5. August 25, 2021 – BMO Virtual Technology Summit**

156. On August 25, 2021, Defendant Wood participated in the BMO 2021 Virtual Technology Summit. Wood provided investors an indication of the ***profitability*** underlying the projected revenues for the TSA contract. Specifically, Wood stated that management estimated the TSA contract alone "to be worth about a billion seven to Telos" over 10 years, generating "roughly $800 million" in profits.

157. The above statement in ¶156, regarding the expected revenue and profitability from the TSA contract, were materially false and/or misleading for the reasons set forth in ¶150. In addition, Defendant Wood's statement regarding the expected profits from the TSA contract was materially false when made because it overstated forecasted profits for the TSA contract by approximately $200 million.

**6. September 9, 2021 – D.A. Davidson 20th Annual Software and Internet Conference**

158. On September 9, 2021, Defendant Wood participated in the D.A. Davidson 20th Annual Software and Internet Conference, during which he was asked about the all-in revenue potential from the TSA contract. In response, Wood stated: "The bigger point I want to make though for our investor community which I'm a significant investor as well is that this is a ***10-year contract and when you think about our share of that 10-year contract, we estimate it to be around $1.7 billion, which generates almost $800 million in profit to us over that period of time***."

159. Regarding the CMS contract, Defendant Wood stated that, "CMS basically is a -- does have a ceiling. I think the ceiling is $3.5 billion or $4 billion I think roughly and then the -- but TSA has no ceiling."

160. Defendant Wood's statements identified in ¶¶158-159, regarding the expected revenue and profitability from the TSA contract, were materially false and/or misleading for the reasons set forth in ¶150. In addition, Defendant Wood's statement regarding the expected profits from the TSA contract was materially false when made because it grossly overstated potential profits by approximately $200 million.

**7. November 15, 2021 Quarterly Report, Press Release and Conference Call**

161. On November 15, 2021, Telos filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2021. The Form 10-Q contained SOX Certifications signed by Defendants Wood and Nakazawa, and a Certification pursuant to 18 U.S.C. §1350. *See supra* ¶¶136-137. The statements set forth above were materially false and misleading for the reasons set forth in ¶138 above.

162. On November 15, 2021, the Company filed a press release on Form 8-K, which reported financial results of the Company for the quarter ended September 30, 2021, and provided

a financial outlook for the full-year 2021. For the full-year 2021, the Company downgraded revenue estimates, from a range of $283 million to $295 million, to $240 million to $245 million.

163. Prior to the market open on November 15, 2021, Telos held its earnings call for the third quarter of 2021. During his prepared remarks, new CFO, Defendant Bendza set forth the Company's updated guidance as follows:

> Our original 2021 guidance reflected sales of $283 million to $295 million, year-over-year growth of 57% to 64% and adjusted EBITDA of $33 million to $36 million. ***We are updating our 2021 guidance with sales of $240 million to $245 million, year-over-year growth of 33% to 36%*** and adjusted EBITDA of $18 million to $19 million.

164. Defendant Bendza also discussed changes the Company was making to its guidance process under his new leadership and acknowledged flaws in Telos' previous process. Bendza assured investors that "I've only recently taken over the forecasting guidance process here. What -- how I'm thinking about ***guidance going forward***, again, ***is that we will guide based on what we have a high degree of visibility into at a point in time***. And then as things become more imminent, as things materialize, we'll pull them into the guidance over the course of the year. So there's going to be a ***shift in terms of the philosophy of guidance here***, at least from my perspective."

165. The above statements identified in ¶¶162-164, regarding the expected revenue from these contracts and the Company's expected overall revenue were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Defendants had failed to perform the critical evaluation to determine how revenue from the TSA and CMS contracts should be accounted for under ASC 606, and, as a result, the revenue guidance for these contracts were materially overstated from the moment it was issued, and required to be reduced by 60-64%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented and in fact violated

GAAP and ASC 606; (2) Defendants' statements about the amount of revenue the TSA and CMS contracts would generate was materially overstated; and (3) the revenue guidance issued by the Company, which improperly included tens of millions of dollars in revenue from the contracts in violation of ASC 606, was also materially false and misleading.

### 8. November 16, 2021 – Needham Virtual Security, Networking, & Communications Conference

166. On November 16, 2021, Defendant Wood participated in the Needham Virtual Security, Networking, & Communications Conference. During that conference, Defendant Wood discussed projected revenues from the TSA contract and revenue growth in the Security Solutions business segment. More specifically, Defendant Wood forecasted that the TSA contract would generate $40 million in 2022 and that revenues from the Security Solutions segment, which includes revenues from the TSA contract, would grow by more than 35%. When pressed about this guidance, Defendant Wood called the guidance "conservative" and the forecasted growth "a floor."

167. The above statement identified in ¶166 regarding the description or nature of the guidance Defendant Wood provided concerning the expected revenues from the TSA contract or revenue growth of the Security Solutions segment, which included projected revenues from the TSA contract, were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Defendants had failed to perform the critical evaluation to determine how revenue from the TSA contract should be accounted for under ASC 606, and, as a result, the revenue guidance for this contract was materially overstated from the moment it was issued and required to be reduced by up to 64%. As a result of the above: (1) the guidance provided by Defendants was not in fact "conservative" as represented and in fact violated GAAP and ASC 606; (2) Defendants' statements about the amount

of revenue the TSA and CMS contracts would generate was materially overstated; and (3) the revenue guidance issued by the Company, which improperly included tens of millions of dollars in revenue from the contracts in violation of ASC 606, was also materially false and misleading.

**B. Additional Scienter Allegations**

168. As alleged herein, the Executive Defendants acted with scienter in that they knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

**1. Management's Continued Focus on ASC 606 and Repeated Acknowledgement that It Was the Company's Most Critical Accounting Policy Supports A Strong Inference of Scienter**

169. Both before and during the Class Period, the Executive Defendants and Telos' management were exposed to, and intimately familiar with, ASC 606. Indeed, management's familiarity with the crucial ASC 606 inquiry dates back years before the start of the Class Period. Defendants first discussed ASC 606 in a Form 10-Q filed on November 14, 2016, noting that the Company was "assessing the impact" that adopting ASC 606 would have on Telos' "condensed consolidated financial position, results of operations and cash flows."

170. In two additional Forms 10-Q, filed on August 22 and November 14, 2017, respectively, management again noted the promulgation of ASC 606 and informed investors that Telos had "formed an internal working group" to aid in an evaluation that included "reviewing [Telos'] current contracts" and "identifying and implementing changes where necessary to [Telos'] business processes, systems and controls to support the adoption of the new standard."

171. Defendants again discussed ASC 606 in their 2018 Form 10-K, filed on April 1, 2019, in this instance adding that Telos adopted ASC 606 on January 1, 2018, "using the modified

retrospective method." Defendants further assured investors that "[Telos] account[s] for revenue in accordance with [ASC] Topic 606," identifying this standard as its "most critical accounting polic[y]."

172. Defendants echoed many of these statements in their 2019 and 2020 Annual Reports. They again identified ASC 606 as their "most critical accounting polic[y]" and stated affirmatively that "[Telos] account[s] for revenue in accordance with [ASC] Topic 606." In fact, Defendants included ASC 606 as the first of the Company's "most critical accounting policies" in every Annual Report filed during the Class Period in dedicated MD&A disclosures. As discussed above, the inclusion of ASC 606 in the MD&A section of the Annual Report is telling because these disclosures are specifically reserved for ***management's*** analysis of the Company's "current and prospective financial position." Indeed, the SEC requires issuers to include in each annual and quarterly report a section designed to provide investors with the ability to look at the company "***through the eyes of management***" with a "***particular emphasis on the registrant's prospects for the future.***"[5] The SEC has stressed the importance of the MD&A Section on "numerous occasions," repeatedly stressing the importance of providing investors " an ***accurate understanding of the company's current and prospective financial position***."[6]

173. Furthermore, throughout the Class Period, Defendants ***certified to investors*** that Telos was timely disclosing truthful material facts about its business, accurately reporting its financial results, and maintaining effective internal controls over financial reporting—including, ASC 606, the Company's self-admitted ***most crucial accounting policy for revenue recognition***. Indeed, Defendants stated that all of Telos' contracts were subject to ASC 606.

---

[5] SEC Release Nos. 33-8056; 34-45321; FR-61, *Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations* (modified Jan. 23, 2001) (internal marks and citations omitted), available at: www.sec.gov/rules/other/33-8056.htm.

[6] *Id.*

174. The Executive Defendants' awareness, exposure to, and deep familiarity with the requirements of ASC 606—and express acknowledgment that it was chief among the Company's most critical accounting policies, strongly supports scienter for their grossly exaggerated revenue guidance.

### 2. The Obvious and Crucial Requirement to Assess Whether Telos Was a "Principal" or "Agent" Under GAAP Before Issuing Revenue Guidance Further Supports a Strong Inference of Scienter

175. ASC 606 is the authoritative GAAP standard governing how companies record revenue (and, by extension, provide revenue forecasts), including revenues associated with contracts that involve three parties. Pursuant to the express terms of ASC 606, any arrangement where more than one party is involved in transferring goods or services to an end consumer requires an evaluation of whether a party is a "principal" or an "agent" in accordance with ASC 606 guidance. This required evaluation is both obvious and critical and must occur ***prior*** to recognizing revenue under ASC 606. ASC 606 makes clear why the distinction between a "principal" and an "agent" is so fundamentally important to investors—and why it is absolutely essential for any public company to undertake this assessment. Indeed, if a company is considered a "principal" under ASC 606, it is entitled to recognize revenue for the contract on a "gross" basis, reflecting the full amount of consideration it is entitled to for the service or good transferred to the customer. If the Company is considered an "agent" however, it may only recognize revenue on a "net" basis, which subtracts the costs the Company must pay out in order to generate that revenue.

176. As Defendants would later admit, the failure to even undertake this most basic, fundamental and rudimentary test led to a staggering overstatement of the Company's guidance: indeed, the erroneous gross revenue figures that Telos consistently affirmed were approximately ***two-thirds*** higher than the appropriate net revenue figures.

177. Importantly, ASC 606 was not new GAAP to Telos, as it had adopted ASC 606 on January 1, 2018, over two years before it went public. Moreover, the TSA and CMS contracts were the typical types of agreements governed by ASC 606 because there were three parties involved in all transactions and Telos did not control all aspects of the transaction. Thus, Defendants had specific knowledge that Telos' service would be directed by and for the benefit of TSA and CMS which should have alerted Telos of the need to, at minimum, conduct an ASC 606 analysis to determine how to properly account for revenue from these contracts.

### 3. The Crucial Importance of the TSA and CMS Contracts to the Company's Growth Supports a Strong Inference of Scienter

178. The Executive Defendants' knowledge of the falsity and massive overstatement of Telos' revenue guidance for the TSA and CMS contracts is supported by the critical importance of these contracts to the Company. Indeed, throughout the Class Period, Defendants made crystal clear to investors that these contracts were absolutely critical to the Company's success, and repeatedly assured investors that the contracts would generate billions of dollars in revenue for Telos, including over two hundred million dollars in revenues within just the first two years. Given the impact of these contracts to Telos, the Executive Defendants knew or recklessly disregarded that the Company had utterly failed to apply ASC 606's critical, basic, and fundamental test to the TSA and CMS contracts, and simply "assum[ed]" that Telos was the principal and thus could report revenues on a gross basis.

179. Further, at numerous times during the Class Period (*see, e.g.*, ¶¶56, 63, 64, 89, 95-96) the Executive Defendants referred to the TSA and CMS contracts as ***billion-dollar plus opportunities***, or otherwise highlighted the critical roles these "10-year multibillion-dollar contracts" played in the Company's financial outlook and long-term growth.

180. The fact that the TSA and CMS contracts were crucially important to Telos' financial performance and growth—a point the Executive Defendants repeatedly emphasized and

touted to investors during the Class Period—supports a strong inference of the Executive Defendants' scienter with respect to the amount of revenue that could be recognized under the contracts.

### 4. The Sharp Analyst Reaction to the Company's Complete Reversal in its Guidance for the TSA and CMS Contracts Further Support a Strong Inference of Scienter

181. As the immediate and harsh analyst reaction to Telos' drastic reduction in revenue guidance, as well as the timing, makes clear, the Company's failure to communicate transparently with the market destroyed its credibility. Indeed, analysts excoriated management for providing—and consistently reaffirming—inflated revenue guidance on the two most important contracts in the Company's history, and for repeatedly misleading investors regarding these contracts.

182. Just as Telos' announcement of the change in revenue guidance shocked the market, the Company's failure to properly recognize revenue and apply basic accounting undermined the Company's credibility. Needham & Co. made clear Wall Street's view that the failure to so much as undertake this basic step prior to disclosing revenue estimates to investors was inexcusable, asking pointedly, "***[s]houldn't [the accounting] have been vetted pre-IPO? And shouldn't it have been consistent with what–you had -- was doing anyway? So shouldn't you have known that before you IPO-ed?***" An analyst report from BMO Capital Markets echoed the sentiment from the Needham & Co. analyst during the earnings call, remarking, as follows: "***We are unclear why the net versus gross rev rec was not assessed previously***."

### 5. Defendants' and Other Insiders' Massive Stock Sales Reinforce a Strong Inference of Scienter

183. Defendants were motivated to engage in their fraudulent course of conduct in order to allow high-level Telos officers and directors, as well as other Company insiders, to sell shares of their personally-held Telos common stock at inflated prices, which yielded them gross proceeds

of more than ***$341 million*** during the short 16-month Class Period. Of this amount, a staggering $66.7 million of gross proceeds were realized by Defendants Wood and Nakazawa ***alone***.[7]

184. The April 1, 2021 $300 million SPO was accomplished, almost entirely, through the sale of common stock held by Telos insiders. Notably, 86% of proceeds went to selling shareholders and over 50% (over $150 million) went to high-level executive insiders, including Defendants Wood and Nakazawa.

185. Shares of Telos common stock were priced at $17 per share during the November 2020 IPO, but just six months later, SPO shares were priced at $33—nearly double the IPO price—which resulted in a windfall to the selling insiders.

186. With the stock price inflated as a result of the Defendants' false and misleading statements, Defendant Wood sold over 1.1 million shares for proceeds of nearly $37 million and Defendant Nakazawa sold over 655,000 shares for proceeds of nearly $22 million. In total, Wood and Nakazawa sold 1.77 million shares for proceeds of $58.4 million in the SPO.

187. In addition, at least ten other separate high-level executive or director insiders, including the Chief Operating Officer and the General Counsel, participated in the SPO, and sold an additional 2.89 million shares for proceeds of over $95 million, as provided below.

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| **Defendants** | | **1,805,888** | **$59,594,304** |
| Wood, John B. | Chief Executive Officer | 1,114,669 | $36,784,077 |
| Nakazawa, Michele | Chief Financial Officer | 655,507 | $21,631,731 |
| Bailey Ph.D., Bernard C. | Director | 35,712 | $1,178,496 |
| **Other Insiders** | | **5,235,021** | **$172,755,693** |
| Porter/Toxford Corp. | Longtime Owner, Controlling Shareholder and Consultant | 2,000,000 | $66,000,000 |
| Williams, Edward L. | Chief Operating Officer | 812,959 | $26,827,647 |
| Malloy, Brendan D. | General Manager Cyber Ops. and Defense | 459,065 | $15,149,145 |
| Other Non-Executive Employees | Various | 378,836 | $12,501,588 |

[7] Lead Plaintiffs' counsel relied on publicly-available trading data that Company insiders filed with the SEC on Forms 4 to evaluate their selling activity. Accordingly, the Forms 4 filed with the SEC by Company insiders during the Class Period are hereby incorporated by reference.

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| Wright J.D., Jefferson V. | General Counsel | 347,285 | $11,460,405 |
| Wood, Emmett J. | Executive VP Marketing and Strategy | 308,941 | $10,195,053 |
| Griffin, Mark D. | Executive VP Security Solutions | 249,437 | $8,231,421 |
| Easley, David S. | Controller, VP of Finance and Accounting | 228,958 | $7,555,614 |
| Tracy, Richard P. | Chief Security Officer | 213,258 | $7,037,514 |
| Pisani, Rinaldi D. | Sr. Vice President – Sales | 196,073 | $6,470,409 |
| Fagan Jr., Kenneth F. | Vice President | 40,209 | $1,326,897 |
| **Grand Total** | | **7,040,909** | **$232,349,997** |

188. After the SPO, the massive insider selling continued. Eight high level executives or directors, including Defendant Nakazawa, continued to sell post-SPO, selling over 3.5 million shares for proceeds of nearly $109 million. The latest sale occurred on November 5, 2021 and was made by the firm's general counsel (one week before the November 12, 2021 disclosure). The chart below details post-SPO insider sales:

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| **Defendants** | | **285,094** | **$9,280,857** |
| Nakazawa, Michele | Chief Financial Officer | 249,445 | $8,259,701 |
| Bailey Ph.D., Bernard C. | Director | 35,649 | $1,021,156 |
| **Other Insiders** | | **3,275,577** | **$99,382,734** |
| Porter/Toxford Corp. | Longtime Owner, Controlling Shareholder and Consultant | 1,000,000 | $29,500,000 |
| Williams, Edward L. | Chief Operating Officer | 600,000 | $17,822,358 |
| Malloy, Brendan D. | General Manager Cyber Ops. and Defense | 551,198 | $16,088,740 |
| Wood, Emmett J. | Executive VP Marketing and Strategy | 300,000 | $9,939,690 |
| Wright J.D., Jefferson V. | General Counsel | 320,000 | $9,520,388 |
| Tracy, Richard P. | Chief Security Officer | 214,379 | $7,093,243 |
| Pisani, Rinaldi D. | Sr. Vice President – Sales | 200,000 | $6,450,323 |
| Maluda, John W. | Director | 60,000 | $1,996,400 |
| Fagan Jr., Kenneth F. | Vice President | 30,000 | $971,592 |
| **Grand Total** | | **3,560,671** | **$108,663,591** |

189. The extensive insider selling was so suspicious that management was specifically questioned about it during an investor earnings call. For example, on the August 16, 2021 earnings call, management was asked about a recent string of insider selling. Defendant Wood tried to explain away the selling as due to the purported timing of Rule 10b5-1 plans and a purported desire

to diversify investments by long-term employees claiming that "[i]t's not a question about the company or its condition."

190. The over 10 million shares sold by Telos' officers and directors during the Class Period – accounting for $341 million in proceeds—were highly unusual in both amount and timing, *i.e.*, shortly after Telos went public and when Defendants were repeatedly misleading investors about the TSA and CMS contracts. The chart below details the total Class Period insider sales:

| Name | Position | Shares | Proceeds |
|---|---|---|---|
| **Defendants** | | **2,090,982** | **$68,875,161** |
| Wood, John B. | Chief Executive Officer | 1,114,669 | $36,784,077 |
| Nakazawa, Michele | Chief Financial Officer | 904,952 | $29,891,432 |
| Bailey Ph.D., Bernard C. | Director | 71,361 | $2,199,652 |
| **Other Insiders** | | **8,510,598** | **$272,138,427** |
| Porter/Toxford Corp. | Longtime Owner, Controlling Shareholder and Consultant | 3,000,000 | $95,500,000 |
| Williams, Edward L. | Chief Operating Officer | 1,412,959 | $44,650,005 |
| Malloy, Brendan D. | General Manager Cyber Ops. and Defense | 1,010,263 | $31,237,885 |
| Wright J.D., Jefferson V. | General Counsel | 667,285 | $20,980,793 |
| Wood, Emmett J. | Executive VP Marketing and Strategy | 608,941 | $20,134,743 |
| Tracy, Richard P. | Chief Security Officer | 427,637 | $14,130,757 |
| Pisani, Rinaldi D. | Sr. Vice President – Sales | 396,073 | $12,920,732 |
| Other Non-Executive Employees | Various | 378,836 | $12,501,588 |
| Griffin, Mark D. | Executive VP Security Solutions | 249,437 | $8,231,421 |
| Easley, David S. | Controller, VP of Finance and Accounting | 228,958 | $7,555,614 |
| Fagan Jr., Kenneth F. | Vice President | 70,209 | $2,298,489 |
| Maluda, John W. | Director | 60,000 | $1,996,400 |
| **Total** | | **10,601,580** | **$341,013,588** |

191. Accordingly, the Defendants—and in particular, the Executive Defendants—were highly motivated to perpetuate the fraud so that they could capitalize on Telos' inflated share price. The extensive insider selling by numerous other senior executives and members of the Company's Board of Directors bolsters the strong scienter inference.

### 6. Suspicious Executive Departures Further Support a Strong Inference of Scienter

192. The timing and circumstances of Defendant Nakazawa's resignation—shortly after she dumped $21 million of shares in the SPO and just weeks before the first disclosure of delays in the TSA and CMS contracts—further supports the inference of scienter.

193. Until her resignation on July 19, 2021, Defendant Nakazawa, as CFO of Telos, was responsible for the Company's financial reporting and spoke regularly about the Company's financial performance and revenue guidance. During her tenure, Nakazawa signed the IPO Registration Statement, all of Telos' Class Period annual and quarterly reports, and participated on earnings conference calls in which Defendants disseminated materially false and misleading statements regarding the status of the Company's contracts with the TSA and CMS and their associated revenue. Her sudden resignation – just weeks before the first announcement of delays in the TSA and CMS contracts – supports a strong inference of scienter.

194. The announced retirement of Chief Operating Officer ("COO") Ed Williams on November 16, 2021, who had served as COO for 18 years, and sold over $44 million of his personally-held shares during the short 16-month Class Period, including over $26 million in the SPO, is similarly suspicious. His sudden resignation, the same day as the revelation of the truth regarding the delays of the TSA and CMS contracts, supports a strong inference of scienter.

## C. Loss Causation

195. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Telos common stock and operated as a fraud or deceit on purchasers of Telos common stock. When the truth about Telos' misrepresentations was revealed, the price of the Company's common stock fell precipitously. As a result of their purchases of Telos common stock at artificially inflated prices during the Class

Period, Lead Plaintiffs and other Exchange Act Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

196. Approximately two months after their listing on NASDAQ, Telos common stock reached a Class Period high of $40.21 per share on January 20, 2021, and then continued to trade at artificially inflated prices before losing 77% of its value to close at $9.11 per share at the end of the Class Period after the truth about the TSA and CMS contracts emerged. In total, nearly $2 billion of shareholder value was destroyed during the Class Period, including over $1 billion following the first corrective disclosure on November 15, 2021 and the final corrective disclosure on March 16, 2022.

197. On November 15, 2021, Defendants shocked the market by disclosing that, rather than being "on track" to realize upwards of $75 million in revenues under the TSA and CMS contracts in 2021, neither contract had generated a ***single penny*** in revenue—a shocking admission that fundamentally undermined Defendants' prior representations to investors that, if anything, their revenue guidance was "conservative." On this news, the Company's stock price plummeted 28% in a single day on massive volume that was more than 15 times the average volume since the start of the Class Period. Specifically, the price of Telos stock fell from a close of $24.38 per share on Friday, November 12, 2021, to close at $17.54 per share on Monday, November 15, 2021, a decline of $6.84 per share that destroyed $325 million in shareholder market capitalization.

198. On February 28, 2022, following market close, Defendants disclosed that the Company had "identified material weaknesses that will be described in its Form 10-K and has begun the remediation process to address the identified material weaknesses." As a result of these material weaknesses, Telos needed to postpone filing its 2021 Form 10-K. In particular, the Company cited "delays in completing our year-end closing and financial reporting process, primarily due to the delay in completing our assessment of internal control over financial reporting

required by Section 404 of the Sarbanes-Oxley Act." On this news, Telos stock price fell from a close of $11.42 on February 28, 2022, to a close of $9.17 on March 4, 2022 for a total decline of $2.25.

199. Then, on March 16, 2022, the Company admitted to further delays in the TSA contract and stunned investors yet again by disclosing it had failed to conduct a bedrock accounting test to determine whether Telos was an agent or a principal in the TSA and CMS contracts, and therefore had massively overstated the Company's projected revenue under the contracts. On the accompanying conference call, Bendza disclosed that, under ASC 606, "revenue recognition is 64% lower than gross revenue recognition on new enrollments and 61% lower on renewals." These disclosures caused the price of Telos stock to decline another 11% when markets opened that morning, falling from a close $10.27 on March 15, 2022, to close at $9.11 on March 16, 2022, on volume that was over three and a half times the average Class Period volume prior to the disclosure.

200. The declines in the price of Telos common stock after the truth came to light were the direct result of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the Company's stock price declines negate any inference that the losses suffered by Lead Plaintiffs and other members of the Exchange Act Class were caused by unrelated changes in market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The following graphic shows the performance of a $100 investment in Telos common stock from November 19, 2020, through the end of the Class Period, as compared an equity market index and an industry peer group index. One hundred dollars invested in an index fund or a software and services index would be worth $122.14 or $115.41, respectively, compared to only $44.90, if invested in Telos.




### D. Presumption of Reliance (Fraud-On-The-Market Doctrine)

201. The market for Telos common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Telos common stock traded at artificially inflated and/or maintained prices during the Class Period. Lead Plaintiffs and other members of the Exchange Act Class purchased the Company's common stock relying upon the integrity of the market price of Telos common stock and market information relating to Telos and have been damaged thereby.

202. At all relevant times, the market for Telos common stock was an efficient market for the following reasons, among others:

(a) Telos was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Telos filed periodic public reports with the SEC and/or the NASDAQ;

(c) Telos regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) According to the Company's Form 10-K filed March 25, 2021, there were more than 64 million shares of common stock issued and outstanding as of December 31, 2020, demonstrating a very active and broad market for Telos common stock; and/or

(e) Telos was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

203. As a result of the foregoing, the market for Telos common stock promptly digested current information regarding Telos from all publicly available sources and reflected such information in Telos stock price. Under these circumstances, all purchasers of Telos stock during the Class Period suffered similar injury through their purchase of Telos stock at artificially inflated prices and a presumption of reliance applies.

204. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Exchange Act Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. EXCHANGE ACT COUNTS

### COUNT III

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against Telos and the Executive Defendants)

205. Lead Plaintiffs repeat and re-allege each and every allegation contained above (with the exception of ¶¶112-132) as if fully set forth herein.

206. During the Class Period, Telos and the Executive Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Telos common stock; and (iii) caused Lead Plaintiffs and other members of the Exchange Act Class to purchase Telos common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the above-named Defendants, took the actions set forth herein.

207. The above-named Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Telos common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The above-named Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

208. The above-named Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Telos' business, operations, and prospects, as specified herein. The above-named Defendants

employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Telos' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Telos and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

209. Each of the Executive Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Executive Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Executive Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Executive Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Executive Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

210. The above-named Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to

them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Telos' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by the above-named Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

211. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Telos common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the above-named Defendants, or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Exchange Act Class purchased Telos common stock during the Class Period at artificially high prices and were damaged thereby.

212. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Exchange Act Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Exchange Act Class and the marketplace known the truth regarding the problems that Telos was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their Telos

common stock, or if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

213. By virtue of the foregoing, the above-named Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

214. As a direct and proximate result of the above-named Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

**COUNT IV**

**Violation of Section 20(a) of the Exchange Act**
**(Against the Executive Defendants)**

215. Lead Plaintiffs repeat and re-allege each and every allegation contained above (with the exception of ¶¶112-132) as if fully set forth herein.

216. The Executive Defendants acted as controlling persons of Telos within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Each of the Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Further, Defendants Wood and Nakazawa signed the Company's 2020 Annual Report on Form

10-K and First Quarter of 2021 Form 10-Q for 2021 and Defendants Wood and Bendza signed the Company's Second Quarter of 2021 Form 10-Q and Third Quarter of 2021 Form 10-Q.

217. In particular, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

218. As set forth above, Telos and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## X. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D. Awarding such other relief as this Court deems appropriate.

## XI. JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: March 14, 2023

THE OFFICE OF CRAIG C. REILLY
CRAIG C. REILLY, VSB #20942

*/s/ Craig C. Reilly*

CRAIG C. REILLY

209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: 703/549-5354
703/549-5355 (fax)
craig.reilly@ccreillylaw.com

*Liaison Counsel for the Class*

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL RUDMAN
WILLIAM J. GEDDISH
AVITAL O. MALINA
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: 631/454-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
wgeddish@rgrdlaw.com
amalina@rgrdlaw.com

SAXENA WHITE P.A.
DAVID R. KAPLAN
505 Lomas Santa Fe Dr., Suite 180
Solana Beach, CA 92075
Telephone: 858/997-0860
858/369-0096 (fax)
dkaplan@saxenawhite.com

STEVEN SINGER
CRAIG MAIDER
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: 914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
cmaider@saxenawhite.com

*Attorneys for Lead Plaintiffs and Lead Counsel for the Class*